**Proposed Hearing Date and Time:  November 29, 2017 at 2:00 p.m.**
**Proposed Objection Date and Time:  November 27, 2017 at 4:00 p.m.**

CULLEN AND DYKMAN LLP
100 Quentin Roosevelt Boulevard
Garden City, New York 11530
(516) 357-3700
C. Nathan Dee, Esq.
Elizabeth M. Aboulafia, Esq.

*Proposed Counsel to Navillus Tile, Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------------x
                                        :
In re:                                  :  Chapter 11
                                        :
NAVILLUS TILE, INC., DBA NAVILLUS       :  Case No. 17-13162 (SHL)
CONTRACTING                             :
                                        :
              Debtor.                   :
                                        :
-----------------------------------------------------------------x
```

## MOTION OF THE DEBTOR FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§105(a), 362, 363, AND 364 OF THE BANKRUPTCY CODE (I) AUTHORIZING POST-PETITION SECURED FINANCING; (II) GRANTING SECURITY INTERESTS AND SUPERPRIORITY CLAIMS; (III) AUTHORIZING USE OF CASH COLLATERAL AND (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(c)

Navillus Tile, Inc. d/b/a Navillus Contracting, the above-captioned debtor and debtor-in-possession ("Navillus" or the "Debtor"), by and through its proposed attorneys Cullen and Dykman LLP, hereby submits this motion (the "Motion") pursuant to sections 105, 362, 363 and 364 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, et seq. (the "Bankruptcy Code"), Rules 4001 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules of the United States Bankruptcy Court for the Southern District of New York (the "Local Rules") for: (i) entry of an interim order (the "Interim Order") substantially in the form annexed hereto as Exhibit "1" (a) authorizing Navillus to obtain secured post-petition financing on a superpriority basis up to the aggregate amount of

$135,000,000 (the "DIP Facility") pursuant to the terms and conditions of that certain Financing Agreement, by and among Navillus, Donal O'Sullivan, individually and Kathleen O'Sullivan, individually (collectively, the "Indemnitors") as borrowers and Liberty Mutual Insurance Company ("Liberty"), as lender (the "DIP Financing Agreement"), a copy of which is annexed hereto as Exhibit "2"; (b) granting Liberty, pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority, perfected and indefeasible lien on and security interest in (the "Post-Petition Lien and Security Interest") all of Navillus' assets directly related to the Bonded Contracts including, without limitation, property constituting "cash collateral" (as defined in section 363(a) of the Bankruptcy Code and, hereinafter, "Cash Collateral"), except for the Equipment (defined herein); (c) granting Liberty, pursuant to sections 364(c)(1) and 105 of the Bankruptcy Code, an allowed superpriority administrative expense claim (the "Superpriority Claim") with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, subject only to the Liberty Carve-Out (defined herein), to the extent of any losses incurred by Liberty in connection with the Bonds (defined herein) or the Indemnity Agreements (defined herein) after the filing of this chapter 11 case (the "DIP Loan Obligations"); (d) authorizing Navillus' use of Cash Collateral on the terms and conditions set forth in the DIP Financing Agreement and the Interim Order in accordance with the terms of a rolling thirteen week budget (the "Budget"), a copy of which is annexed hereto as Exhibit "3"; and (ii) scheduling a final hearing (the "Final Hearing") to consider entry of a final order (the "Final Order") authorizing any requested relief not granted under the Interim Order on a final basis.  In support of the Motion, Navillus respectfully represents as follows:

## INTRODUCTION

1.      On November 8, 2017 (the "Petition Date"), Navillus filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code.

2.      Navillus has remained in possession of its property and continues in the operation and management of its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.      No official committee of unsecured creditors has been appointed by the Office of the United States Trustee for the Southern District of New York in this chapter 11 case.

4.      On the Petition Date, Navillus filed the Affidavit of Donal O'Sullivan pursuant to Local Bankruptcy Rule 1007-2 (the "O'Sullivan Affidavit" at Dkt. No. 7).  A detailed factual background of Navillus' business and operations, as well as the events leading to the filing of this chapter 11 case, is more fully set forth in the O'Sullivan Affidavit, filed contemporaneous herewith and incorporated herein by reference.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

6.      The statutory predicates for the relief sought herein are sections 105, 362, 363 and 364 of the Bankruptcy Code, Bankruptcy Rules 4001and 6004 and Local Rule 4001-2.

## STATEMENT PURSUANT TO BANKRUPTCY RULE 4001(C)

7.      Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2(a), the following sets forth a statement of the material provisions of the DIP Facility and Interim Order[1]:

---

[1] This statement is qualified in its entirety by reference to the applicable provisions of the DIP Financing Agreement or the Interim Order, as applicable.  To the extent there exists any inconsistency between this

| MATERIAL TERMS OF THE PROPOSED POST-PETITION FINANCING | |
|---|---|
| **Parties**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)] | Borrower:    Navillus Tile, Inc., d/b/a Navillus Contracting, Donal O'Sullivan and Kathleen O'Sullivan<br><br>Lender:      Liberty Mutual Insurance Company<br><br>[DIP Financing Agreement at preamble] |
| **Amounts**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)]<br><br>[Local Rule 4001-2(a)(1)] | The DIP Facility will provide Navillus with financial assistance in an amount not to exceed $135,000,000.<br><br>[DIP Financing Agreement, ¶ F; Interim Order ¶ 2]<br><br>Interim authorization pending Final Hearing:  $13,500,000<br><br>[Interim Order ¶3] |
| **Purpose**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)] | Navillus has an immediate need to obtain the DIP Facility to, among other things, demonstrate its willingness and ability to continue to perform, and to actually continue to perform, work in connection with its construction projects to all other obligees under the Bonded Contracts and its counterparties on the Non-Bonded Projects.<br><br>[DIP Financing Agreement, ¶ E; Interim Order ¶ E(i)] |
| **Maturity & Termination**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)] | The DIP Financing Agreement shall terminate upon the later to occur of: (a) the effective date of a confirmed plan in this chapter 11 case; or (b) the date of indefeasible payment in full of all obligations due under the DIP Financing Agreement; but in any event not later than one (1) year from the Effective Date of the DIP Financing Agreement, unless otherwise extended in writing by the parties thereto.<br><br>[DIP Financing Agreement, ¶ K] |
| **Limitations on Funding Obligations**<br><br>[Local Rule 4001-2(a)(9)] | Any disbursement from the DIP Facility is subject to Liberty's approval, which approval shall not be withheld unless a DIP Financing Default has occurred.  Disbursements from the DIP Facility shall be used for costs associated with the Bonded Projects and for the Permitted Uses. |

statement and the provisions of the DIP Financing Agreement and the Interim Order, the provisions of the DIP Financing Agreement shall control over the statement, and the Interim Order shall control over the DIP Financing Agreement.

| MATERIAL TERMS OF THE PROPOSED POST-PETITION FINANCING | |
|---|---|
| | [DIP Financing Agreement, ¶ F]<br><br>There are no other limitations on Liberty's funding obligations. |
| **Events of Default and Effect on Financing**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)]<br><br>[Local Rule 4001-2(a)(10)] | Any of the following occurring after the Effective Date of the Financing Agreement that have not been cured by Navillus within three (3) business days of receipt of written notice from Liberty shall constitute a "DIP Financing Default" as to a particular Bonded Project or as otherwise set forth herein.<br><br>• Liberty determines that Navillus has abandoned the Bonded Project or has willfully refused to perform the Bonded Project in a material respect;<br><br>• an obligee of the performance bond relative to the Bonded Project provides notice of an intent to declare Navillus to be in default and/or to terminate the Bonded Contract for default (or to terminate Liberty under any Takeover Agreement relative to a Bonded Project);<br><br>• Navillus rejects the Bonded Contract in its Chapter 11 proceeding or the Bankruptcy Court enters a final order that precludes or prevents Navillus from assuming the Bonded Contract;<br><br>• Liberty determines that Navillus has experienced a material adverse change in its operations that cannot be cured by a disbursement(s) from the DIP Facility, which shall constitute a DIP Financing Default as to all Bonded Projects;<br><br>• Navillus's bankruptcy proceeding is converted from Chapter 11 to Chapter 7.<br><br>The occurrence of a DIP Financing Default on a particular Bonded Project only provides Liberty with sole discretion regarding future funding with respect to that that particular Bonded Project.<br><br>[DIP Financing Agreement, ¶ F] |
| **Interest Rate**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)] | Interest Rate:  3.0%<br><br>Default Rate:  9.0% |
| | |

| MATERIAL TERMS OF THE PROPOSED POST-PETITION FINANCING | |
|---|---|
| **Pricing and Economic Terms**<br><br>[Local Rule 4001-2(a)(3)] | There are no letter of credit fees, commitment fees or other fees under the DIP Facility.<br><br>Pursuant to the Indemnity Agreements and the Financing Agreement, the costs and expenses of Liberty, including its professionals, are recoverable under the Indemnity Agreements.  Additionally, certain of those costs shall be paid to Liberty pursuant to an Initial Collateral Deposit Agreement entered into between Liberty and Indemnitors other than Navillus. |
| **Conditions**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)]<br><br>[Local Rule 4001-2(a)(2) and (9)] | Reaffirmation of the Indemnitors' obligations under the Indemnity Agreements.<br><br>[DIP Financing Agreement, ¶ I]<br><br>The DIP Financing Agreement is required to be incorporated into this Motion.  In the event the Motion is not granted as to Navillus, the DIP Financing Agreement shall be effective as to all other Indemnitors.<br><br>[DIP Financing Agreement, ¶ L]<br><br>Navillus shall execute and provide, with respect to each specific Bonded Contract, an (a) irrevocable assignment, (b) irrevocable letter of direction, and (c) voluntary letter of default (each of which shall be in forms provided by Liberty), and each of which shall be held by Liberty and used, in Liberty's sole discretion if, pursuant to a further Order of the Bankruptcy Court after notice and hearing, (x) Navillus is terminated for default on the specific Bonded Contract or (y) Navillus rejects the specific Bonded Contract.<br><br>[DIP Financing Agreement, ¶ L; Interim Order ¶ 10]<br><br>Navillus retains complete control of and responsibility for its operations, over which Liberty assumes no responsibility or control.<br><br>[DIP Financing Agreement, ¶ L; Interim Order ¶ 13] |
| **Liens and Priorities**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)(i)] | Subject to the Liberty Carve-Out, Navillus grants to Liberty, as security for the DIP Loan Obligations, the following priorities, security interests and liens:<br><br>• pursuant to section 364(c)(l) of the Bankruptcy Code, the DIP Loan Obligations shall constitute an allowed Superpriority Claim against Navillus with priority over any and all administrative |

| MATERIAL TERMS OF THE PROPOSED POST-PETITION FINANCING | |
|---|---|
| | expense claims;<br><br>• pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Loan Obligations are secured by a first priority, perfected and indefeasible Post-Petition Lien on and Security Interest in all of Navillus' assets directly related to the Bonded Contracts, except for the Equipment (the "Collateral").<br><br>[DIP Financing Agreement, ¶ L; Interim Order ¶¶ 5-6] |
| **Carve-Out**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)]<br><br>[Local Rule 4001-2(a)(5)]<br><br>[Local Rule 4001-2(d)] | The Superpriority Claim and Post-Petition Lien and Security Interest shall be subject only to a carve-out for the following (the "Liberty Carve-Out"):  (i) all fees required to be paid by the Clerk of the Bankruptcy Court and to the Office of the United States Trustee; (ii) $50,000 for any potential Chapter 7 trustee; (iii) all reasonable and unpaid fees, costs, disbursements and expenses of any professional retained by Navillus in this case up to an aggregate amount of $4,235,000; and (iv) all reasonable and unpaid fees, costs, disbursements and expenses of any professional retained by the official committee of unsecured creditors in this case, should one be appointed by the Office of the United States Trustee up to an aggregate amount of $500,000.  For the avoidance of doubt, any payments made pursuant to the Liberty Carve-Out shall not reduce the amount of the Superpriority Claim or the amount of any obligation of any Party due to Liberty under the Bonds, the Indemnity Agreements, the Motion or related agreements, or otherwise.<br><br>[DIP Financing Agreement, ¶ L; Interim Order ¶ 8]<br><br>The Liberty Carve-Out is effective upon approval of the DIP Motion by the Court.<br><br>The Liberty Carve-Out remains unaltered after payment of interim fees made before an event of default pursuant to the Financing Agreement. |

| MATERIAL TERMS OF THE PROPOSED POST-PETITION FINANCING | |
|---|---|
| **Release and Waiver of Claims**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)(viii)] | Navillus acknowledges, represents, warrants and agrees that it has no defenses, offsets, or counterclaims to any obligations or liabilities to Liberty under the Indemnity Agreements and waives and releases all claims as of the Effective Date of the Financing Agreement.<br><br>[DIP Financing Agreement, ¶ S] |
| **506(c) Limits**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B )(x)] | The maximum amount of the Liberty Carve-Out, including any claims under section 506(c) of the Bankruptcy Code relating to Liberty's Collateral, shall in no event exceed $5,000,000.  For the avoidance of doubt, any payments made pursuant to the Liberty Carve-Out shall not reduce the amount of the Superpriority Claim or the amount of any obligation of any Party due to Liberty under the Bonds, the Indemnity Agreements, the Motion or related agreements, or otherwise.<br><br>[DIP Financing Agreement, ¶ L] |
| **Waiver/Modification Of Automatic Stay**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)(iv)] | To the extent the automatic stay imposed under section 362(a) of the Bankruptcy Code is applicable to any provision of the DIP Financing Agreement, Liberty shall be granted relief from the automatic stay to the extent necessary to authorize Navillus and Liberty to take any action necessary to implement and effectuate the terms and provisions of the DIP Financing Agreement.<br><br>[DIP Financing Agreement, ¶ K] |

## **BACKGROUND**

**A.**    **Pre-Petition Bonding and Credit Facilities**

> *(i)*    *The Liberty Indemnity Agreements*

8.    Prior to the Petition Date, on or around October 24, 1995, December 12, 2006 and March 15, 2007, the Indemnitors and certain other individuals and non-debtor entities executed General Agreements of Indemnity (collectively, the "Indemnity Agreements") in favor of Liberty and for the purpose of obtaining bonding for Navillus' construction operations.

9.    In the Indemnity Agreements, the Indemnitors agreed, among other things, to exonerate, hold harmless and indemnify Liberty from and against any and all liability for losses,

8

fees, costs and expenses incurred by Liberty, *inter alia*, as a result of executing certain surety

bonds to guarantee (i) the performance of various contracts (the "Bonded Contracts") and (ii) the

payment of certain obligations of Navillus with respect to the Bonded Contracts (the "Bonds").

10.    As of the Petition Date, Navillus continued to perform work on twenty two (22)

Bonded Contracts with a total contract value of over seven hundred fifty million ($750,000,000)

dollars and in excess of five hundred million ($500,000,000) dollars' worth of remaining work in

progress to be performed.   Additionally, Navillus continued to perform work on forty six (46)

non-bonded contracts with a total contract value of approximately one hundred forty five million

($145,000,000) dollars and in excess of forty three million ($43,000,000) dollars' worth of

remaining work in progress to be performed.

(ii)    *The Signature Pre-Petition Credit Facility and Signature Financial
Equipment Loans*

11.    In addition, in October 2003, Navillus executed a promissory note for a line of

credit (the "LOC") in the original principal amount of ten million ($10,000,000) dollars in favor

of Signature Bank, N.A. ("Signature") which was secured by all personal property assets of

Navillus pursuant to a Continuing General Security Agreement.   The principal amount of the

LOC was increased to thirteen million ($13,000,000) dollars pursuant to a 2014 amendment and

has been further amended and extended from time to time, with a present maturity date of

November 29, 2017.   Moreover, following entry of the Judgment (defined below), Signature

froze Navillus' access to the LOC and, as a result, Navillus no longer has any ability to borrow

from Signature under the LOC.

12.    As of the Petition Date, there were no amounts outstanding under the LOC, and

Navillus intends to allow the LOC to expire by its terms on November 29, 2017.   Accordingly,

because there are no amounts due and owing Signature under the LOC, there is no pre-petition

9

secured indebtedness due Signature secured by Navillus' personal property assets. Therefore, Navillus' cash does not constitute Signature's "cash collateral" and the Post-Petition Lien and Security Interest proposed to be granted pursuant to the DIP Financing Agreement will not impact Signature's rights under the LOC.

13.     Prior to the Petition Date, Navillus entered into equipment loans with Signature Financial LLC ("Signature Financial") secured by a 2015 Toyota 8FDU25 Forklift and a 2014 Kenworth T800 truck (the "Equipment"). As of the Petition Date, approximately $68,080 remained due and owing Signature Financial on account of the loans secured by the Equipment.

**B.     Events Leading to Chapter 11 Filing**

14.     On September 22, 2017, a $76 million judgment (the "Judgment") was entered against Navillus in an action brought by five union pension and welfare benefit funds in the United States District Court for the Southern District of New York. Navillus strongly disagrees with the Judgment and has filed a notice of appeal with the Second Circuit Court of Appeals.

15.     Since entry of the Judgment, Navillus has exhausted all judicial and non-judicial options to obtain a stay of execution of the Judgment pending appeal without posting a full appeal bond, as Navillus lacks the ability to obtain a bond of such significant size. Following a hearing held before the Second Circuit on October 31, 2017, the Court entered an order denying Navillus' emergency motion for a stay of execution of the Judgment pending appeal. On or around November 1, 2017, the Union Plaintiffs commenced with execution on the Judgment by serving restraining notices on Navillus' bank accounts, levying on an account and serving restraining notices on Navillus. Accordingly, after considering all remaining options, Navillus determined that filing the instant chapter 11 case represented the best and only available means to preserve the value of Navillus' estate for the benefit of its creditors.

10

16.    The Judgment has led to numerous operational issues on Navillus' two largest open construction projects.  On October 3, 2017 and October 5, 2017, Tishman Construction Corporation of New York ("Tishman"), in its capacity as construction manager on Navillus' two largest construction projects – One Vanderbilt and Manhattan West (the "Tishman Projects"), respectively, issued alleged notices of default and termination to Navillus based on its determination that the Judgment had rendered Navillus insolvent.  The Tishman Projects, with a combined contract value of over $279 million and over $190 million in work in progress remaining as of the Petition Date, account for approximately forty (40%) percent of Navillus' current work in progress as of the Petition Date.

17.    While Navillus contests the propriety of the terminations[2], Navillus agreed to continue working on the Tishman Projects on a week to week basis pursuant to the terms of transition work agreements while Tishman, Liberty and Navillus determined how best to proceed on the Tishman Projects.  Tishman has requested that Liberty provide Navillus with backstop financing in the form of the DIP Facility to ensure the continued progression of work on the Tishman Projects.

## C.    The Need for Access to the DIP Facility

18.    In light of Tishman and certain project owners' reactions to the Judgment and concerns regarding Navillus' ability to complete its current construction projects and bid on new construction projects, Navillus believes that the DIP Facility is critical to its ability to demonstrate to the project owners on all of its open construction projects that it is ready, willing

---

[2]    As of the date of this Motion, after multiple rounds of negotiations between the parties, Navillus, Liberty and Tishman are close to a consensual resolution of their respective disputes regarding the Tishman Projects that will include, among other things, Navillus' and Liberty's waiver of certain claims against Tishman, and Tishman and Liberty's agreement to Navillus' continued performance of the work on the One Vanderbilt contract as the completion contractor for Liberty.

and able to continue its construction operations in the same manner as it did prior to the entry of the Judgment and filing of this chapter 11 case.

19.     In addition, a substantial portion of Navillus' current work in progress is comprised of public work for government agencies where there is typically a delay in processing payment requisitions which requires Navillus to wait sometimes months to receive payment for work duly performed.  To avoid any liquidity constraints during the early stages of the chapter 11 case when Navillus' subcontractors and suppliers may be less inclined to honor the payment terms that existed prior to the Petition Date, Navillus requires access to the DIP Facility to ensure an orderly transition into chapter 11 without any attendant disruption to its construction operations.

20.     Accordingly, Navillus believes that the DIP Facility is essential to provide Navillus with additional liquidity on an as-needed basis and assure Navillus' customers that it can complete its over $543 million worth of ongoing construction projects and thereby maximize the value of this estate for the benefit of creditors as it seeks to successfully exit chapter 11.

**D.      The DIP Facility Was the Product of Good Faith, Arms' Length Negotiations and Alternative Sources of Post-Petition Financing Are Not Readily Available**

21.     The terms of the DIP Financing Agreement and related documents have been negotiated in good faith and at arm's length among Navillus and Liberty, reflect Navillus' exercise of prudent business judgment consistent with its fiduciary duties, and are fair and reasonable under the circumstances.

22.     Moreover, Navillus determined that procurement of a secured loan from a traditional bank lender was likely futile because Navillus' most significant assets capable of being collateralized are its work in progress on construction projects.  Traditional bank lenders are often wary of providing financing to construction contractors due to the fact that a

contractor's receivables are treated as trust fund monies belonging to subcontractors, suppliers, and other statutory beneficiaries of the trust fund provisions contained within Article 3-A of the New York Lien Law.  Nonetheless, prior to the Petition Date, Navillus sought a proposal from Signature, its pre-petition lender, for entering into a post-petition lending facility.  Signature declined to offer Navillus a proposal for post-petition financing.

23.     Further, due to the fast-paced and intense negotiations with Tishman regarding Navillus' continued performance of work on the Tishman Projects, which necessarily involved Liberty based on Liberty's obligations under the applicable Bonds, Liberty presented the best available option.  Awaiting a lengthy loan and commitment approval process from a traditional lender was simply not an option based on Navillus' need to continue work without disruption.

24.     Finally, after several weeks of arm's length negotiations and financial analysis, Navillus reached an agreement with Liberty whereby Liberty has agreed to provide Navillus with the DIP Facility.

**E.     Summary of Terms of DIP Facility**

25.     In accordance with the terms and conditions of the DIP Financing Agreement, Liberty has agreed to provide financing up to the amount of $135,000,000.  The DIP Facility is subject to specific funding requests to be made by Navillus from time to time in accordance with the terms of a cash needs budget for any particular project.  Navillus' requests are not subject to the approval of Liberty unless a DIP Financing Default has occurred.  Upon the occurrence of a DIP Financing Default (i) relating to a particular Bonded Project, the funding requests for that project shall be subject to approval by Liberty in its sole discretion or (ii) relating to a material adverse change in Navillus' operations or the conversion of Navillus' chapter 11 case to a case

under chapter 7 of the Code, all funding requests shall be subject to approval by Liberty in its sole discretion.

*(i)*    <u>*Liberty Protections*</u>

26.    Pursuant to the DIP Financing Agreement, the DIP Facility is to be secured by the Post-Petition Lien and Security Interest on all of Navillus' assets directly related to the Bonded Contracts which, for the avoidance of doubt, do not extend to the proceeds of avoidance actions, except for the Equipment.  Moreover, the DIP Financing Agreement provides Liberty with a Superpriority Claim having priority over any and all other administrative expenses to the extent of the DIP Loan Obligations, subject only to the Liberty Carve-Out.

*(ii)*    <u>*Liberty Carve-Out*</u>

27.    Liberty has consented to the Liberty Carve-Out from its Post-Petition Lien and Security Interest and Superpriority Claim for: (i) all fees required to be paid by the Clerk of the Bankruptcy Court and to the Office of the United States Trustee; (ii) $50,000 for any potential Chapter 7 trustee; (iii) all reasonable and unpaid fees, costs, disbursements and expenses of any professional retained by Navillus in this case up to an aggregate amount of $4,235,000; and (iv) all reasonable and unpaid fees, costs, disbursements and expenses of any professional retained by the official committee of unsecured creditors in this case, should one be appointed by the Office of the United States Trustee up to an aggregate amount of $500,000.  The Liberty Carve-Out is in addition to Navillus' rights under section 506(c) of the Bankruptcy Code, provided that the maximum amount of the Liberty Carve-Out and Navillus' rights under section 506(c) of the Bankruptcy Code may not exceed $5,000,000.

14

*(iii)*   *Economic Terms of the DIP Facility*

28.     Liberty has not charged any commitment fees, lender fees, unused line fees or exit fees in connection with the DIP Facility.  The DIP Loan Obligations bear interest at a rate of three (3%) percent and a default rate of interest of nine (9%) percent.  The DIP Facility terminates upon the later to occur of: (a) the effective date of a confirmed plan in this chapter 11 case; or (b) the date of indefeasible payment in full of all obligations due under the DIP Financing Agreement; but in any event not later than one (1) year from the Effective Date of the DIP Financing Agreement, unless otherwise extended in writing by the parties thereto.

## RELIEF REQUESTED

29.     Liberty has agreed to provide the DIP Facility to Navillus pursuant to the DIP Financing Agreement which will be used to provide Navillus with the liquidity required to fund its operations while it continues performing work on its open construction projects and implements its reorganization strategy to successfully exit chapter 11.  By this Motion, Navillus respectfully requests entry of interim (Exhibit 1) and final orders:

(a)     authorizing Navillus to obtain the DIP Facility on the terms and conditions set forth in the DIP Financing Agreement annexed hereto as Exhibit 2 and to borrow up to $13,500,000 thereunder on an interim basis;

(b)     granting Liberty the Post-Petition Lien on and Security Interest in all of Navillus' assets directly related to the Bonded Contracts, except for the Equipment;

(c)     granting Liberty an allowed Superpriority Claim with respect to the DIP Loan Obligations;

(d)     authorizing Navillus' use of Cash Collateral subject to the Budget on the terms and conditions set forth in the Interim Order; and

(e)     scheduling the Final Hearing for this Court to consider entry of the Final Order authorizing the DIP Facility on a final basis.

## BASIS FOR RELIEF REQUESTED

I.    **The Debtor Should be Authorized to Obtain the DIP Facility Through the DIP Financing Agreement**

        A.    **Entry into the DIP Financing Agreement is an Exercise of the Debtor's Sound Business Judgment**

30.    Navillus submits that it should be authorized, in the exercise of its sound business judgment, to enter into the DIP Financing Agreement and obtain access to the DIP Facility pursuant to the provisions of section 364 of the Bankruptcy Code described below.

31.    Courts grant debtors significant deference in acting in accordance with their sound business judgment in obtaining post-petition secured financing, so long as such financing does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See In re Barbara K. Enters., Inc.*, 2008 WL 2439649 at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (nothing that approval of postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment").

32.    To determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006).  Here, Navillus'

decision to enter into the DIP Financing Agreement is an exercise of its sound business judgment that warrants approval by the Court.  Navillus and its advisors undertook a detailed investigation as to Navillus' projected financing needs during the chapter 11 case and determined that Navillus would require postpetition financing to ensure the completion of its construction projects without disruption.  Indeed, the DIP Facility will provide Navillus with access to funding to pay employees, vendors, subcontractors, materialmen and service providers, while also supplying liquidity to give Navillus' project owners the comfort and confidence required to stabilize operations.

33.     Given Navillus' current situation on the Tishman Projects and desire to continue working on all of its projects without disruption, Navillus worked to secure financing that would support Navillus' chapter 11 goals of preserving the company and its value.  Accordingly, after extensive discussions by Navillus and its advisors with Liberty, Navillus negotiated the DIP Financing Agreement with Liberty in good faith and at arm's-length to obtain the required post-petition financing on the best and only terms available to Navillus.

34.     As noted above, the DIP Facility will provide Navillus with access to $13,500,000 immediately upon entry of the Interim Order and a total of up to $135,000,000 (inclusive of the amount authorized by the Interim Order) after entry of the Final Order, which Navillus and its advisors have determined should be sufficient to support Navillus' essential ongoing operations while it pursues its reorganization strategy to successfully exit chapter 11.  Thus, Navillus submits that entry into the DIP Facility constitutes an exercise of Navillus' sound business judgment that should be approved by the Court.

### B.    The Terms of the DIP Facility Should be Approved

35.    Navillus proposes to obtain financing under the DIP Facility by providing Liberty

with security interests and liens on the terms set forth in the DIP Financing Agreement.  Section

364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and a

hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative

expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

> 1)  with priority over any or all administrative expenses of the kind specified in
> section 503(b) or 507(b) of [the Bankruptcy Code];
>
> 2)  secured by a lien on property of the estate that is not otherwise subject to a
> lien; or
>
> 3)  secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. §364(c).

36.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor

need only demonstrate "by a good faith effort that credit was not available" to the debtor on an

unsecured or administrative expense basis.  *See Ames Dept. Stores,* 115 B.R. at 37; *In re 495*

*Central Park Avenue Corp.*, 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992).  Although ''[t]he statute

imposes no duty to seek credit from every possible lender before concluding that such credit is

unavailable", the statute does obligate a debtor to show "by a good faith effort that credit is not

available without a senior lien."   *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe*

*Co.),* 789 F.2d 1085, 1088 (4th Cir. 1986); *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor*

*Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized

where debtor could not obtain credit as an administrative expense); *In re YL West 87th Holdings*

*I, LLC*, 423 B.R. 421, 441 n.44 (Bankr. S.D.N.Y. 2010) (noting that courts require only a

showing of "reasonable efforts" to obtain credit otherwise).  When few lenders are likely to be

18

able and willing to extend the necessary credit to a debtor, ''it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing.'' *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989).

37.      Here, Navillus does not believe that financing on less onerous terms would be available based on the illiquid nature of Navillus' assets and the trust fund obligations imposed on its contract receivables under the Lien Law, both of which make traditional bank financing difficult to procure.  Navillus solicited a proposal for financing from Signature, its pre-petition lender, but did not receive any expression of interest.  Aside from the lack of traditional third party lenders, there are few lenders with the financial wherewithal or willingness to extend the DIP Facility on a short term basis to meet Navillus' backstop financing needs on its projects given the favorable economic terms of the DIP Facility.  Moreover, given Navillus' obligations to Liberty under the Indemnity Agreements, if Navillus was to pursue alternative financing, Liberty would likely object to the terms of any financing that would impact its interest in the proceeds of the Bonded Contracts, thereby requiring Navillus to proceed with a costly, contested and likely protracted proceeding.

38.      After extended, good faith and arm's length negotiations, Liberty agreed to provide the DIP Facility on the terms provided in the DIP Financing Agreement and as summarized above.  Notably, the DIP Facility carries what Navillus believes to be a reasonable interest rate and does not contain any of the fees and charges traditionally associated with debtor-in-possession financing.  Because the DIP Facility proceeds are critical to Navillus' operations and success for reorganization, and because Liberty would not have agreed to provide financing

without the protections afforded by the DIP Financing Agreement, Navillus believes that the terms of the DIP Facility are reasonable under the circumstances.

39.     Navillus sought, but was unable to obtain, the required funds in the form of unsecured debt allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense, pursuant to section 364(a) or (b) of the Bankruptcy Code.

40.     The Court should therefore authorize Navillus to (a) provide Liberty with the Post-Petition Lien and Security Interest on all of Navillus' assets relating to the Bonded Contracts, except for the Equipment; and (b) grant Liberty the Superpriority Claim with respect to Navillus' repayment of the DIP Loan Obligations.

### C.    Liberty Should Be Deemed a Good Faith Lender Under Section 364(e) of the Bankruptcy Code

41.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor and its right in any lien securing those loans, even if the authority of the debtor to obtain such loan or grant such lien is later reversed or modified on appeal.  Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incurred debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt or the granting of such priority or lien were stayed pending appeal.

11 U.S.C. §364(e).

42.     The DIP Financing Agreement is the result of Navillus' reasonable and informed determination that Liberty offered favorable, fair market terms on which to obtain needed post-petition funding, and of extended arm's length good faith negotiations between Navillus and Liberty.  The terms and conditions of the DIP Financing Agreement are fair and reasonable and

the proceeds under the DIP Facility will only be used for purposes that are permissible under the Bankruptcy Code.

43.    Accordingly, Navillus submits that the Court should find Liberty to be a good faith lender within the meaning of section 364(e) of the Bankruptcy Code entitled to the protections afforded by that section.

## II.    The Debtor Should be Authorized to Use Cash Collateral

44.    For the reasons set forth herein, Navillus requires use of Cash Collateral in the form of the receivables from Bonded Contracts to fund daily operations.  Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral.  Specifically, that provision provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless –
>
> (A)  each entity that has an interest in such cash collateral consents; or
> (B)  the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

45.    Further, section 363(e) of the Bankruptcy Code provides for adequate protection of an entity's interest in property upon request.  11 U.S.C. § 363(e).  Navillus submits that it has satisfied the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code and should be authorized to use the Cash Collateral because Liberty has consented to Navillus' use of Cash Collateral, subject to the Budget, to the extent Navillus is able to fund operations from the proceeds of the Bonded Contracts without drawing down on the DIP Facility.  Moreover, because Liberty's security interest in Navillus' Cash Collateral is limited to the extent of borrowing under the DIP Facility, and any amounts borrowed by Navillus are subject to the

Superpriority Claim, Navillus submits that Liberty's interest in the Cash Collateral is adequately protected.  In addition, Liberty has not requested additional adequate protection.

46.    Adequate protection may be provided in various forms, including the granting of administrative claims.  What constitutes adequate protection is decided on a case-by-case basis. *See*, *e.g.*, *In re Realty SW Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution of the value of its collateral during the reorganization process"); *495 Central Park Ave. Corp.*, 136 B.R. at 631 (same).

47.    In light of the adequate protection provided to Liberty in the form of the Superpriority Claim, Navillus has appropriately provided for any diminution in the value of Liberty's Post-Petition Lien and Security Interest on Cash Collateral.  Accordingly, Navillus believes that the adequate protection proposed herein and in the Interim Order is fair, reasonable, and sufficient to satisfy the requirements of section 363(c) of the Bankruptcy Code.

## III.    Failure to Obtain Immediate Interim Access to the DIP Facility Would Cause Immediate and Irreparable Harm to the Debtor's Estate

48.    The Court may grant interim relief in respect of a motion filed pursuant to section 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  FED. R. BANKR. P. 4001(b)(2) and (c)(2). In examining requests for interim relief under this rule, courts in this jurisdiction generally apply the same business judgment standard applicable to other business decisions.  *See, e.g., Ames Dep't Stores*, 115 B.R. at 36.

49.    Given the liquidity pressures that typically arise during the early stages of any chapter 11 case, Navillus and its estate will suffer immediate and irreparable harm if the interim

relief requested herein is not granted promptly.  Navillus requires access to the proceeds of the DIP Facility to maintain and ensure timely and adequate funding for essential business operations. Accordingly, Navillus has an immediate need for access to liquidity to, among other things, permit the orderly continuation of the operation of its business, to maintain business relationships with project owners, subcontractors and suppliers, and to satisfy other essential operational needs, all of which are required to preserve and maintain Navillus' value for the benefit of all parties in interest.  Navillus therefore requests authority to borrow funds under the DIP Facility in the amount of up to $13,500,000 on an interim basis pending the Final Hearing.

50.    The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in similar circumstances.  *See, e.g., In re Global Aviation Holdings, Inc.*, Case No. 12-40783 (CEC) (Bankr. E.D.N.Y. March 1, 2012); *In re United Retail Group, Inc.*, Case No. 12-10405 (SMB) (Bankr. S.D.N.Y. Feb. 2, 2012); *In re Insight Health Servs. Holdings Corp.*, Case No. 10-16564 (AJG) (Bankr. S.D.N.Y. Jan. 4, 2011); *In re NR Liquidation III Co. (f/k/a Neff Corp.)*, Case No. 10-12610 (SCC) (Bankr. S.D.N.Y. June 30, 2010); *In re Reader's Digest Ass'n*, Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2009); *In re Gen. Growth Prop. Inc.*, Case No. 09-11977 (Bankr. S.D.N.Y. May 14, 2009); *In re Tronox Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Jan. 13, 2009); *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. Jan. 8, 2009); *In re Lenox Sales, Inc.*, Case No. 08-14679 (S.D.N.Y. Nov. 25, 2008); *In re Wellman, Inc.*, Case No. 08-10595 (S.D.N.Y. Feb. 27, 2008).

51.    Accordingly, for all of the reasons set forth above, prompt entry of the Interim Order is necessary to avert immediate and irreparable harm to Navillus' estate and is consistent with, and warranted under, Bankruptcy Rule 4001(c)(2).

**IV.**     **Request for Final Hearing**

52.     Pursuant to Bankruptcy Rule 4001(c)(2), Navillus requests that the Court (a) schedule the Final Hearing as soon as practicable, and (b) fix the time and date for parties to file objections to the Motion in advance of the Final Hearing.

**V.**     **Request for Waiver of Stay**

53.     Navillus further seeks a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court others otherwise."  As set forth above, the relief requested herein is essential to prevent irreparable damage to the value of Navillus' estate. Accordingly, the relief requested herein is appropriate under the circumstances and under Bankruptcy Rule 6004(h).

## NOTICE

54.     Notice of this Motion has been given to (a) the United States Trustee for the Southern District of New York; (b) Navillus' twenty (20) largest unsecured creditors; (c) counsel to Liberty Mutual Insurance Company; (d) counsel to Signature Bank; (e) any known parties asserting a lien against any portion of the Collateral; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; (h) the United States Department of Justice; and (i) any other party who requests to receive notices.  Navillus submits that, under the circumstances, no other or further notice is required.

55.     No previous application for the relief sought herein has been made to this or any other Court.

## CONCLUSION

**WHEREFORE**, for the reasons set forth herein, Navillus respectfully requests that the

Court (a) enter an order granting the relief requested herein; and (b) grant Navillus such other

and further relief as the Court deems just and proper.

Dated: Garden City, New York
     November 21, 2017

CULLEN AND DYKMAN LLP

By:   */s/   Nathan Dee*_____
        C. Nathan Dee, Esq.
        Elizabeth M. Aboulafia, Esq.
        100 Quentin Roosevelt Boulevard
        Garden City, New York 11530
        (516) 357-3700
        *Proposed Counsel to Navillus Tile, Inc.*

**<u>Exhibit 1</u>**

**INTERIM ORDER**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                                    :
In re:                                              :    Chapter 11
                                                    :
NAVILLUS TILE, INC., DBA NAVILLUS                   :    Case No. 17-13162 (SHL)
CONTRACTING                                         :
                                                    :
                        Debtor.                     :
                                                    :
---------------------------------------------------------------x

### INTERIM ORDER PURSUANT TO 11 U.S.C. §§105(a), 362, 363, AND 364 OF THE BANKRUPTCY CODE (I) AUTHORIZING POST-PETITION SECURED FINANCING; (II) GRANTING SECURITY INTERESTS AND SUPERPRIORITY CLAIMS; (III) AUTHORIZING USE OF CASH COLLATERAL AND (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(c)

Upon the motion (the "Motion")[1] of Navillus Tile, Inc. d/b/a Navillus Contracting, the above-captioned debtor and debtor-in-possession (the "Debtor"), seeking entry of an interim order (this "Interim Order") and a Final Order (defined herein) pursuant to sections 105, 362, 363 and 364 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, et seq. (the "Bankruptcy Code"), Rules 4001 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), *inter alia*:

(i)    authorizing Navillus to obtain secured post-petition financing on a superpriority basis up to the aggregate amount of $135,000,000 (the "DIP Facility") pursuant to the terms and conditions of that certain Financing Agreement, dated as of November [__], 2017, by and among Navillus, Donal O'Sullivan, individually and Kathleen O'Sullivan, individually (collectively, the "Indemnitors") as borrowers and Liberty Mutual Insurance Company ("Liberty"), as lender (the

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion or the DIP Financing Agreement, as applicable.

"DIP Financing Agreement"), a copy of which is annexed as Exhibit "1" to the Motion, and authorizing Navillus to borrow up to $13,500,000 on an interim basis;

(ii)    granting Liberty, pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority, perfected and indefeasible lien on and security interest in (the "Post-Petition Lien and Security Interest") all of Navillus' assets directly related to the Bonded Contracts including, without limitation, property constituting "cash collateral" (as defined in section 363(a) of the Bankruptcy Code and, hereinafter, "Cash Collateral"), except for the Equipment;

(iii)    granting Liberty, pursuant to sections 364(c)(1) and 105 of the Bankruptcy Code, an allowed superpriority administrative expense claim (the "Superpriority Claim") with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, subject only to the Liberty Carve-Out, to the extent of any losses incurred by Liberty in connection with the Bonds or the Indemnity Agreements after the filing of this chapter 11 case (the "DIP Loan Obligations");

(iv)    authorizing Navillus' use of Cash Collateral on the terms and conditions set forth in this Interim Order, subject to the terms of a rolling thirteen week budget (the "Budget"), a copy of which is annexed to the Motion as Exhibit "2";

(v)    scheduling a final hearing (the "Final Hearing") to consider entry of a final order (the "Final Order") authorizing any requested relief not granted under the Interim Order on a final basis, all as set forth in the Motion; and

(vi)    such other and further relief as is sought in the Motion;

The Court having considered the Motion, the Declaration filed in support of the Motion; the Affidavit of Donal O'Sullivan in support of Navillus' first day motions and orders, the DIP Financing Agreement, the arguments of counsel and evidence submitted by Navillus at an

2

interim hearing held before the Court on _____, 2017 (the "Interim Hearing"); and in accordance with Bankruptcy Rules 2002, 4001 and Local Rule 4001-2, and due and proper notice of the Motion and the Interim Hearing having been given; and it appearing that approval of the relief requested in the Motion is necessary to prevent immediate and irreparable harm to Navillus, and otherwise is fair and reasonable and in the best interest of Navillus, its creditors and its estate, and is essential for the continued operation of Navillus' business and to preserve and maximize the value of Navillus' estate for the benefit of all stakeholders; and it further appearing that Navillus is unable to secure unsecured credit for money borrowed allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and this Court having found good and sufficient cause appearing therefor;

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.      <u>Petition</u>.  On November 8, 2017 (the "Petition Date"), Navillus filed a voluntary petition for relief with this Court under chapter 11 of the Bankruptcy Code.  Navillus is continuing in possession of its property, and operating and managing its business, as debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

B.      <u>Jurisdiction and Venue</u>.  Consideration of the Motion constitutes a "core proceeding" as defined in 28 U.S.C. §§157(b)(2)(A), (D), (K), (M) and (O).  This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of Navillus' case is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      <u>Notice</u>.  Under the circumstances, notice of the Motion, the Interim Hearing and the relief sought thereunder given by Navillus to (a) the United States Trustee for the Southern District of New York; (b) Navillus' twenty (20) largest unsecured creditors; (c) counsel to

3

Liberty Mutual Insurance Company; (d) counsel to Signature Bank; (e) any known parties asserting a lien against any portion of the Collateral; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; (h) the United States Department of Justice; and (i) any other party who requests to receive notices (the "Notice Parties") constitutes due and sufficient notice thereof and complies with the Bankruptcy Rules and Local Bankruptcy Rules, and no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

D.    Findings Regarding Pre-Petition Indemnity Agreements and Pre-Petition Secured Indebtedness.    Without prejudice to the rights of any other party in interest, Navillus acknowledges, admits, and agrees that:

(i)    *Pre-Petition Indemnity Agreements.* Prior to the Petition Date, on or around October 24, 1995, December 12, 2006 and March 15, 2007, the Indemnitors and certain other individuals and non-debtor entities executed General Agreements of Indemnity (collectively, the "Indemnity Agreements") in favor of Liberty (and any affiliate of Liberty).  In the Indemnity Agreements, the Indemnitors agreed, among other things, to exonerate, hold harmless and indemnify Liberty from and against any and all liability for losses, fees, costs and expenses incurred by Liberty, *inter alia*, as a result of executing certain surety bonds to guarantee (i) the performance of various contracts by Navillus (the "Performance Bonds") and (ii) the payment of certain obligations of Navillus (the "Payment Bonds" and, together with the Performance Bonds, the "Bonds") with respect to certain of Navillus' contracts (the "Bonded Contracts").  The DIP Financing Agreement is being executed in addition to, and not in lieu of, the Indemnity

4

Agreements, and nothing contained in the DIP Financing Agreement or this Interim Order in any way diminishes the rights set forth in the Indemnity Agreements.

(ii)     *Pre-Petition Obligations*.   As of the Petition Date, Navillus and the Indemnitors were not obligated for any losses under the Bonds, however certain costs and expenses are recoverable under the Indemnity Agreements as of the Petition Date. Additionally, certain of those costs shall be paid to Liberty pursuant to an Initial Collateral Deposit Agreement entered into between Liberty and Indemnitors other than Navillus.

(iii)     *Pre-Petition Equipment Loans*.   Prior to the Petition Date, Navillus entered into equipment loans with Signature Financial LLC ("Signature Financial") secured by a 2015 Toyota 8FDU25 Forklift and a 2014 Kenworth T800 truck (the "Equipment").  As of the Petition Date, approximately $68,080 remained due and owing Signature Financial on account of the loans secured by the Equipment.

E.     <u>Findings Regarding DIP Financing</u>.

(i)     *Need for Post-Petition Financing*.   Navillus' ability to continue operating on its open construction projects and maintain its business relationships with Tishman and all project owners depends on obtaining immediate access to the DIP Facility to address their concerns regarding Navillus' ability to complete its open construction projects.  The access of Navillus to liquidity through the incurrence of new indebtedness for borrowed money is vital for preserving and maintaining the going concern value of Navillus.  Failure to obtain the relief requested in the Motion will immediately and irreparably harm Navillus, its estate, creditors and equity holders.

          (ii)     *No Credit Available on More Favorable Terms*.  Navillus is unable to obtain financing on terms more favorable than those offered by Liberty under the DIP Facility and is unable to obtain unsecured credit allowable under section 503(b)(l) of the Bankruptcy Code as an administrative expense.  Navillus is also unable to obtain secured credit under section 364(c) of the Bankruptcy Code on equal or more favorable terms than those offered by Liberty under the DIP Facility.  Navillus has made an adequate showing of its efforts to obtain financing on more favorable terms.  A credit facility in the amount and on the terms provided by the DIP Facility is not available from Liberty without Navillus granting Liberty (a) the Post-Petition Lien and Security Interest and the Superpriority Claims, and (b) the other protections set forth in this Interim Order.

          (iii)    *Business Judgment and Good Faith Pursuant to Section 364(e)*.  The terms and conditions of the DIP Facility and the DIP Financing Agreement are fair, reasonable, and the best available to Navillus under the circumstances, reflect the exercise of prudent business judgment by Navillus consistent with its fiduciary duties, and are supported by reasonably equivalent value and consideration. The DIP Facility was negotiated without collusion, in good faith and at arms' length between and among Navillus and Liberty.  Use of credit to be extended under the DIP Facility shall be deemed to have been so allowed, advanced, made, used or extended in good faith, within the meaning of section 364(e) of the Bankruptcy Code and in express reliance on the protections offered by section 364(e) of the Bankruptcy Code, and Liberty is therefore entitled to the full protection and benefits of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

6

(iv)     *Interim Relief.*  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001. The permission granted herein to obtain the DIP Facility and the access to funds available thereunder on an interim basis in the amount of up to $13,500,000 is necessary to avoid immediate and irreparable harm to Navillus.   No party appearing in Navillus' chapter 11 case has filed or made an objection to the relief sought in the Motion, or the entry of this Interim Order, or any objections that were made (to the extent such objections have not been withdrawn) are hereby overruled.

F.     <u>Good Cause</u>.  The relief requested in the Motion is necessary, essential and appropriate for continued operations, and the management, maintenance and preservation of Navillus' assets as it will, among other things, provide Navillus with the necessary liquidity to (i) minimize disruption to ongoing operations and allow for Navillus to perform and complete its open construction projects and continue bidding work to obtain new construction projects; (ii) preserve and maximize the value of the estate for the benefit of all creditors; and (iii) avoid immediate and irreparable harm to Navillus, its creditors, its business, its employees, and its estate.  It is in the best interest of Navillus' estate for Navillus to be allowed to establish the DIP Facility contemplated by the DIP Financing Agreement and to grant the other relief set forth herein.  Good cause has been shown for the relief requested in the Motion and as granted in this Interim Order.

Based upon the foregoing findings and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor,

7

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    <u>Interim Financing Approved</u>.  The Motion is granted in accordance with the terms of this Interim Order.  All objections to the Motion, to the extent not withdrawn or resolved, and all reservations of rights included therein, are hereby overruled.

2.    <u>Authorization of the DIP Facility</u>.    Navillus is expressly and immediately authorized to execute and deliver the DIP Financing Agreement and to incur and perform any obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Financing Agreement, and to execute and deliver all instruments and documents which may be necessary or required for the performance by Navillus under the DIP Financing Agreement and any documents executed pursuant thereto and the creation and perfection of the Post-Petition Lien and Security Interest described in and provided for by this Interim Order and the DIP Financing Agreement.  Pending entry of the Final Order, the DIP Financing Agreement is hereby approved on an interim basis and shall represent a valid and binding obligation of Navillus, enforceable against Navillus and its estate in accordance with its terms.

3.    <u>Authorization to Borrow</u>.  Subject to the terms and conditions set forth in the DIP Financing Agreement and this Interim Order, Navillus is hereby authorized to borrow on an interim basis up to $13,500,000 under the DIP Facility.

4.    <u>Use of DIP Facility Proceeds</u>.  From and after the Petition Date, Navillus shall use the proceeds of the DIP Facility only for the purposes specifically set forth in this the DIP Financing Agreement and any documents executed pursuant thereto.  Notwithstanding anything to the contrary in this Interim Order or the DIP Financing Agreement, in no event shall any proceeds of the DIP Facility be used (a) for any purpose that is not permitted under this Interim Order; (b) in a manner not consistent with any budget provided to Liberty under the DIP

8

Financing Agreement; (c) for any investigation or analysis of any claim or cause of action against Liberty or any of its affiliates; and (d) for any preparation or prosecution of any claim or cause of action against Liberty or any of its affiliates.

5.    Superpriority Claim.  Pursuant to section 364(c)(l) of the Bankruptcy Code, but subject to the Carve-Out (as defined herein), the DIP Loan Obligations shall constitute an allowed superpriority administrative expense claim against Navillus (the "Superpriority Claim") with priority over any and all administrative expense claims of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, as provided under sections 364(c)(1) and 105 of the Bankruptcy Code; and which shall at all times be senior to the rights of Navillus, and the estate, any successor trustee or other estate representative and any creditor or other party in interest to the extent permitted by law.

6.    Post-Petition Lien and Security Interest.  As security for any and all obligations due to Liberty from Navillus in connection with the Bonds and/or the Indemnity Agreements, effective and perfected upon the date of this Interim Order and without the necessity of the execution,  recordation of filings by Navillus of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by Liberty or its agents over any collateral, Liberty is hereby granted a first priority, perfected and indefeasible lien on and security interest in (the "Post-Petition Lien and Security Interest"), pursuant to section 364(c)(2) of the Bankruptcy Code, all of Navillus' assets directly related to the Bonded Contracts, except for the Equipment (the "Collateral").  The Post-Petition Lien and Security Interest shall not extend to the proceeds of any avoidance actions under Chapter 5 of the Bankruptcy Code.

7.      Perfection of Post-Petition Lien and Security Interest.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Post-Petition Lien and Security Interest, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any lockbox or deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the Post-Petition Lien and Security Interest, or to entitle Liberty to the priorities granted herein.  Notwithstanding the foregoing, Liberty is authorized to file, at its sole discretion, such financing statements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the Post-Petition Lien and Security Interest, and all such financing statements, mortgages, notices, other documents and approvals shall be deemed to have been filed or recorded as of the Petition Date; *provided, however*, that no such filing or recordation shall be necessary or required in order to create or perfect the Post-Petition Lien and Security Interest.  Navillus is authorized and directed to execute and deliver promptly upon demand to Liberty all such financing statements, mortgages, notices and other documents as Liberty reasonably requests.  Liberty in its discretion may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument.

8.      Liberty Carve-Out.  Liberty's Superpriority Claim and Post-Petition Lien and Security Interest granted under this Interim Order or in existence on, or arising after, the Petition Date, shall be subject only to a carve-out for the following (the "Liberty Carve-Out"):  (i) all fees

10

required to be paid by the Clerk of the Bankruptcy Court and to the Office of the United States

Trustee; (ii) $50,000 for any potential Chapter 7 trustee; (iii) all reasonable and unpaid fees,

costs, disbursements and expenses of any professional retained by Navillus in this case up to an

aggregate amount of $4,235,000; and (iv) all reasonable and unpaid fees, costs, disbursements

and expenses of any professional retained by the official committee of unsecured creditors in this

case, should one be appointed by the Office of the United States Trustee up to an aggregate

amount of $500,000.  The Liberty Carve-Out shall be in addition to any of Navillus' rights under

section 506(c) of the Bankruptcy Code to the extent that those rights relate to the Collateral;

however, the maximum amount of the Liberty Carve-Out, including any claims under section

506(c) of the Bankruptcy Code relating to Liberty's Collateral in the bankruptcy proceeding,

shall in no event exceed $5,000,000.  For the avoidance of doubt, any payments made pursuant

to the Liberty Carve-Out shall not reduce the amount of the Superpriority Claim or the amount of

any obligation due to Liberty under the Bonds, the Indemnity Agreements, the DIP Financing

Motion or related agreements, or otherwise.

       9.      <u>Authorization to Use Cash Collateral</u>.  Subject to the terms and conditions of this

Interim Order and the DIP Financing Agreement and the Budget, Navillus is authorized to use

Cash Collateral until the time of termination of the DIP Facility.

       10.     <u>Voluntary Letters of Default</u>.  The irrevocable assignment, irrevocable letter of

direction and voluntary letters of default being provided to Liberty pursuant to paragraph L of

the DIP Financing Agreement shall only be used by Liberty, with respect to a specific Bonded

Contract if, pursuant to a further Order of the Court after notice and hearing, (a) Navillus is

terminated for default on that specific Bonded Contract or (b) Navillus rejects that specific

Bonded Contract.  Upon such Order of the Court relating to the termination or rejection of a

11

Bonded Contract, Liberty shall be granted relief from the automatic stay without further Order of the Court.

11.      <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order</u>.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended or vacated by a subsequent order of this Court or any other court, Liberty is entitled to the protections provided in section 364(e) of the Bankruptcy Code.  Any such modification, amendment or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or any lien, claim or priority authorized or created hereby.  Any liens or claims granted to Liberty hereunder arising prior to the effective date of any such modification, amendment or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

12.      <u>Modification of Automatic Stay</u>.   The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified solely to the extent necessary to authorize Navillus and Liberty to take any action necessary to implement and effectuate the terms and provisions of this Interim Order, the DIP Financing Agreement and any documents executed pursuant thereto.

13.      <u>Liberty Not Responsible Person</u>.   In (a) making the decision to provide the DIP Facility; (b) administering the DIP Facility; or (c) extending related financial accommodations to Navillus, Liberty shall not be considered to be exercising control over any operations of Navillus or acting in any way as a "responsible person," or as an "owner or operator" with respect to the

operation or management of Navillus, or otherwise cause liability to arise to the federal or state government or the status of responsible person or managing agent to exist under any applicable law. Navillus retains complete control of and responsibility for its operations, over which Liberty assumes no responsibility or control.

14.    <u>No Third Party Rights</u>.    Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

15.    <u>No Waiver by Failure to Seek Relief</u>.    The failure of Liberty to seek relief or otherwise exercise its rights and remedies under this Interim Order, the DIP Financing Agreement, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise.

16.    <u>Binding Effect of Interim Order</u>.    Immediately upon execution by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of Navillus, Liberty, all other creditors of Navillus, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in this case, or upon dismissal of this case.

17.    <u>Binding Effect on Non-Debtor Indemnitors</u>.    In the event that the full extent of the relief sought in the Motion is not granted as to Navillus, the non-debtor Indemnitors shall nevertheless be bound by the DIP Financing Agreement pursuant to the terms thereof.

18.    <u>Headings</u>.    Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

19.    <u>Survival</u>.    The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to Liberty pursuant to this Interim Order,

notwithstanding the entry of any further order, shall continue in this case, or following dismissal of this case, and shall maintain their priority as provided by this Interim Order until any and all obligations pursuant to the DIP Financing Agreement and this Interim Order have been indefeasibly paid in full (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms), and any agreement to extend credit under the DIP Facility is terminated.

20.    Final Hearing.  The Final Hearing to consider final approval of the DIP Facility and entry of the Final Order is scheduled before this Court for _____, 2017, at __:00 _.m. On or before _____, 2017, Navillus shall serve a copy of this Interim Order and the Motion (a) by electronic mail upon the Notice Parties.  Any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on _____, 2017 at 4:00 p.m., which objections shall be served so as to be received on or before such date by: (1) counsel to Navillus, Cullen and Dykman LLP, 100 Quentin Roosevelt Boulevard Garden City, NY 11530 (Attn: C. Nathan Dee, Esq. and Elizabeth M. Aboulafia, Esq.); (2) the U.S. Trustee, 33 Whitehall Street, 21st Floor, New York, NY 10004; and (3) counsel to Liberty, Chiesa Shahinian & Giantomasi, P.C., 1 Boland Drive, West Orange, NJ 07052 (Attn:  Adam Friedman, Esq. and Scott Zuber, Esq.).

21.    Bankruptcy Rule 7052.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry of this Interim Order.

22.    Bankruptcy Rule 6004(h).  This Interim Order shall take effect immediately upon the entry hereof notwithstanding the stay provisions of Bankruptcy Rule 6004(h) which are hereby waived.

14

23.    <u>Retention of Jurisdiction</u>.    The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

<u>**Exhibit 2**</u>

**FINANCING AGREEMENT**

## FINANCING AGREEMENT

   This Financing Agreement is executed this November __, 2017 ("the Effective Date"), by and between Navillus Tile, Inc., d/b/a Navillus Contracting ("Navillus"), Donal O'Sullivan, individually, and Kathleen O'Sullivan, individually (Navillus, Donal O'Sullivan, and Kathleen O'Sullivan are collectively referred to herein as the "Indemnitors"), and Liberty Mutual Insurance Company ("Liberty"), and reflects the understandings, agreements, and intentions of the parties hereto (collectively the "Parties") regarding the subject matter discussed herein:

A.  Liberty, as surety, executed various surety bonds on behalf of Navillus which, as limited by their terms, conditions, and applicable law, guarantee (i) the performance of various contracts by Navillus (the "Performance Bonds") and (ii) the payment of certain obligations of Navillus (the "Payment Bonds" and, together with the Performance Bonds, the "Bonds") with respect to certain of Navillus' contracts (the "Bonded Contracts"). The Bonds include penal sums and are for the benefit of the obligees as set forth on Exhibit A hereto with respect to each of the projects designated on Exhibit A (each a "Bonded Project" and, collectively, the "Bonded Projects"). Additionally, Navillus is currently performing work on certain non-bonded projects (the "Non-Bonded Projects" and together with the Bonded Projects, the "Projects").

B.  As partial consideration for the execution of the Bonds, the Indemnitors (among others) executed various Agreements of Indemnity in favor of Liberty (collectively, the "Indemnity Agreements"). In the Indemnity Agreements, the Indemnitors agreed, among other things, to exonerate, hold harmless, and indemnify Liberty from and against any and all liability for losses, fees, costs, and expenses incurred by Liberty as a result of executing the Bonds.

   The Indemnitors and Liberty acknowledge and agree that this Financing Agreement is being executed in addition to, and not in lieu of, the Indemnity Agreements, and nothing herein abrogates or in any way diminishes the rights set forth in the Indemnity Agreements. Liberty expressly reserves all rights under the Indemnity Agreements and all other rights at law and in equity.

C.  As a result of a judgment obtained against Navillus by certain union benefit funds and its related impact on Navillus' operations and certain of its projects, on November 8, 2017, Navillus filed a voluntary petition under Chapter 11 of title 11 of the United States Code ("Chapter 11").

D.  Navillus represents that it is able and willing to perform and complete all of the Bonded Projects and the Non-Bonded Projects, and presently intends to assume all or substantially all of its construction contracts, including specifically the One Manhattan West project, as part of its chapter 11 plan in its Chapter 11 proceeding, with the exception of the Bonded Contract pertaining to the Bonded Project identified on Exhibit A as "One Vanderbilt", and intends to continue bidding work to obtain new construction projects. With respect to the "One Vanderbilt" Bonded Project, Navillus represents that it intends to seek authority from the Bankruptcy Court to enter into the Completion

Agreement between it and Liberty relative thereto (the definition of "Bonded Contracts" herein shall be deemed to include the Completion Agreement).

E.   Navillus desires to obtain Liberty's commitment to finance Navillus on all Bonded Projects and for the Permitted Uses (defined herein) to the extent necessary and in order to demonstrate its willingness and ability to continue to perform work in connection with its Projects to all obligees under the Bonded Contracts and its counterparties on the Non-Bonded Projects.

F.   Liberty has agreed to provide Navillus with financial assistance in an amount not to exceed $135,000,000 (the "DIP Facility"), should Navillus require financial assistance to pay its obligations in connection with the Bonded Projects and other Permitted Uses (defined herein) to complete its  open Projects.  The proceeds of the DIP Facility shall be available to Navillus upon written request in accordance with the provisions of this paragraph "F".  Any disbursement from the DIP Facility is subject to Liberty's approval, which approval shall not be withheld unless a DIP Financing Default (as defined below) has occurred.  If a DIP Financing Default has occurred on a particular Bonded Project, all further requests for disbursement from the DIP Facility relative to that Bonded Project shall be subject to approval or rejection by Liberty in its sole discretion.  All financing provided by Liberty to Navillus as described herein shall be used for costs associated with the Bonded Projects and for the Permitted Uses (defined herein), and shall be credited against the penal sum of the applicable Bond.  With respect to expenses identified in F(iii) below (e.g., necessary overhead expenses), Liberty must demonstrate to the obligee of a particular Bond that such expenses were actually, reasonably incurred expenses of a Bonded Project before crediting such amounts against the penal sum of the applicable  Bond.  To the extent such expenses were not actually, reasonably incurred expenses of a particular Bonded Project, then such expenses will be treated as general advances by Liberty to be repaid by Navillus pursuant to the terms of this Agreement without credit against the penal sum of any Bond.

Any of the following occurring after the Effective Date of this Financing Agreement that have not been cured by Navillus within three (3) business days of receipt of written notice from Liberty shall constitute a "DIP Financing Default" as to a particular Bonded Project:

(a)   Liberty determines that Navillus has abandoned the Bonded Project or has willfully refused to perform the Bonded Project in a material respect;

(b)   an obligee of the performance bond relative to the Bonded Project provides notice of an intent to declare Navillus to be in default and/or to terminate the Bonded Contract for default (or to terminate Liberty under any Takeover Agreement relative to a Bonded Project);

(c)   Navillus rejects the Bonded Contract in its Chapter 11 proceeding or the Bankruptcy Court enters a final order that precludes or prevents Navillus from assuming the Bonded Contract;

(d)      Liberty determines that Navillus has experienced a material adverse change in its operations that cannot be cured by a disbursement(s) from the DIP Facility, which shall constitute a DIP Financing Default as to all Bonded Projects;

(e)      Navillus's bankruptcy proceeding is converted from Chapter 11 to Chapter 7.

Liberty will consider Navillus's written requests for funding (each, a "Funding Request") for a one calendar month period (each, a "Funding Period") generally in the estimated amounts as agreed to by Liberty and Navillus pursuant to the terms of a cash needs budget (the "Budget") for the specific Project(s) for which the Funding Request is made, which payments shall be deemed to be reimbursable losses pursuant to the Indemnity Agreements.  The Budget shall be updated no less frequently than monthly by Navillus or at such other intervals as shall be agreed to by the Parties and shall estimate the cash needs of Navillus for that specific Project(s) during the Funding Period.  In addition, Navillus may make one or more supplemental Funding Requests for a specific Project during any Funding Period on a case-by-case basis.

The Parties anticipate that the funding under the DIP Facility shall be used primarily as follows:

(i)      payments to be made to subcontractors, suppliers, laborers, and/or labor union fringe benefit funds which have provided and/or which may hereafter provide material and/or labor to or on behalf of Navillus in furtherance of the Bonded Projects;

(ii)      payments to be made for the purpose of funding Navillus's payroll costs relative to the Bonded Projects and other expenses relating to the Bonded Projects; and

(iii)      such other payments as Navillus may deem necessary or appropriate to maintain its operations,  progress the work on its Bonded Projects, including, but not limited to, insurance costs, equipment costs, and necessary overhead expenses, and for payment of any approved professional fees incurred during the post-petition period subject to the Liberty Carve-Out.

The anticipated uses of funding described in paragraphs (i) through (iii) above shall be collectively referred to as the "Permitted Uses".

Navillus and the Indemnitors agree to give Liberty any Funding Request(s) at least five (5) business days in advance of the date upon which Navillus shall require such funds. Liberty shall advise Navillus within two (2) business days of receipt of a Funding Request of its response to such Funding Request.  Liberty shall use its best efforts to disburse such funding within three (3) business days of its response to the Funding Request. Within ten (10) business days of the conclusion of each Funding Period, Navillus shall use its best efforts to furnish to Liberty a statement showing, as to each Bonded Project for which a Funding Request was made during such Funding Period, the revenues received by Navillus during such Funding Period as well as the expenses incurred in connection therewith, including copies of all relevant documents (e.g., invoices, purchase orders, subcontracts, etc.) or other evidence of payment as reasonably requested by Liberty regarding the payment of Bonded Project expenses or other

3

Permitted Uses from the proceeds of the DIP Facility.  Liberty also may require that Navillus obtain and furnish to Liberty conditional releases, assignments, and acknowledgments from subcontractors and vendors of Liberty's rights of subrogation with respect to payments made during the prior Funding Period, in a form acceptable to Liberty, and that Liberty's rights under such documents shall be in addition to, cumulative with, and not in lieu of, its rights to repayment by the Indemnitors of all such funds it so paid or advanced.  In addition, with respect to any Funding Request that shall be used for the payment of wages of Navillus's employees providing labor for the Bonded Projects, Liberty may require documentation that all associated tax withholding obligations of Navillus have been or will be met.

In the event that the amount of funding requested by Navillus during any Funding Period for a specific Project exceeds the amount set forth in the Budget for a particular Project subject to a Funding Request, then and in such event Liberty shall have the right, but not the obligation, to fund such extra amount.  At any time and from time to time Navillus shall have the right to make repayments to Liberty of any amounts advanced by Liberty hereunder.

The Indemnitors represent and confirm that their execution of this Financing Agreement has not been induced by or made in reliance upon any oral or written representations, promises, or directives by Liberty.  Liberty's providing any funding or considering any request for funding shall not, in and of itself, bind or commit Liberty to provide any funding or other type of financial assistance.  Pursuant to the Indemnity Agreements and otherwise, the Indemnitors acknowledge and agree that Liberty is not obligated, but has agreed to consider, the execution of additional bonds on behalf of Navillus on a case by case basis, and that Liberty is not a fiduciary with respect to Navillus or the Indemnitors.

G.     As partial consideration for Liberty agreeing to provide funding to Navillus under this Financing Agreement, the Indemnitors have further executed and delivered to Liberty, or will concurrently execute and deliver to Liberty, the following instruments:

1.     Initial Collateral Deposit Agreement between Liberty, Navillus, Donal O'Sullivan, and Kathleen Sullivan, regarding initial collateralization;

2.     Note, executed by Navillus, Donal O'Sullivan, and Kathleen Sullivan, a form of which is annexed hereto as Exhibit B; and

3.     such other agreements and documents as Liberty may require.

H.     Provided that the Indemnitors have duly executed this Financing Agreement, the Note, and the Initial Collateral Deposit Agreement, Liberty agrees and acknowledges that the property located at 115 Park Lane, Douglaston, New York, shall be exempt from execution for the purposes of Donal O'Sullivan's and/or Kathleen O'Sullivan's obligations to Liberty pursuant to the terms of the Indemnity Agreements, the Note and this Financing Agreement and Liberty waives any claim to that real property or its proceeds. Donal O'Sullivan's and Kathleen O'Sullivan's obligations under the Indemnity Agreements otherwise shall remain in full force and effect.

4

I.    The Indemnitors reaffirm their obligations under the Indemnity Agreements, including their promise to exonerate, hold harmless, and indemnify Liberty from and against all liability for losses, fees, costs, and expenses incurred by Liberty as a result of executing the Bonds and otherwise as provided in the Indemnity Agreements.  Nothing in this Financing Agreement is intended to waive, impede, impair, or modify Liberty's rights under the Indemnity Agreements, as any rights afforded Liberty under this Financing Agreement are in addition to, and not in lieu of, any rights Liberty has under the Indemnity Agreements.

J.    All sums paid or advanced by Liberty under this Financing Agreement or otherwise shall conclusively be deemed a loss covered and recoverable under the Indemnity Agreements. Liberty shall have the option of allocating recoveries from any source against any compensable loss or expense under its Indemnity Agreements and/or this Financing Agreement.  Notwithstanding anything in this Financing Agreement to the contrary, Liberty shall have the right to seek reimbursement of any and all sums paid or advanced under this Financing Agreement from any person and entity at any time in its sole discretion except to the extent Liberty seeks to recover any and all sums paid or advanced under this Financing Agreement from Navillus during the pendency of a Chapter 11 proceeding, absent Bankruptcy Court approval.

K.    This Financing Agreement shall terminate upon the later to occur of: (a) the effective date of a confirmed plan in Navillus' Chapter 11 case or (b) the date of indefeasible payment in full of all obligations due hereunder in accordance with the terms hereof; but in any event not later than one (1) year from the Effective Date of this Financing Agreement, unless otherwise extended in writing by the Parties.

L.    Navillus (subject to the approval of the Bankruptcy Court) and Donal O'Sullivan (unconditionally) agree that:

- Navillus shall execute and provide, with respect to each specific Bonded Contract, an (a) irrevocable assignment, (b) irrevocable letter of direction, and (c) voluntary letter of default (each of which shall be in forms provided by Liberty), and each of which shall be held by Liberty and used, in Liberty's sole discretion if, pursuant to a further Order of the Bankruptcy Court after notice and hearing, (x) Navillus is terminated for default on the specific Bonded Contract or (y) Navillus rejects the specific Bonded Contract.

- Navillus and the Indemnitors shall continue to commit their full cooperation and diligent efforts to the efficient, timely, and successful completion and closeout of the Bonded Contracts including, without limitation, full and final completion of contract work and collection of all contract funds, including any pending change orders and claims.

- Navillus retains complete control of and responsibility for its operations, over which Liberty assumes no responsibility or control.

5

- This Financing Agreement shall be incorporated into a motion to approve debtor-in-possession financing under section 364 of the Code ("DIP Financing Motion"). Navillus shall include in the DIP Financing Motion a request that, subject to applicable law, Liberty be granted administrative expense claims with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Code, pursuant to, *inter alia,* sections 364(c)(1) and 105 of the Code, to the extent of any losses incurred by Liberty in connection with the Bonds or the Indemnity Agreements after the filing of Navillus's Chapter 11 proceeding (the "Superpriority Claim"). Any and all obligations due to Liberty from Navillus and/or the Indemnitors in connection with the Bonds and/or the Indemnity Agreements shall also be secured by a first priority, perfected, and indefeasible lien on and security interest in all of Navillus's assets directly related to the Bonded Contracts, except for that certain 2015 Toyota 8FDU25 Forklift and 2014 Kenworth T800 Truck (the "Equipment") that are subject to a lien in favor of Signature Financial, LLC. Liberty's Superpriority Claim and post-petition lien granted pursuant to an Order approving the DIP Financing Motion shall be subject only to a carve-out (the "Liberty Carve-Out") for the following: (i) all fees required to be paid by the Clerk of the Bankruptcy Court and to the Office of the United States Trustee; (ii) $50,000 for any potential Chapter 7 trustee; (iii) all reasonable and unpaid fees, costs, disbursements, and expenses (the "Navillus' Professional Fees") of any professional retained by Navillus in this case (collectively, the "Navillus''s Professionals") up to an aggregate amount of $4,235,000; and (iv) all reasonable and unpaid fees, costs, disbursements, and expenses (the "Committee Professional Fees") of any professional retained by the official committee of unsecured creditors in this case, should one be appointed by the Office of the United States Trustee (collectively, the "Committee's Professionals") up to an aggregate amount of $500,000. This Carve-Out shall be in addition to any of the Navillus' rights under section 506(c) of the Code to the extent that those rights relate to Liberty's collateral in the bankruptcy proceeding (and not collateral provided to Liberty by parties other than Navillus); however, the maximum amount of the Liberty Carve-Out, including any claims under section 506(c) of the Code relating to Liberty's collateral in the bankruptcy proceeding, shall in no event exceed $5,000,000. For the avoidance of doubt, any payments made pursuant to the Liberty Carve-Out shall not reduce the amount of the Superpriority Claim or the amount of any obligation of any Party due to Liberty under the Bonds, the Indemnity Agreements, the DIP Financing Motion or related agreements, or otherwise. To the extent the automatic stay of section 362 of the Code is applicable to any provision of this Financing Agreement, Liberty shall be granted relief from the automatic stay and such grant of stay relief shall be included in any order approving the DIP Financing Motion.

- The DIP Financing Motion must be approved by the Bankruptcy Court only as to Navillus or it will be null and void and of no force and effect as to only Navillus; provided, however, that this Financing Agreement shall, upon execution by the Parties, be effective as to all Indemnitors other than Navillus irrespective of

6

whether the Bankruptcy Court approves the DIP Financing Motion (in whole or in part).

M.    The Indemnitors hereby acknowledge and agree that Liberty may contact any third party as is reasonable and necessary and notify it of the Indemnitors' current financial condition and of the terms of this Financing Agreement and the Indemnity Agreements, and otherwise communicate and disclose any and all documents and/or information regarding this Financing Agreement, the Indemnity Agreements, the Bonded Contracts, and copies of all other documents pertaining to the Indemnitors Liberty currently possesses or acquires; provided, however, that, to the extent Liberty seeks to disclose any personal financial information of the individual, and not corporate, Indemnitors, Liberty shall obtain prior written consent from the individual whose information Liberty seeks to disclose and such written consent shall not be unreasonably withheld.  In any event, Liberty shall not be required to seek such written consent from an individual Indemnitor to the extent it seeks to enforce its rights under this Financing Agreement, the Bonds, or the Indemnity Agreements.

N.    The Indemnitors hereby acknowledge and agree that they will continue to provide Liberty representatives with timely and continuous access to their books and records, including, but not limited to, all financial and other documents relating to Navillus's business generally, the Bonded Projects, and the Bonds, and all other matters directly or indirectly pertaining to any and all of the Indemnitors' assets or liabilities.  The Indemnitors agree to maintain, protect, and preserve their respective books and records, and future books and records, and not move, transfer, or destroy those books and records without Liberty's express written consent.  The Indemnitors agree to suspend immediately any document destruction policy in effect at Navillus pending further notification from Liberty that they may resume.

The Indemnitors acknowledge that Liberty enters into this Financing Agreement in reliance upon financial information that they have supplied to Liberty to date.  The Indemnitors represent and warrant that neither of them will materially change their financial condition without first providing notice thereof to Liberty.

O.    Except as provided in this Financing Agreement, the Indemnitors hereby acknowledge and agree that Liberty is not obligated to provide financial assistance to them in any manner or method, or to make any payments other than those payments, if any, that Liberty has specifically agreed to make pursuant to this Financing Agreement.  The Indemnitors hereby forever waive and release any claim that they may have, at any time, against Liberty arising from or relating in any manner to any failure or refusal by Liberty to provide financial assistance to any of them under this Financing Agreement.

P.    The Indemnitors represent, covenant, and warrant that all signatories to this Financing Agreement have the full right, power, and authority, uninhibited by contract or otherwise, to execute and perform this Financing Agreement, and that the signatories have been duly authorized, as needed, by all necessary and corporate action, and that all consents and approvals of all stockholders or other interested parties have been obtained.

Q.  The Indemnitors hereby acknowledge and confirm that they, and not Liberty, are and will be responsible for payment of all required state and federal taxes in any way relating to amounts advanced under this Financing Agreement.  The Indemnitors are responsible for the timely preparation and filing of all federal, state, and local tax filings, including, but not limited to, IRS Forms 940, 941, 1099s, W-2s, etc.  The Indemnitors agree to provide to Liberty satisfactory documentation verifying the payment of all required state and federal taxes from funds so received or advanced and as otherwise may relate to the Bonded Projects.

R.  All notices, Funding Requests (and related responses), consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt), (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested), (c) on the date sent by email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications must be sent to the respective parties at the following addresses:

| | |
|---|---|
| If to Navillus: | Navillus Tile, Inc.<br>Attn: Donal O'Sullivan<br>633 Third Avenue, 17th Floor<br>New York, New York 10017<br>dosullivan@navillusinc.com |
| With a copy to: | Cullen and Dykman LLP<br>Attn: C. Nathan Dee, Esq.<br>100 Quentin Roosevelt Boulevard<br>Garden City, NY 11530<br>cdee@cullenanddykman.com |
| If to Donal and/or<br>Kathleen O'Sullivan: | Navillus Tile, Inc.<br>Attn: Donal O'Sullivan<br>633 Third Avenue, 17th Floor<br>New York, New York 10017<br>dosullivan@navillusinc.com |
| If to Liberty: | Liberty Mutual Insurance Company<br>Attn: James D. Gibson<br>2200 Renaissance Blvd.<br>Suite 400<br>King of Prussia, PA 19406-2755<br>James D.Gibson@LibertyMutual.com |

With a copy to:                    Chiesa Shahinian & Giantomasi PC
                                   Attn: Adam P. Friedman, Esq.
                                   One Boland Drive
                                   West Orange, NJ 07052
                                   afriedman@csglaw.com

S.    Each and every obligation of the Indemnitors under the Indemnity Agreements, this
      Financing Agreement, and otherwise relative to the subject matter hereof are joint and
      several.  In the event that any Indemnitor fails to sign this Financing Agreement, or if any
      Indemnitor's signature is invalid or nonbinding for any reason (including but not limited
      to invalidity under the Code), this Financing Agreement nevertheless shall be and remain
      binding and enforceable as to all other Indemnitors.  In addition, in the event that any
      provision hereof is found to be invalid or unenforceable, all other provisions of this
      Financing Agreement shall be and remain enforceable in favor of Liberty.   THE
      INDEMNITORS EXPRESSLY WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY
      DISPUTE WITH LIBERTY UNDER OR RELATING TO THE INDEMNITY
      AGREEMENTS, THIS FINANCING AGREEMENT, THE NOTE, OR THE INITIAL
      COLLATERAL DEPOSIT AGREEMENT.

T.    This Financing Agreement shall be governed by the law of the State of New York,
      without regard to conflicts of law principles.  Any suit, action, or proceeding arising out
      of or relating to this Financing Agreement shall be brought in a federal court with
      competent jurisdiction within the Southern District of New York; if no such court exists,
      then any such suit, action, or proceeding shall be brought in the commercial division of
      an appropriate state court located in New York County.   The Parties accept the
      jurisdictions of such courts for the purpose of any such action, suit, or proceeding.

U.    The Indemnitors each acknowledge, represent, warrant and agree that they have no
      defenses, offsets, or counterclaims to any obligations or liabilities to Liberty under the
      Indemnity Agreements and hereby waive and release all claims and/or defenses against
      Liberty, including all of its affiliates, predecessors in interest, parent corporations,
      subsidiaries, successors-in-interest, and assigns and all of Liberty's present and future
      directors, officers, employees, agents and attorneys, from any and all claims, causes of
      action, suits and damages (including claims for attorneys' fees) which any or all of the
      Indemnitors ever had or now has as of the Effective Date of this Financing Agreement
      against any or all of said parties, whether arising out of this Financing Agreement, the
      Indemnity Agreements, the Bonds, the Bonded Contracts, the Indemnity Agreements, or
      otherwise.  The Indemnitors further acknowledge that Liberty is not a fiduciary in any
      way with respect to any of the Indemnitors.

V.    **NAVILLUS AND THE INDEMNITORS ACKNOWLEDGE AND REPRESENT
      THAT THEY HAVE CONSULTED WITH THEIR OWN ATTORNEY(S)
      REGARDING THE CONTENT OF THIS FINANCING AGREEMENT (OR HAVE
      BEEN AFFORDED A FAIR AND REASONABLE OPPORTUNITY TO DO SO),
      AND EXECUTE THIS FINANCING AGREEMENT VOLUNTARILY AND WITH
      FULL AND COMPLETE KNOWLEDGE OF THE IMPLICATIONS OF SAME.
      THIS FINANCING AGREEMENT SHALL NOT BE SUBJECT TO THE**

**DOCTRINE OF CONTRA PROFERENTEM, AND SHALL BE INTERPRETED AND APPLIED IN FAVOR OF PROTECTING LIBERTY'S RIGHTS.**

W.    This Financing Agreement may be executed in any number of counterparts, and each such counterpart hereof shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement. A "PDF" signature shall be deemed sufficient to bind the Parties until an original Financing Agreement has been executed by all Parties.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF the undersigned have executed this Financing Agreement as of the Effective Date.

**NAVILLUS TILE, INC.**

By: _____
   Donal O'Sullivan, President

**DONAL O'SULLIVAN**

By: _____

**KATHLEEN O'SULLIVAN**

By: _____

**LIBERTY MUTUAL INSURANCE COMPANY**

By: _____

**EXHIBIT A**

**<u>Bonded Projects</u>**

**Exhibit 5**
**Bonded Contracts**

| NAVILLUS TILE, INC. D/B/A NAVILLUS CONTRACTING SCHEDULE OF BONDED CONTRACTS ISSUED BY LIBERTY MUTUAL INSURANCE COMPANY | | | |
|---|---|---|---|
| **Obligees** | **Bond/Project Description** | **Original Penal Sum** | **Bond Number** |
| SLSCO Ltd | SLS BIBSI NAV0004 App #014356 P. Royblat 1139 Mason Avenue, Staten Island , NY | $1,061,748.80 | 015050612 |
| Yonkers Contracting Company Inc., YCC Field Office Five Stations | Pelham Line 5 Stations Contract # A36007-10,16 | $120,000.00 | 015049443 |
| New York City Housing Authority | Restoration Associated with the Sandy Recovery Program Lillian Wald Houses, New York, NY - Contract No. GR 1700259 | $63,873,000.00 | 015054782 |
| JRM Construction Management, LLC | Purchase Order #: 40-059594- Trade Package: French/Mansard Foundation and Superstructure Concrete Work - 2616-00 422 Fulton Street, Brooklyn, NY | $5,126,856.00 | 015054786 |
| Tishman Construction Corporation of New York | Hurricane Sandy Residential Community Recover, Package 21: APP-021326, 001474, 004798,007324, 009055 | $1,690,000.00 | 015052662 |
| Tishman Construction Corporation of New York, One Vanderbilt Owner LLC, Wells Fargo Bank, N.A. | Superstructure Concrete - One Vanderbilt Avenue, New York, NY 10017 | $135,926,646.00 | 015052680 |
| New York City Housing Authority | Contract No. GR1429259- Smith Houses - Restoration Associated with the Sandy Recovery Program | $51,333,000.00 | 015049455 |
| Tishman Construction Corporation of New York | Hurricane Sandy Residential Community Recovery Package #33: APP-020379, APP-025351,APP006938,APP-007637, APP-013473, APP-020086 and App-020258 | $5,782,300.00 | 015052666 |
| Gotham Construction LLC | 250 Ashland Place BAM PROJECT - Gotham Job #817- Brooklyn, NY-Subcontract No. 817-04200-000 | $7,500,000.00 | 015043070 |
| Tishman Construction Corporation of New York, BOP NE Tower Lessee LLC c/o Brookfield Financial Properties LP | Manhattan West - Northeast Tower, New York, NY - Superstructure Concrete | $144,000,000.00 | 015049450 |
| Triton Structural Concrete Inc. | New Construction of the Hunters Point/Queens West Library - Borough of Queens - FMS ID No. LQD122-QW-1 | $480,000.00 | 015049452 |
| New York City Housing Authority | GR1429250- Astoria Houses -Restoration Associated with the Sandy Recovery Program | $54,789,210.00 | 015049449 |
| SLSCO Ltd | SLS BIBSI NAV0003 App #013996 L. Barbely 716 Liberty Avenue, Staten Island, NY | $1,252,784.21 | 015050611 |
| SLSCO Ltd | SLS BIBSI NAV0001 App #000778 M. Taylor 68 McLaughlin Street, Staten Island, New York | $2,017,518.32 | 015050609 |

**Exhibit G**
**Bonded Contracts**

| Obligees | Bond/Project Description | Original Penal Sum | Bond Number |
|---|---|---|---|
| Triborough Bridge and Tunnel Authority | Miscellaneous Construction on a as-needed basis at Various Bridge and Tunnel Facilities - GFM-516 H | $2,000,000.00 | 015052677 |
| New York City Housing Authority | contract no. -GR1429268 - Ocean Bay Apartments (Oceanside) -Restoration Associated with the Sandy Recovery Program | $53,900,000.00 | 015049444 |
| The City of New York Department of Environmental Protection | Registration #20141404086, Contract: HRP-JOC-10, Pin: 82613B0049, NYC Housing Rehabilitation Program Region 10 | $1,000,000.00 | 015041111 |
| Tishman Construction Corporation of New York | Hurricane Sandy Residential Community Recovery Package 22: APP-012479, AP-022616, AP-006482 and AP-011589 | $1,795,000.00 | 015052664 |
| NYCHA | Contract No. BW1507030, Masonry repairs, Roofing and parapet replacement. | $33,113,151.00 | 015047275 |
| New York City Housing Authority | (CDBG-DR) - Contract No. GR1429248 - Restoration Associated with the Sandy Recovery Program - LaGuardia Houses | $19,420,000.00 | 015054768 |
| New York City School Construction Authority | SCA 17-025184-2 Lease Renovation Interior Build-out at Educational Campus @K280 (Brooklyn) | $15,400,000.00 | 015054779 |
| SLSCO Ltd | SLS BIBSI NAV0005 App #017206 J. Paul 423 Hamden Avenue, Staten Island, NY | $1,075,104.12 | 015050613 |
| Lend Lease (US) Construction LMB Inc., (f/k/a Bovis Lend Lease LMG, Inc. | 252 E. 57th Street | $54,200,000.00 | 015043072 |
| New York City Housing Authority | GR1508571 - Restoration Associated with the Sandy Recovery Program Redfern Houses | $92,287,000.00 | 015052685 |
| SLSCO Ltd | SLS BIBSI NAV0005 App #023424 J. Paul 135 Beachview Avenue, Staten Island, NY | $1,199,850.33 | 015050614 |
| Bayside Land Lease Corp., as beneficial owner, and NYCHA RAD I Housing Development Fund Corporation, as nominal owner | Ocean Bay (Bayside), Rockaway-Queens, NY. Contractor's individual portion of the Project is Reinforcement and Waterproofing of Masonry Walls at Existing Buildings | $5,168,059.65 | 015052679 |
| SLSCO Ltd | SLS BIBSI NAV0002 App #008102 G. Borg 175 Kiswick Street, Staten Island , NY | $1,252,784.21 | 015050610 |
| GCT Constructors, JV | Grand Central Terminal Concourse Contract CM014B | $2,500,000.00 | 015049437 |
| | | | |
| **TOTAL BONDED CONTRACTS** | | **$764,432,072.29** | |

**EXHIBIT B**

**<u>Note</u>**

<u>PROMISSORY NOTE</u>

Principal Amount:  $135,000,000

Effective Date:  November ___, 2017

Secured by a first priority, perfected and indefeasible lien on and security interest in all of Navillus Tile, Inc.'s assets directly related to the Bonded Contracts (as defined in the Financing Agreement).[1]

FOR VALUE RECEIVED, the undersigned, Navillus Tile, Inc., d/b/a Navillus Contracting ("Navillus"), Donal O'Sullivan and Kathleen O'Sullivan (individually and collectively, jointly and severally, hereinafter referred to as the "Maker"), hereby jointly and severally and unconditionally promise to pay to the order of Liberty Mutual Insurance Company (the "Payee"), in lawful money of the United States of America and in immediately available funds, all amounts that may be advanced by the Payee pursuant to a written "Financing Agreement" dated November ___, 2017, between the Maker and the Payee, up to the principal sum of ONE HUNDRED THIRTY FIVE MILLION AND 00/100 DOLLARS ($135,000,000) (hereinafter referred to as the "Loan"), together with interest, fees and other expenses, if any, as set forth below.

1.    **Repayment.**

(a)    On or before the date that is three (3) years after the Effective Date (hereinafter, the "Maturity Date"), the Maker shall make full and final payment to the Payee of the principal balance amount of this Note, accompanied by payment of all accrued and unpaid interest, fees, expenses and other sums due and owning under this Note, if any.

(b)    The outstanding principal balance of this Note (together with all unpaid accrued interest, fees, expenses and other sums due and owing under this Note, if any) shall immediately become due and payable upon the occurrence of any Event of Default.

(c)    Should the indebtedness represented by this Note or any part hereof be collected at law or in equity, or in bankruptcy, receivership, or any other court proceeding, or should this Note be placed in the hands of attorneys for collection upon default, the Maker agrees to pay, in addition to the principal and interest due and payable thereon, all costs of collecting or attempting to collect this Note, including reasonable attorneys' fees and expenses.

(d)    This Note shall be and remain in full force and effect and in no way impaired until the actual payment thereof to the Payee, its successors or assigns.

2.    **Interest.**    Interest on any advance made by Payee to Maker under the Loan shall accrue from the date of each such advance.  So long as there is no Event of Default, as defined below, interest shall so accrue at the rate of three percent (3%) per annum. Quarterly payments of

---

[1] To the extent of any conflict between the terms of this Note and the terms of the Financing Agreement, the terms of the Financing Agreement shall control.

accrued interest on any advance shall be made by Maker to Payee on each December 31st,  March 31st, June 30th, and September 30th.

3.      **Prepayment.**  This Note may be prepaid in whole or in part at any time without premium or penalty.  All partial payments shall be applied first against accrued and unpaid interest and then against outstanding principal.

4.      **Default.**

A "DIP Financing Default" as defined in the Financing Agreement referenced above shall constitute an "Event of Default" hereunder.   In addition, the failure to make any payment required by paragraph 2 above without curing such failure within ten (10) days of the Maker's receipt of notice thereof shall constitute an "Event of Default" hereunder.   Should an Event of Default occur, all amounts outstanding hereunder shall become immediately due and payable, and shall accrue interest at the rate of nine (9%) percent per annum (the "Default Rate").   Notice under this paragraph shall be deemed made and received when sent by or on behalf of the Payee by email to:

If to Navillus:                          Navillus Tile, Inc.
                                         Attn:  Donal O'Sullivan
                                         633 Third Avenue, 17th Floor
                                         New York, New York  10017
                                         dosullivan@navillusinc.com

With a copy to:                          Cullen and Dykman LLP
                                         Attn:  C. Nathan Dee, Esq.
                                         100 Quentin Roosevelt Boulevard
                                         Garden City, New York  11530
                                         ndee@cullenanddykman.com

If to Donal O'Sullivan or:               Navillus Tile, Inc.
Kathleen O'Sullivan                      Attn:  Donal O'Sullivan
                                         633 Third Avenue, 17th Floor
                                         New York, New York  10017
                                         dosullivan@navillusinc.com

If to Liberty Mutual                     Liberty Mutual Insurance Company
Insurance Company:                       Attn:  James D. Gibson
                                         2200 Renaissance Blvd.
                                         Suite 400
                                         King of Prussia, PA  19406-2755
                                         JamesD.Gibson@LibertyMutual.com

With a copy to:                 Chiesa Shahinian & Giantomasi PC
                                Attn:  Adam P. Friedman, Esq.
                                One Boland Drive
                                West Orange, NJ  07052
                                afriedman@csglaw.com.

5.      **Miscellaneous.**

        (a)     The Maker hereby waives the right to any jury trial in any action, proceeding or counterclaim brought against the Maker under this Note.

        (b)     The Maker's obligations under this Note shall not be subject to any setoff or recoupment.  In any proceeding under this Note, the Maker covenants not to plead or interpose any counterclaims or crossclaims, and shall not raise any defense other than actual payment.

        (c)     The Maker acknowledges this Note is secured by all assets of Navillus Tile, Inc. related to the Bonded Contracts (as defined in the Financing Agreement).

        (d)     This Note is binding upon the Maker and their successors, assigns, heirs and representatives and shall inure to the benefit of the Payee and its successors and assigns.

        (e)     This Note and the rights and obligations of the parties hereto shall be governed by the law of the State of New York, without regard to conflicts of law principles.  Any suit, action, or proceeding arising out of or relating to this Note shall be brought in a federal court with competent jurisdiction within the Southern District of New York; if no such court exists, then any such suit, action, or proceeding shall be brought in the commercial division of an appropriate state court located in New York County.  The Parties accept the jurisdictions of such courts for the purpose of any such action, suit, or proceeding.

        (f)     The Maker has had the opportunity to review this Note with the Maker's own counsel, and agrees that the doctrine of contra proferentem shall not apply to this Note.  Rather, the Note shall be interpreted in favor of securing the rights of the Payee to repayment in full. The Maker hereby waives and release all claims and/or defenses against Payee, including all of its affiliates, predecessors in interest, parent corporations, subsidiaries, successors-in-interest and assigns and all of Payee's present and future directors, officers, employees, agents and attorneys, from any and all claims, causes of action, suits and damages (including claims for attorneys' fees) which any or all of the Makers ever had or now has as of the Effective Date of this Note against any or all of said parties whether arising out of this Note, the Financing Agreement, or any other matter, even if unrelated to the subject matter of the referenced agreements.

        (g)     This Note may not be changed orally, but only by an agreement in writing, signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

        (h)     In the event that any Maker fails to sign this Note, or if any Maker's signature is invalid or nonbinding for any reason (including but not limited to invalidity under the

3

Bankruptcy Code), this Note shall nevertheless be and remain binding and enforceable as to all other Makers.

PRIOR TO SIGNING THIS NOTE, THE MAKER READ AND UNDERSTOOD ALL OF THE PROVISIONS OF THIS NOTE.  THE MAKER AGREES TO THE TERMS OF THE NOTE.

THE MAKER ACKNOWLEDGES RECEIPT OF A COMPLETED AND FULLY-EXECUTED COPY OF THIS NOTE.

In WITNESS WHEREOF, the undersigned has cause this Note to be duly executed by its authorized officers, members, managers or individuals, as applicable, as of the day and year above written.


**NAVILLUS TILE, INC.**


By: _____
       Donal O'Sullivan, President




_____
**DONAL O'SULLIVAN**




_____
**KATHLEEN O'SULLIVAN**



**LIBERTY MUTUAL INSURANCE COMPANY**


By: _____

4

## **Exhibit 3**

**BUDGET**

**[TO BE PROVIDED]**