Hearing Date: December 19, 2017 at 2:00 p.m.
Objections Due: December 6, 2017
Reply Due: December 13, 2017

Kennedy, Jennik & Murray, P.C.
113 University Place
New York. New York 10003
Telephone: (212) 358-1500
Facsimile: (212) 358-0207

Attorneys for Metallic Lathers & Reinforcing Ironworkers, Local 46
And Cement & Concrete Workers District Council, LIUNA

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
In re:                                              :    Chapter 11
                                                    :
Advanced Contracting Solutions LLC,                 :    Case No. 17-13147 (SHL)
                                                    :
              Debtor.                               :
------------------------------------------------------------x
In re:                                              :    Chapter 11
                                                    :
Navillus Tile Inc d/b/a Navillus Contracting        :    Case No. 17-13162 (SHL)
                                                    :
              Debtor.                               :
------------------------------------------------------------x

### MOTION OF METALLIC LATHERS AND REINFORCING IRONWORKERS, LOCAL 46 AND CEMENT & CONCRETE WORKERS DISTRICT COUNCIL, LIUNA FOR RELIEF FROM THE AUTOMATIC STAY UNDER § 362(d) OF THE CODE

### INTRODUCTION

1.  These related chapter 11 bankruptcy cases were filed because of a judgment obtained in *Moore v. Navillus Tile, Inc.* No. 14-CV-8326 (S.D.N.Y.) by four groups of employee benefit funds ("*Moore* Plaintiffs").[1] (ACS Dkt. No. 2, ¶¶ 17-18; Navillus Dkt. No. 7 at 3-6.) In

---

[1] The employee benefit funds which brought the *Moore* action are: Metal Lathers Local 46 Pension Fund, Metal Lathers Local 46 Trust Fund, Metal Lathers Local 46 Annuity Fund, Metal Lathers Local 46 Vacation Fund, Metal Lathers Local 46 Apprenticeship Fund, and Metal Lathers Local 46 Scholarship Fund (collectively, "Local 46 Funds"); Cement & Concrete Workers Pension Trust Fund, Cement & Concrete Workers Welfare Trust Fund, Cement &

pertinent part, the decision in *Moore* found that Advanced Contracting Solutions, LLC ("ACS") and Navillus Tile Inc. ("Navillus") "are, and always have been, alter egos." (Ex. A at 76 (emphasis added).) On September 22, 2017, a judgment was entered jointly and severally against Navillus and ACS for $73.4 million ("Judgment"). (Ex. B.)

2. Two of the unions which sponsor the funds which brought the *Moore* action – Metallic Lathers and Reinforcing Ironworkers Local 46 ("Local 46") and Cement & Concrete Workers District Council, LIUNA ("Cement Workers") (collectively, "Unions") submit this motion for relief from the automatic stay to allow the Unions to process a grievance alleging that Navillus has violated, and is continuing to violate, its collective bargaining agreements ("CBAs") with the Unions ("Motion"). The grievances that the Unions intend to file allege two distinct claims:

(i) Navillus, and its alter ego entity ACS, violated the CBAs between Navillus and the Unions by failing to make contributions to the Local 46 and Cement Workers Funds for the work which has been and is being performed by ACS after the filing of these chapter 11 cases;[2] and

(ii) Navillus, and its alter ego ACS, have violated the CBAs between Navillus and the Unions by failing to make contributions to the Local 46 and Cement Workers

---

Concrete Workers Annuity Trust Fund, Cement & Concrete Workers Scholarship Trust Fund, and Cement & Concrete Workers Training and Education Trust Fund (collectively, "Cement Workers Funds"); Cement Masons' Local 780 Trust Fund, Cement Masons' Local 780 Pension Fund, Cement Masons' Local 780 Annuity Fund, Cement Masons' Local 780 Vacation Fund, and Cement Masons' Local 780 Apprenticeship Fund (collectively, "Local 780 Funds"); and New York City District Council of Carpenters Pension Fund, New York City District Council of Carpenters Welfare Fund, New York City District Council of Carpenters Apprenticeship Journeyman Retraining, Educational and Industry Fund, and the New York City District Council of Carpenters Annuity Fund (collectively, "Carpenters Funds"). All of the plaintiff funds in the *Moore* case will be referred to as "*Moore* Plaintiffs."

[2] The petition *In re Advanced Contracting Solutions, LLC*, was filed on November 6, 2017; the petition in *In re Navillus Tile, Inc.* was filed on November 8, 2017.

2

    Funds for the work ACS performed from June 22, 2016 through the filing of these chapter 11 cases.

3. This Motion to lift the automatic stay should be granted for three reasons: (i) actions on claims that arise after the commencement of the case are not subject to the automatic stay, *see Collier on Bankruptcy* ¶ 3-362.03[3](c); (ii) a union's resort to the grievance and arbitration process under its collective bargaining agreements is not subject to the automatic stay, *Shugrue v. Air Line Pilots Association, International (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984, 993 (2d Cir. 1990); and (iii) the grievance and arbitration process is the most efficient and timely method of liquidating the remaining claims of the Unions, and the Local 46 and Cement Workers Fund against Navillus and its alter ego, ACS.

4. The ability to craft an efficient and timely process to resolve these claims is particularly important given the looming prospect of administrative insolvency that hovers over the ACS case, as discussed at the hearing in the ACS case on November 21, 2017.

5. Navillus is no stranger to the grievance and arbitration process under its CBAs, having engaged in a trade board and arbitration with Local 46 in 2012. (Exs. C and D.) The matter was completed much more quickly and at far less cost than would have been the case if the matter was resolved in court litigation. The Supreme Court has repeatedly emphasized the federal policy favoring arbitration as the best alternative for resolving disputes arising under CBAs. *Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364, 371-72 (1984); *Gateway Coal Co.* v. *Mine Workers*, 414 U.S. 368, 378-79 (1974); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960).

6. The Unions acknowledge that only the Bankruptcy Court can make a determination whether any contributions found owing based on covered work hours performed

3

by ACS are administrative expenses pursuant to Section 503 of the Bankruptcy Code. The Unions are not seeking to deprive the various constituencies to these Chapter 11 proceedings of their opportunity to contend that even if it is determined that benefit fund contributions are owed by Navillus and/or ACS for covered work hours performed by ACS as an adjudicated alter ego of Navillus, the Bankruptcy Court must determine whether such obligation satisfies the standards of Section 503 for either or both debtors.

## RELEVANT FACTS

**THE JUDGMENT**

7.     In 2014, the *Moore* Plaintiffs commenced an action in the Southern District of New York to recover damages from Navillus, ACS and others, on the grounds that ACS was started as, and continued at all relevant times, to be an alter ego of Navillus. (Navillus Dkt. No. 7 at 3.) Navillus is a concrete contractor that had collective bargaining agreements with the Unions that covered the work being performed by ACS. (Ex. A at 6, 9-12.) A trial was held in that action in August, 2017 and on September 20, 2017, Chief Judge Colleen McMahon issued her decision in which she squarely ruled that ACS was, in fact, an alter ego of Navillus ("Decision"). (Ex. A at 76.)

8.     On September 22, 2017, the Clerk entered the Judgment finding ACS to be jointly and severally liable with Navillus for unpaid contributions to the *Moore* Plaintiffs in the amount of $73.4 million. (Ex. B.)

9.     The Decision found that the alleged principals of ACS had engaged in repeated fraudulent activity and had lied to the Court regarding the ownership of ACS and its relationship to the principal of Navillus. (Ex. A at 74-75.)

4

**ACS AND NAVILLUS ARE ACCUMULATING SIGNIFICANT ADMINISTRATIVE DEBTS TO THE *MOORE* PLAINTIFFS**

10. The *Moore* Plaintiffs sought, and the Decision and Judgment imposed, joint and several damages against Navillus and ACS for the period July 1, 2013 to June 21, 2016. (Ex. A at 78.) ACS has continued to perform work covered by the Navillus contracts with Local 46 and the Cement Workers (i) after June 21, 2016 through the filing of the chapter 11 petitions by ACS and Navillus on November 6 and 8, 2017, respectively; and (ii) after the filing of the petitions until today.

11. ACS has advised the Court that it is currently engaged on fifteen (15) construction jobs across New York City and that estimated future revenues from ACS's ongoing jobs is approximately $100,000,000. (ACS Dkt. No. 2, ¶ 10.) In its emergency motion to allow payment of pre-petition wages, ACS admitted that it contributes toward the cost of medical insurance <u>for salaried personnel only</u>. (ACS Dkt. No. 4, ¶ 13.) The 450 hourly employees of ACS are "offered access to Medical Benefits, the costs of which are deducted from their Prepetition Wages" and it is likely that very few, if any, of its hourly construction employees receive any health benefits because the total monthly premiums paid by ACS is only $11,717.27 which, when spread over its 22 salaried employees, represents an average of only $532 per month. (*Id.*, ¶ 14.) In addition to its total failure to pay health benefits to its hourly employees, ACS explains that it "<u>maintains a paid time off policy for Salaried Employees only</u>" to be used for vacation, sick or personal days. (*Id.*, ¶ 15.) Needless to say, ACS does not provide any pension benefits to its hourly employees.

12. ACS is thus currently working on $100,000,000 in concrete construction projects, doing work that is covered by the Union CBAs, for which it is paying nothing towards the costs

of its hourly employees medical, dental, vision, vacation, holiday, sick leave or pension benefits and for which it is not making contributions to the Local 46 and Cement Workers Funds.

13. This tight-fisted approach to employee benefits is not compelled by a lack of resources: the Statement of Financial Affairs filed by ACS identifies the following payments to ACS insiders in the preceding year:

- $9,510,443 to TMG Contracting, which is owned by ACS owner Eoin Moriarty;
- $930,000 in payments to TMG Solutions, which is owned by ACS owner, Eoin Moriarty;
- $894,792 in payments to, or for the benefit of, ACS owner, Eoin Moriarty; and
- $1,413,000 to, or for the benefit of, ACS owner, Willie O'Donnell.

(ACS Dkt. No. 52 at 45-48.)

14. ACS will fall further in debt to the *Moore* Plaintiffs each month after the filing of these chapter 11 petitions as it continues to perform work covered by the Union CBAs. While the exact number of covered hours being worked is not known to the Unions, or to the Local 46 and Cement Workers Funds, the weekly payroll is represented to be $710,000. (ACS Dkt. No. 4, ¶ 10.) It is likely that the contributions that would be required for the hours being worked is an equivalent amount. In *Hassen Imports Partnership v. City of West Covina (In re Hassen Imports Partnership)*, No. 2:11-42068, 2013 Bankr. LEXIS 3870 (B.A.P. 9th Cir. Aug. 19, 2013), the appellate panel upheld the bankruptcy court's finding of cause to convert a case to chapter 7 because there was a substantial and continuing loss to the estate. *Id.* at *40-41. The bankruptcy court determined that the debtor's failure to pay $175,000 in post-petition property taxes and its substantial accrual of administrative expenses were a continuing diminution of the estate. *Id.* at *40-41.

6

**THE COLLECTIVE BARGAINING AGREEMENTS**

15. Article X of the contract between the Building Contractors Association ("BCA") and the Cement Workers to which Navillus is bound ("Cement Workers BCA CBA") requires that Navillus make contributions to various employees benefit funds for each hour of covered work performed. (Ex. E at 17-26.) The contributions currently required to be made to the Cement Workers Funds for a journeyman are $25.76 for each covered hour worked. (Ex. F.)

16. Article XIV, Section 1 of the contract between the BCA and the Cement Workers provides for the resolution of disputes arising under the contract, as follows:

> All complaints, disputes and differences arising under this agreement between the Association and the Union or between any Employer and any Employee shall be referred to the Joint Trade Board of THE BUILDING CONTRACTORS ASSOCIATION and CEMENT AND CONCRETE DISTRICT COUNCIL. Should the Joint Trade Board fail to reach a decision, the matter shall be referred to an umpire as set forth in Section 3 of the Article. The Joint Trade Board and/or the umpire are hereby empowered to hear, adjust and decide the matter at issue and a decision by either of these two agencies shall be final and binding on all parties.

(Ex. E at 34.)

17. The Local 46 contract with the BCA contains similar provisions.

18. On October 25, 2017, the Cement Workers presented to the BCA a request for a Trade Board asserting that ACS, as the alter ego of Navillus, is required to, *inter alia,* make contributions to the Cement Workers Funds, as required by the Cement Workers BCA CBA for the job at 1059 Third Avenue. (Ex. G.) Since these petitions were filed, that request has been held in abeyance. When the mandatory stay is lifted, Local 46 and the Cement Workers will each file grievances that Navillus and ACS violated the Local 46 and Cement Workers BCA CBAs by failing to make contributions to the Local 46 and Cement Workers Funds for all of the covered work that ACS is performing and, if the matter is not resolved at the Trade Board, arbitration

requests pursuant to their collective bargaining agreements seeking the relief set forth in paragraph 2 of this Motion.

## ARGUMENT

19.    Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a), provides for a stay of virtually all actions against the debtor's estate, as follows:

> Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title [11 USCS § 301, 302, or 303], or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970 [15 USCS § 78eee(a)(3)], operates as a stay, applicable to all entities, of—
>
> > (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
> >
> > (2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title.

20.    Section 362(d) of the Code, 11 U.S.C. § 362(d), provides for relief from the stay as follows:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> > (1) for cause, including the lack of adequate protection of an interest in property of such party in interest.

### I.    THE AUTOMATIC STAY DOES NOT APPLY TO POST-PETITION OBLIGATIONS.

21.    The automatic stay rule is limited to actions that could have been instituted before the petition was filed or that are based on claims that arose before the petition was filed. 2 *Collier on Bankruptcy* ¶ 362.04[1] (L. King 15th ed. 1989). It does not apply to claims arising post-petition. *Bellini Imports, Ltd. v. Mason & Dixon Lines, Inc.*, 944 F.2d 199, 201 (4th Cir.

8

1991); *Grady v. A.H. Robins Co.*, 839 F.2d 198, 200 (4th Cir. 1988); *Rodriguez v. Biltoria Realty LLC*, 203 F. Supp. 2d 290 ( E.D.N.Y. 2001); *Weymouth v. York (In re York)*, 13 Bankr. 757 (Bankr. D. Me. 1981).

22. One issue which will be raised in the proposed grievances relates to the obligations of Navillus and ACS to make contributions to the Local 46 and Cement Workers Funds for the time after the chapter 11 petitions were filed in these cases. It would be inefficient, and could result in conflicting decisions, if the pre-petition and post-petition liability of Navillus and ACS were decided in different fora since the effect of the September 22, 2017 judgment is the same for both periods.

## II. THE AUTOMATIC STAY DOES NOT APPLY TO COLLECTIVE BARGAINING AGREEMENT GRIEVANCES OR ARBITRATION.

23. Section 1113 of the Bankruptcy Code prohibits the modification of a collective bargaining agreement unless its requirements are met. Section 1113(f) provides: "No provision of this title [11 U.S.C. §§ 101 *et seq.*] shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section." 11 U.S.C. § 1113(f).

24. The Second Circuit has held that "an arbitration brought pursuant to a provision in a collective bargaining agreement is not subject to the automatic stay since its application would allow a debtor unilaterally to avoid its obligation to arbitrate." *Ionosphere*, 922 F.2d at 993. In *Ionosphere,* the Air Line Pilots Association sought relief from the automatic stay to commence an arbitration against Eastern Air Lines which was in bankruptcy. The Court considered the purposes and legislative history of both §§ 1113 and 362, and concluded that where a "collective bargaining agreement expressly provides for arbitration as the method of dispute resolution" the § 1113 prohibition on unilateral modification of any provision of the CBA applies to arbitration

9

clauses. 922 F.2d at 992; *see also Antol v. Esposto*, 100 F.3d 1111, 1121 n.4 (3d Cir. 1996); *In re Pearl Cos.*, 10-BR-19336, 2010 Bankr. LEXIS 2896 (Bankr. S.D. Fla. Sept. 2, 2010); *In re Chestnut Hill Rehab Hosp.*, 387 B.R. 285, 291 (Bankr. M.D. Fla. 2008) ("A debtor's agreement to arbitrate cannot be modified absent compliance with §1113(f)."); *In re Marine Pollution Services*, 88 B.R. 588 (S.D.N.Y.) *rev'd on other grounds*, 857 F.2d 91 (2d Cir. 1988).

25.     Moreover, no other Code provision may be used by the debtor to achieve the result of blocking arbitration. *See, e.g.*, *In re Bob's Supermarkets*, 118 B.R. 783 (Bankr. D. Mont. 1990) (§§ 362, 365, 501 and 502 are all nullified by § 1113(f) as related to labor arbitration); *cf. In re Cedar Rapids Meats*, 117 B.R. 448 (Bankr. N.D. Iowa 1990) (general equitable powers of § 105 are useless to prevent arbitration; the court has no authority to use equitable powers to violate § 1113).

26.     In addition, courts have become more sympathetic to motions to lift the stay to permit arbitration proceedings to go forward pursuant to contracts other than CBAs. *Hays and Co. v. Merill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149 (3d Cir. 1989); *In re RDM Sports Group,* 260 B.R. 905, 913 (Bankr. N.D. Ga. 2001); *In re Chorus Data Systems, Inc.*, 122 B.R. 845 (Bankr. D.N.H. 1990); *see also In re U.S. Lines, Inc.*, 197 F.3d 631, 640-41 (2d Cir. 1999); *In re National Gypsum Co.*, 118 F.3d 1056, 1064 (5th Cir. 1997).

27.     The District Court conclusively ruled that "ACS and Navillus are, and always have been, alter egos." (Ex. A at 76.) The District Court also found that ACS and Navillus are jointly and severally liable for damages attributable to the work of ACS in the amount of $73.4 million. (*Id.* at 93-95.) The damages award covered the period July 1, 2013 to June 21, 2016, the period which was stipulated to by the parties in order to be able to quantify the damages. (*Id.* at 78.)

28. While normally a nonsignatory cannot be required to arbitrate under a CBA, the Second Circuit has "made clear that a nonsignatory party may be bound to an arbitration agreement if so dictated by the 'ordinary principles of contract and agency.'" *Thomson-CSF. S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) (quoting *McAllister Bros., Inc. v. A&S Transp. Co.*, 621 F.2d 519, 524 (2d Cir. 1980)). The Second Circuit has recognized five theories for binding nonsignatories to arbitration agreements: 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel. *Thomson-CSF*, 64 F.3d at 776; *see also Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (explaining that "'traditional principles' of state law allow a contract to be enforced by or against nonparties through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel") (internal quotations and citation omitted). These principles have been applied in the context of labor contracts. *Century Vertical Systems, Inc. v. Local No. 1, Int'l Union of Elevator Constructors*, 379 F. App'x 68, 70 (2d Cir. 2010) ("It is well established that in appropriate circumstances a successor employer can be bound by an arbitration provision contained in a CBA entered into by the predecessor employer. These circumstances include, but are not limited to, those cases where the contracting employer disappears into another by merger, where the successor company expressly or impliedly assumes the CBA, and where the successor employer is an alter ego of the predecessor employer.") (internal quotations and citations omitted); *Trs. of the I.B.E.W Local Union No. 488 Pension Fund v. Norland Elec., Inc.*, No. 3:11-CV-709, 2013 U.S. Dist. LEXIS 28576, at *13-14 (D. Conn. Mar. 1, 2013).

29. In *Local Union No. 38, Sheet Metal Workers' International Association v. Custom Air Systems*, 357 F.3d 266, 268 (2d Cir. 2004), the Second Circuit stated:

11

>This case turns on the theory of alter ego, a doctrine that "provides an analytical hook to bind a non-signatory to a collective bargaining agreement." *Truck Drivers Local Union No. 807, I.B.T. v. Regional Imp. & Exp. Trucking Co.*, 944 F.2d 1037, 1046 (2d Cir. 1991). <u>A district court's independent determination of alter ego signifies that, for all relevant purposes, the non-signatory is legally equivalent to the signatory and is itself a party to the CBA</u>. *See id.*, *Southport Petroleum Co. v. NLRB,* 315 U.S. 100, 106 (1942); *Goodman Piping Products, Inc. v. NLRB*, 741 F.2d 10, 11 (2d Cir. 1984) (per curiam).

(Emphasis added). Here, the District Court made the determination that ACS is, and always has been, the alter ego of Navillus. Therefore, ACS can be required to arbitrate whether it is bound to make payments to the Local 46 and Cement Workers Funds under the Unions' CBAs with Navillus.

30.     This conclusion is bolstered by the congressional policy in favor of "settlement of disputes by the parties through the machinery of arbitration." *Warrior & Gulf*, 363 U.S. at 582-83. The Supreme Court cautioned that the court's role "must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance," and doubts should be resolved in favor of arbitration. *Id.* at 582. "An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id*. at 582-83. Here, it is clear that the contracts between Navillus and the Unions require contributions to be made to the Local 46 and Cement Workers Funds for covered work performed by Navillus, and its alter ego.

**III.    THE STAY SHOULD BE LIFTED TO PERMIT THESE GRIEVANCES AND ARBITRATIONS TO PROCEED UNDER THE *SONNAX* STANDARDS.**

31.     The Second Circuit has adopted the factors, first put forth in *In re Curtis*, 40 Bankr. 795 (Bankr. D. Utah 1984), to be weighed in deciding whether litigation should be permitted to continue in another forum: (1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized

12

tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms. *See id.* at 799-800; *In re Sonnax Indus.*, 907 F.2d 1280, 1286 (2d Cir. 1990).

32. Application of the relevant factors to this case shows that the stay should be lifted:

(1) granting the relief, though it would not resolve the Judgment, would resolve the obligation of ACS to abide by the Union CBAs into the future;

(2) the Judgment is the central issue in this bankruptcy case, and Local 46 and the Cement Workers are entitled to arbitrate the ongoing obligation of Navillus and ACS to abide by the CBA;

(3) the grievance and arbitration proceeding would not involve the Debtors as fiduciaries and so this factor is irrelevant;

(4) the Trade Board is a specialized tribunal with the necessary expertise to hear the claim that the CBAs were violated;

(5) Local 46 and the Cement Workers do not believe that the Debtors' insurers have assumed responsibility for defending ACS and Navillus in an arbitration proceeding;

(6) the arbitration primarily involves Navillus and ACS, as well as third parties to this bankruptcy case: Local 46 and the Cement Workers;

(7) the Unions seek to arbitrate the ongoing obligation of ACS to make contributions to the Local 46 and Cement Workers Funds, and therefore their interests would be protected by such an arbitration. Concededly, if the arbitration results in an award to the Unions, there would be less money available to creditors other than the *Moore* Plaintiffs. However, because the claims of the *Moore* Plaintiffs constitute virtually all of the claim pool, any action taken by the *Moore* Plaintiffs to protect the Judgment will necessarily disadvantage other creditors;

(8) the Unions' claim to arbitrate the obligations of Navillus and ACS under the CBAs is not subject to equitable subordination because the Unions have no control over Navillus and ACS;

(9) the Unions' success in an arbitration proceeding would not result in judicial liens avoidable by the Debtor because the Unions are not seeking a lien and any damages resulting from the arbitration proceeding would not be avoidable by Navillus and ACS;

(10) the interests of judicial economy and the expeditious and economical resolution of litigation favor proceeding in the arbitral forum, which is less costly and more expedited than a court action, and eliminates the risk that conflicting decisions could be rendered by different fora with regard to the pre-petition and post-petition liability of Navillus and ACS, as discussed in paragraph 21, *supra*;

(11) the Trade Board and arbitration proceeding would be more expeditious than raising the claims in a court forum and would be resolved more quickly; and

(12) the impact of the stay on the Unions is to deny them the right to protect their CBAs and to obtain moneys for the *Moore* Plaintiffs, who may be able to collect only a fraction of the Judgment as a result of this bankruptcy case.

33. While counsel for ACS has asserted that an award requiring it to make ongoing payments to the Local 46 and Cement Workers Funds would make it administratively insolvent, the balance of harms, nonetheless, favors the Unions. ACS and Navillus brought this situation upon themselves by attempting to cover up their alter ego relationship and by lying to the *Moore* Plaintiffs, third parties, and, most egregiously, to the District Court. The Unions should not be deprived of the right to enforce the CBAs because the actions of Navillus and ACS have put them in a difficult financial position.

## **NOTICE**

34. Notice of this Motion has been given by email, facsimile or overnight mail of a copy to (a) the United States Trustee for the Southern District of New York (Attn: Richard Morissey, Esq. and Paul Schwartzberg, Esq.); (b) counsel to Navillus Tile, Inc.; (c) counsel to Advanced Contracting Solutions, LLC; (d) Navillus' twenty (20) largest unsecured creditors; (e) counsel to Liberty Mutual Insurance Company; (f) ACS' twenty (20) largest unsecured creditors; (g) counsel to Signature Bank; (h) Citibank; (i) American Express; (j) Wells Fargo; (k) Wall Street Access; and (l) any other party who requests to receive notices. In light of the nature of the relief requested herein, the Unions submit that no other or further notice need be given.

35. No previous application for the relief sought herein has been made to this or any other Court.

## **CONCLUSION**

WHEREFORE, the Unions respectfully request entry of the Order annexed hereto as Exhibit "H" granting the relief requested herein, together with such other and further relief as the Court deems just and proper.

Dated: November 22, 2017
       New York, NY

                                          KENNEDY, JENNIK & MURRAY, P.C.

                                          By: _____/s/_____
                                              Thomas M. Kennedy
                                              Susan M. Jennik
                                              113 University Place, 7th Floor
                                              New York, New York 10003
                                              (212) 358-1500 Telephone
                                              (212) 358-0207 Facsimile