CULLEN AND DYKMAN LLP
100 Quentin Roosevelt Boulevard
Garden City, New York 11530
(516) 357-3700
C. Nathan Dee, Esq.
Elizabeth M. Aboulafia, Esq.

*Proposed Counsel to Navillus Tile, Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------x

In re:

NAVILLUS TILE, INC., DBA NAVILLUS
CONTRACTING

          Debtor.

Chapter 11
Case No. 17-13162 (SHL)

---------------------------------------------------------------------x

## MOTION OF NAVILLUS TILE, INC. FOR AN ORDER (I) AUTHORIZING THE DEBTOR TO (A) MAKE PAYMENTS TO ELIGIBLE EMPLOYEES UNDER THE PERFORMANCE BONUS PROGRAM AND (B) CONTINUE THE PERFORMANCE BONUS PROGRAM IN THE ORDINARY COURSE OF BUSINESS; (II) APPROVING THE KEY EMPLOYEE INCENTIVE PROGRAM; AND (III) GRANTING RELATED RELIEF

Navillus Tile, Inc. d/b/a Navillus Contracting, the above-captioned debtor and debtor-in-possession (the "Debtor" or "Navillus"), by and through its proposed attorneys Cullen and Dykman LLP, hereby submits this motion (the "Motion"), pursuant to sections 105, 363 and 503 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order (i) authorizing Navillus to (a) make payments to the Eligible Employees (defined herein) under its pre-petition performance incentive bonus program (the "Performance Bonus Program") in the ordinary course of business for prior periods including from April 1, 2016 through March 31, 2017 (the "Initial Incentive Period") and (b) continue the Performance Bonus Program in the

ordinary course of business for the period from April 1, 2017 through March 31, 2018 (the

"Current Incentive Period") and any subsequent Incentive Period (defined herein); (ii) approving

a key employee incentive program (the "KEIP") for the KEIP Participants (defined herein) for

the Current Incentive Period and any subsequent Incentive Period; and (iii) granting related

relief.  In support of the Motion, Navillus respectfully represents as follows:

### PRELIMINARY STATEMENT[1]

At Navillus, the Performance Bonus Program is of equal if not greater importance than

weekly paychecks, with the amounts payable under the Performance Bonus Program

representing more than fifty (50%) percent of annual income for some Eligible Employees.  It is

undeniable that failing to pay the amounts due under the Performance Bonus Program for the

Initial Incentive Period and continue the program on a going forward basis in the ordinary course

of business would destroy morale among the Eligible Employees and cause irreparable damage

to Navillus and the value of its estate.  To deprive the Eligible Employees of their Performance

Bonuses that were fully earned as of the Petition Date but had simply not been calculated on a

final basis would be manifestly inequitable, as the Eligible Employees rely on the Performance

Bonus Program as a substantial source of annual income.  Moreover, the program is a crucially

vital part of Navillus' historical profitability. At this critical time, Navillus requires its workforce

to be more incentivized than ever in order to enable Navillus to continue to progress its

construction projects during this chapter 11 case, attempt to obtain new work in the future and

exit chapter 11 on strong financial footing.

Moreover, this chapter 11 case is in its early stages and there remains significant work to

be done.  Navillus has therefore identified certain critical employees whose involvement is

---

[1] Capitalized terms used but not otherwise defined in this Preliminary Statement shall have the meanings ascribed to them in the sections of this Motion that follow.

necessary to maximize the value of the estate for the benefit of the creditors and requests approval of a KEIP during the Current Incentive Period based on the performance metrics described herein.

Navillus submits that a strong business justification exists for the payment of amounts due to Eligible Employees for the Initial Incentive Period and continuation of the Performance Bonus Program during this chapter 11 case because the Performance Bonus Program is an indispensable component of employee compensation at Navillus, and denying the Eligible Employees the compensation they have earned based on the quality of their performance during the Initial Incentive Period would not only cause significant personal financial harm for many Eligible Employees, but would also send a message to Navillus' workforce (and the marketplace as a whole) that is entirely inconsistent with the reorganization objectives that Navillus desires and fully intends to achieve in this chapter 11 case.

Under these circumstances, it is essential to provide a monetary incentive to those Eligible Employees whose knowledge, skills, experience and relationships are critical to the continuation of Navillus' sixty eight (68) open construction projects, the successful completion of which is a major component of Navillus' strategy to maximize the value of its estate for the benefit of creditors.  For the same reasons, Navillus believes that the KEIP should be approved as to the KEIP Participants whose efforts will directly contribute to the profitability of the business and the success of this chapter 11 case.

## **INTRODUCTION**

1.      On November 8, 2017 (the "Petition Date"), Navillus filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code.

2.      Navillus has remained in possession of its property and continues in the operation and management of its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.      On November 28, 2017, an official committee of unsecured creditors (the "Committee") was appointed by the Office of the United States Trustee for the Southern District of New York in this chapter 11 case.

4.      On the Petition Date, Navillus filed the Affidavit of Donal O'Sullivan pursuant to Local Bankruptcy Rule 1007-2 (the "O'Sullivan Affidavit"). A detailed factual background of Navillus' business and operations, as well as the events leading to the filing of this chapter 11 case, is more fully set forth in the O'Sullivan Affidavit, incorporated herein by reference.

## JURSIDICTION AND VENUE

5.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

6.      The statutory predicates for the relief sought herein are sections 105, 363 and 503 of the Bankruptcy Code and Bankruptcy Rule 6004.

## BACKGROUND

7.      Founded in 1987 as a small family-owned tile business, Navillus is now one of the largest subcontractors and general contractors in New York, serving primarily as a masonry and concrete subcontractor on large private and public construction projects in the New York metropolitan area. Although the size of its workforce fluctuates based on the volume of open construction projects, as of the Petition Date, Navillus employed approximately seven hundred

(700) individuals to provide labor in connection with approximately sixty eight (68) open construction projects as well as home office support in its Manhattan headquarters.

8.     Approximately sixty five (65) of Navillus' employees as of the Petition Date are non-union, salaried employees including, without limitation, management, project managers, project supervisors, estimators, accounting and other in-house administrative staff (the "Eligible Employees").[2]  The remaining approximately six hundred forty (640) of Navillus' employees as of the Petition Date are hourly union employees whose wages, benefits and other compensation are provided under the terms of the applicable union agreements.

### A.     The Performance Bonus Program

9.     Prior to the Petition Date, in the ordinary course of business, Navillus compensated its Eligible Employees through (a) base salary on a weekly basis and (b) cash bonuses earned under the Performance Bonus Program.  For some Eligible Employees, the cash bonus component comprises more than fifty (50%) percent of their annual income.  The Performance Bonus Program, which has been in place since at least 2010, is a critical component of employee compensation at Navillus which is disclosed to Eligible Employees at the time of hire which Eligible Employees rely on to supplement to their base weekly salary.

10.     On the Petition Date, Navillus filed a motion (the "Wage Motion" at Dkt. No. 8) seeking approval to, among other things, pay prepetition wage claims and approve certain employee benefit programs that have historically been maintained by Navillus for the benefit of its Eligible Employees, including the Performance Bonus Program.  Navillus ultimately did not request payment of any amounts related to the Performance Bonus Program through the Wage

---

[2] While the large majority of the Eligible Employees are salaried, non-union employees, a small percentage of the amounts payable under the Performance Bonus Program are paid to project foremen based on exceptional performance on Navillus' projects.  These project foremen are hourly, union employees.

Motion because the amounts due had not yet been calculated as of the date of the final hearing on the Wage Motion. The Wage Motion was approved by this Court on a final basis on December 1, 2017, thus ensuring that the Eligible Employees would continue to receive the base salary portion of their compensation on an uninterrupted basis. (See Dkt. No. 81).

11.     Accordingly, through this Motion, to provide the Eligible Employees with the balance of their compensation earned prior to the Petition Date, Navillus seeks, among other things, authority to pay the amounts due to the Eligible Employees under the Performance Bonus Program for the Initial Incentive Period in the aggregate dollar amount of approximately $3,698,925.99.[3]

12.     Navillus submits that the failure to pay the amounts due and owing to Eligible Employees under the Performance Bonus Program for the Initial Incentive Period would cause certain of the Eligible Employees to experience personal financial damage, thus having an extremely detrimental effect on employee morale that would carry over into construction operations and lead to a decline in the quality of work performed.

**B.     Description of the Performance Bonus Program**

13.     Prior to the Petition Date, Navillus has maintained the Performance Bonus Program in the ordinary course of business as an incentive program developed for the purpose of rewarding Eligible Employees for their performance and contribution to Navillus, providing the Eligible Employees with an incentivizing financial interest in the profitability of Navillus and

---

[3] Navillus intends to file as **Exhibit "1"** to this Motion a schedule listing each Eligible Employee and the amount proposed to be paid pursuant to the Performance Bonus Program for the Initial Incentive Period. Navillus intends to request authority to file such exhibit under seal with the Court with copy to the U.S. Trustee, counsel to Liberty and counsel to the Committee. In the interest of ensuring that its project-level and administrative, non-managerial office staff receive the Performance Bonuses earned for the Initial Incentive Period during this holiday season and prior to the end of the calendar year, Navillus is seeking approval of $2,763,355.59 due and owing to such project-level and administrative, non-managerial office staff at the hearing scheduled for December 20, 2017. Navillus is willing to defer consideration of the remaining $935,570.39 due and owing to senior management and officers to a later date to the extent necessary.

rewarding long-time employment with Navillus.  This objective is achieved by tying the success

of the company, through its individual projects, to the compensation of the Eligible Employees

who, directly and indirectly, are responsible for that success.

14.      In 2010, Navillus formalized its then-existing bonus program into the current

Performance Bonus Program based on a formula of multiple data-driven metrics which directly

correlate to project profitability on each of Navillus' open construction projects.      The

Performance Bonus Program is funded with a portion of net profits (the "Performance Bonus

Fund") derived from certain projects (the "Eligible Projects").

15.      A summary of the key terms of the Performance Bonus Program is as follows:

- **Eligible Employees**:  All full time non-union, salaried employees including, without
  limitation, management, project managers, project supervisors, estimators, accounting
  and other administrative staff, or any other position that Navillus deems to be eligible,
  including certain project foremen who are union members.[4] Navillus' President and
  Chief Executive Officer does not participate in the Performance Bonus Program.

- **Program Period**:  The amounts payable under the Performance Bonus Program have
  historically been assessed on or around September 30 for the period from April 1 of
  the prior year through March 31 of the following calendar year (the "Incentive
  Period").

- **Payment Terms**:  Once assessed and calculated, any Eligible Employee will be
  notified of the amount of their Performance Bonus earned for the Incentive Period.
  Payments under the Performance Bonus Program can be made at any time after
  November 30, either in full or in installments, at the request of each Eligible
  Employee upon approval by Navillus.  Historically, the Eligible Employees have
  requested repayment of amounts earned under the Performance Bonus Program
  during the holiday season to supplement their year-end income.

- **Performance Bonus Program Cost**:  The aggregate amount of all Performance Bonus
  Program payments proposed to be made to the Eligible Employees for the Initial
  Incentive Period is approximately $3,698,925.99.

---

[4] Any employee who terminates their employment with Navillus within six (6) months of the end of the Incentive
Period will not be eligible for any portion of the bonus for the prior and/or current Incentive Period, unless otherwise
agreed to by Navillus and in such circumstances that Navillus should see fit and proper.  Navillus is not seeking to
pay any amounts to terminated employees by this Motion.

- <u>Eligible Projects</u>:  All projects that are generally at least fifty (50%) percent complete as of the end of the Incentive Period.

- <u>Program Payment Metrics</u>:  Amounts payable under the Performance Bonus Program for a given Incentive Period are calculated pursuant to a waterfall formula (the "Formula")[5] which is applied to calculate the Performance Bonuses for project-level Eligible Employees (the "Adjusted Bonus Amount"). In the example below, the net profit margin on the illustrative example Eligible Project is assumed to be ten (10%) percent:

| Illustrative Example Based on $15,000,000 Contract Value ("CV") | | | | | | |
|---|---|---|---|---|---|---|
| CV Tier | Beginning | End | CV Calculation | Net Profit (10% Assumed) | Adjusted Bonus Percentage | Adjusted Bonus Amount |
| $100,000 | $0 | $100,000 | $100,000 | $10,000 | 20.0% | $2,000 |
| $500,000 | $100,001 | $500,000 | $400,000 | $40,000 | 17.5% | $7,000 |
| $1,000,000 | $500,001 | $1,000,000 | $500,000 | $50,000 | 13.0% | $6,500 |
| $2,500,000 | $1,000,001 | $2,500,000 | $1,500,000 | $150,000 | 11.5% | $17,250 |
| $5,000,000 | $2,500,001 | $5,000,000 | $2,500,000 | $250,000 | 10.0% | $25,000 |
| $10,000,000 | $5,000,001 | $10,000,000 | $5,000,000 | $500,000 | 9.0% | $45,000 |
| $25,000,000 | $10,000,001 | $25,000,000 | $5,000,000 | $500,000 | 8.5% | $42,500 |
| $50,000,000 | $25,000,001 | $50,000,000 | | | 7.0% | $0 |
| $100,000,000 | $50,000,001 | $100,000,000 | | | 5.5% | $0 |
| $200,000,000 | $100,000,001 | $200,000,000 | | | 4.0% | $0 |
| TOTAL | | | $15,000,000 | $1,500,000 | | $145,250 |

Under the Formula, the amount completed for each contract value tier as of the end of the Incentive Period is multiplied by the estimated net profit percentage to arrive at the estimated net profit for that contract value tier. This net profit is assigned a fixed bonus percentage depending on the contract value tier.

The Adjusted Bonus Amount derived from the Formula for each Eligible Project represents sixty (60%) percent of the amount payable to the Performance Bonus Fund on account of that particular Eligible Project. The Adjusted Bonus Amount is ultimately used for the payment of Performance Bonuses for project-level Eligible Employees.  The remaining forty (40%) percent of the Performance Bonus Fund for a particular Eligible Project is used towards Performance Bonuses payable to office-level Eligible Employees. An additional 0.4% of net profits is also included in the Performance Bonus Fund as a contingency.

---

[5] Navillus began utilizing the Formula in the Incentive Period beginning on April 1, 2015.  Subject to Navillus' discretion, payments due under Eligible Projects that were twenty five (25%) percent or more complete as of April 1, 2015 continued to be calculated using the original formula (the "Original Formula").  Pursuant to the Original Formula, 5.8% of Adjusted Bonus Amount was used to derive the bonus amount.  Accordingly, approximately 167 of the Eligible Projects whose net profits partially fund the Performance Bonus Fund for the Initial Incentive Period utilize the Original Formula.

- <u>Bonus Payments for Project-Level Eligible Employees</u>:  Once the Performance Bonus Fund is calculated following the conclusion of a particular Incentive Period, Navillus' President, Vice President and Chief Estimator, and Financial Controller review the amount of the Performance Bonus Fund allocable to each Eligible Project.  Sixty (60%) percent of that amount is then earmarked for the project-level Employees to be distributed to the project manager and one or more assistant project managers, project superintendents and foremen on the Eligible Project.  The project manager in consultation with the project team for each Eligible Project reviews the proposed distribution and the project manager makes a recommendation to senior management regarding the proposed distributions.  Once approved, each member of the project team is notified of their Performance Bonus amount.

- <u>Bonus Payments for Office-Level Eligible Employees</u>:  Once the Performance Bonus Fund is calculated following the conclusion of a particular Incentive Period, Navillus' President, Vice President and Chief Estimator, and Financial Controller review the proposed office-level Eligible Employees who will share in the remaining forty (40%) percent of the Performance Bonus Fund.  The amount of Performance Bonus payable to each Eligible Employee that works in the office is discretionary in nature, but a year-over-year basis typically reflect a modest increase to the extent the amount of the Performance Bonus Fund supports it.  The Performance Bonus payable to Navillus' Vice President and Chief Estimator, Financial Controller and Head of Payroll is established by Navillus' President, who himself does not participate in the Performance Bonus Program.

C.      <u>**Continuation of the Performance Bonus Program**</u>

16.      Navillus believes that the Performance Bonus Program is an ordinary course of business practice at Navillus that does not require separate Court approval on a post-petition basis, as it is one of the two primary mechanisms that are used for employee compensation. However, to provide Navillus' Eligible Employees with comfort that the continuation of the Performance Bonus Program is clearly authorized on a post-petition basis, Navillus seeks approval to continue the Performance Bonus Program in the ordinary course of business for the Current Incentive Period and any subsequent Incentive Periods with respect to the Eligible Employees other than those proposed to be subject to the KEIP.

D.    **Approval of the KEIP**

17.    Given the limitations placed on compensation to officers and managers of a chapter 11 debtor under the Bankruptcy Code, with respect to certain Eligible Employees, some of whom are insiders and/or officers and managers of Navillus, Navillus seeks authority to continue the Performance Bonus Program as a KEIP pursuant to a framework that is well-established in chapter 11 cases.

*(i)    Identification of KEIP Participants*

18.    Navillus has worked with its chapter 11 advisors to review the Performance Bonus Program and identify both the individuals whose efforts most directly drive the project profitability which forms the foundation of the Performance Bonus Program and the individuals who have experienced the most significant increase in the demands of their job responsibilities as a result of this chapter 11 case.  As a result of this review and analysis, Navillus has identified the following Eligible Employees at the project-level and the office-level whose specific and direct contributions to Navillus' operations result in the creation of the profits that are utilized to pay performance-based bonuses (the "KEIP Participants"):  (a) fourteen (14) project managers; (b) nineteen (19) assistant project managers; (c) ten (10) project superintendents; (d)  two (2) of Navillus' officers including its Vice President/Chief Estimator, and its Director of Operations; and (e) Navillus' senior management comprised of its Financial Controller and Head of Payroll.

19.    The KEIP Participants' collective understanding of Navillus' construction operations, estimating and bidding, customer and vendor relationships and the infrastructure of Navillus' large-scale operations are vital not only to the day-to-day operations of the company, but also to the ability to effectuate a successful reorganization that will enable Navillus to emerge from chapter 11 on a strong financial footing.

-10-

20.     The project managers, assistant project managers and project superintendents (collectively, the "Project Team") are classified as KEIP Participants because they are the individuals most directly involved in tracking profits on each project and taking measures designed to increase profitability.  Every other month, the Project Team for each project meets to strategize about ways to reduce costs and increase efficiencies to ultimately increase the estimated margin on each project.  The direct correlation of project profitability to performance bonuses incentivizes both the Project Team and senior management to perform at the highest possible levels.

21.     Certain officers and members of the senior management team, all but one of whom are insiders of Navillus (collectively, "Senior Management") are also classified as KEIP Participants because, in addition to their critical responsibilities maintaining key areas of Navillus' operations, these individuals are also heavily involved in the development of Navillus' reorganization strategy.   Leading up to and during this chapter 11 case, Senior Management had to devote significant time to various critical and exigent matters in addition to the normal affairs attendant to daily operations including, without limitation, (a) responding to customer, supplier, creditor and employee inquiries about the chapter 11 case; (b) negotiations with and responses to information and meeting requests from various key constituencies including Navillus' surety and various project owners; (c) the preparation and negotiation of various "first day" and "second day" pleadings in this chapter 11 case; and (d) the ongoing development of Navillus' chapter 11 strategy.

22.     Accordingly, Navillus anticipates that it will continue to require extraordinary efforts from each of the KEIP Participants to continue to prosecute construction operations and implement a successful reorganization strategy that maximizes the value of the estate.  For the

Project Team, field-level operations following the chapter 11 filing have become increasingly complex with project owners, general contractors, subcontractors and suppliers seeking additional assurances of performance and in some instances changing the payment terms that the parties had in place prior to the Petition Date. The Project Team has been handling these additional challenges while continuing to focus on the timely progression of work on each project. For Senior Management, overseeing the chapter 11 process and interfacing with the professionals, complying with chapter 11 reporting requirements and managing operations at Navillus has similarly required an increased time commitment and the development of an understanding of the chapter 11 process.

23.     The absence of incentives for the KEIP Participants to undertake these additional responsibilities at this critical time would likely severely impact this chapter 11 case, potentially resulting in significant losses to the estate and its stakeholders.

*(ii)     Overview of the KEIP*

24.     Navillus submits that, as to the KEIP Participants, the Performance Bonus Program that it has maintained in the ordinary course of business since at least 2010 is a valid KEIP because it is an incentive-based plan pursuant to which the payments to be made are directly tied to project profitability. Navillus proposes to utilize the same detailed, data-driven metrics described above in connection with the Performance Bonus Program to incentivize the KEIP Participants to achieve increased profits during this chapter 11 case and earn payments under the KEIP. Navillus proposes that Performance Bonuses would be payable to KEIP Participants according to the same payment schedule and terms described above in connection with the Performance Bonus Program.

25.    While the Performance Bonus Fund has typically increased year-over-year due to the growth of the business and increased profitability, achieving the same level of profitability during the Current Period will undoubtedly pose additional challenges given the pendency of this chapter 11 case.   Accordingly, under the KEIP, the KEIP Participants will have to work even harder to attempt to achieve the same levels that have been recognized in the past, thus making it even more critical to ensure that financial incentives are in place to reward the KEIP Participants for their extraordinary efforts.   Moreover, just as members of the Project Team are rewarded for profitability, the Project Team members are also required to bear financial responsibility for losses incurred on construction projects.   Accordingly, while Navillus bears the majority of the financial impact of any losses experienced on its construction projects, it does allocate a certain portion of the loss to the Project Team members responsible for the project.   Thus, just as much as the KEIP incentivizes exceptional performance, a Project Team member will experience some financial penalty if the outcomes are not achieved.

26.    Accordingly, Navillus submits that approval of payments under the Performance Bonus Program for the Initial Incentive Period to all Eligible Employees and for the Current Incentive Period for all Eligible Employees other than the KEIP Participants, as well as the approval of the KEIP as to the KEIP Participants, will motivate Navillus' workforce to continue to work tirelessly to achieve the best outcome for Navillus and its creditors in this chapter 11 case.

## RELIEF REQUESTED

27.    By this Motion, Navillus seeks entry of an order, pursuant to section 105(a), 363(b), 363(c) and 503(c)(3) of the Bankruptcy Code, (i) authorizing Navillus to (a) make payments to the Eligible Employees under its pre-petition Performance Bonus Program in the

ordinary course of business in the same manner that such payments have been made prior to the

Petition Date, and (b) continue the Performance Based Program in the ordinary course of

business; (ii) approving the KEIP as to the KEIP Participants on a post-petition basis; and (iii)

granting related relief.

## BASIS FOR RELIEF REQUESTED

28.     Navillus submits that the payment of amounts due under the Performance Bonus

Program for the Initial Incentive Period as well as the continuation of the Performance Bonus

Program and approval of the KEIP during the Current Incentive Period and any subsequent

Incentive Period is vital to Navillus' continued operations during this chapter 11 case.  As set

forth above, the amounts due and owing under the Performance Bonus Program for the Initial

Incentive Period represent a significant portion of annual compensation for the Eligible

Employees that has been fully earned but not yet paid.  Moreover, the continuation of the

incentive based compensation structure is a key to Navillus' ability to continue to operate at a

profitable level, thereby enhancing the value of this estate for the benefit of creditors.

29.     Navillus further submits that the payment of the amounts and approval of the

programs requested in this Motion is permissible under sections 105(a), 363(b), 363(c) and

503(c) of the Bankruptcy Code because the proposed payments, to non-insiders and insiders

alike, satisfy the applicable standards as set forth more fully herein.

**I.      The Payment of Pre-Petition Amounts Due Under the Performance Bonus Program
for the Initial Incentive Period is Warranted Under Sections 105(a) and 363 of the
Bankruptcy Code**

30.     Navillus submits that the payments due under the Performance Bonus Program

for the Initial Incentive Period are permissible under sections 105 and 363 of the Bankruptcy

Code and the necessity of payment doctrine.

    **A.**    **Payment of the Performance Bonuses for the Initial Incentive Period is Authorized Under Section 105(a) of the Bankruptcy Code and the Necessity of Payment Doctrine**

31.    Section 105(a) of the Bankruptcy Code permits the Court to "issue any order…that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 363(b) provides, in relevant part, that a debtor-in-possession "after notice and a hearing, may use . . . other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Accordingly, the Court is authorized to grant the relief requested herein.

32.    A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). "Under Section 105, a court can permit pre-plan payment of pre-petition obligations when essential to the continued operation of the debtor." In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing Ionosphere Clubs, 98 B.R. at 177).

33.    The "necessity of payment" doctrine further supports the relief requested herein. This doctrine recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor. Ionosphere Clubs, 98 B.R. at 176; see also In re Chateaugay Corp., 80 B.R. 279 (S.D.N.Y. 1987); In re Just For Feet, Inc., 242 B.R. 821, 825-26 (D. Del. 1999) ("[n]ecessity of payment doctrine recognizes that paying certain prepetition claims may be necessary to realize the goal of chapter 11 – a successful reorganization"). This doctrine is consistent with the paramount goal of chapter 11 –"facilitating the continued operation and rehabilitation of the debtor . . . ." Ionosphere Clubs, 98 B.R. at 176.

34.     In order to achieve a successful reorganization, Navillus requires its Eligible Employees to continue to use their best efforts in connection with management and supervision of Navillus' operations in the ordinary course of business and in the same manner that the Eligible Employees performed their respective services to Navillus prior to the Petition Date.

35.     The Eligible Employees rely on the Performance Bonus Program as a supplement to their ordinary wages, and the amounts payable thereunder are part of the compensation package that they negotiated for at the time of hire and have an expectation to receive.  For some Eligible Employees, a greater percentage of their annual income is payable under the Performance Bonus Program than through base salary.  Given that the Performance Bonus Program is based on project profitability, the expectation of payment under the Performance Bonus Program has provided the Eligible Employees with an incentive to use their best efforts in connection with the construction projects that they are responsible for and the supporting work done in the home office.  As of the Petition Date, the Eligible Employees had earned Performance Bonuses payable for the Initial Incentive Period which had not been calculated and paid in accordance with the terms of the Performance Bonus Program.  To deprive these Eligible Employees of their Performance Bonuses – which they typically receive during the holiday season – would have an extremely detrimental impact on employee morale and the smooth operation of the business during the already challenging chapter 11 process.

**B.     Payment of the Performance Bonuses for the Initial Incentive Period is an Exercise of Sound Business Judgment Permissible Under Section 363 of the Bankruptcy Code**

36.     Pursuant to section 363(b) of the Bankruptcy Code, the Court is empowered to authorize a debtor to expend funds outside the ordinary course of business, including to pay certain prepetition claims.  As of the Petition Date, the Eligible Employees were owed or had

accrued various amounts under the Performance Bonus Program because Navillus filed its chapter 11 case prior to calculating the amounts that had been earned through the Performance Bonus Program during the Initial Incentive Period.

37.    Navillus submits that a strong business justification exists to pay the amounts due to Eligible Employees for the Initial Incentive Period, even if such payment were deemed to be outside the ordinary course of business, because such payment will enable Navillus to preserve its business and incentivize Eligible Employees in a manner that will ultimately contribute to the reorganization.   See Ionosphere Clubs, 98 B.R. at 175.  On the other hand, failing to pay these amounts will not only cause personal financial harm to Eligible Employees, but will also send a negative message to Navillus' workforce and the marketplace as a whole that is entirely inconsistent with the reorganization objectives of this chapter 11 case.

38.    According the courts in this circuit and other circuits, courts should authorize business transactions outside the ordinary course of business if the debtors have exercised sound business judgment. See In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); see In re Boston Generating, LLC,440 B.R. 302, 321 (Bankr. S.D.N.Y. 2010) (citing In re Chateaugay Corp. (LTV Corporation), 973 F.2d 141, 143 (2d Cir.1992)). Under section 363 of the Bankruptcy Code, a debtor must establish that it has a valid business purpose for using property of the estate outside the ordinary course of business. Lionel Corp., 722 F.2d at 1070-1071. As long as the debtor establishes said valid business purpose, a presumption arises that the debtor's decision was made "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the [debtor]." (In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (citing Smith v. Van Gorkom, 488 A.2d 858, 872 (Del.1985)).

39.     Navillus has a strong and valid business purpose for seeking to perform its obligations under the Performance Bonus Program, including to pay the amounts due to Eligible Employees for the Initial Incentive Period, because the Performance Bonuses represent a critical component of employee compensation and were earned based on the Eligible Employees' significant efforts for the benefit of Navillus.  Thus, a presumption arises that Navillus' decision is taken in the best interests on Navillus and its successful business operations.

**II.     The Continuation of the Performance Bonus Program and Entry into the KEIP is Permissible Under Section 503(c) of the Bankruptcy Code**

40.     Navillus submits that continuation of the Performance Bonus Program as to the Eligible Employees and approval of the KEIP as to the KEIP Participants is permissible under section 503(c)(3) of the Bankruptcy Code because the amounts proposed to be paid are in the ordinary course of business and are justified under the facts and circumstances of this chapter 11 case.  Section 503(c)(3) of the Bankruptcy Code prohibits the allowance of payment of "other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition." 11 U.S.C. § 503(c)(3).

**A.     Payments Under the KEIP Represent an Ordinary Course of Business Transaction**

41.     Navillus maintains that continuation of the Performance Bonus Program and approval of the KEIP during the post-petition period are in the ordinary course of business under section 363(c) of the Bankruptcy Code because they are consistent with past practices and are the

type of transactions that creditors would expect Navillus to pursue.[6]   Section 363(c) of the
Bankruptcy Code provides, in relevant part, that a debtor in possession "may enter into
transactions . . . in the ordinary course of business without notice or a hearing, and may use
property of the estate in the ordinary course of business without notice or a hearing . . ." 11
U.S.C. § 363(c)(1).   Section 363 of the Bankruptcy Code is designed to afford a debtor-in-
possession "flexibility to engage in ordinary transactions without unnecessary creditor and
bankruptcy court oversight, while protecting creditors by giving them an opportunity to be heard
when transactions are not ordinary."   In re Roth Am., Inc., 975 F.2d 949, 952 (3d Cir. 1992).

42.   The Bankruptcy Code does not define "ordinary course of business".   However,
courts have developed two commonly used tests for determining whether a transaction is in the
ordinary course of business: (1) horizontal dimension test; and (2) vertical dimension test.   3
COLLIER ON BANKRUPTCY ¶ 363.03 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2015).

43.   A transaction is in the ordinary course of business if it satisfies both prongs of a
two-part test: first, the "horizontal dimension test" determines whether a transaction is of the
type commonly undertaken by companies in the debtor's industry; and, second, the "vertical
dimension test" determines whether the transaction subjects a hypothetical creditor to economic
risks that are different from those accepted when such creditor decided to enter into a contract
with the debtor.   See Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne), 114 F.3d 379, 384-
85 (2d Cir. 1997).

---

[6] As set forth above, Navillus submits that the continuation of the Performance Bonus Program for the Current
Incentive Period and any subsequent Incentive Periods as to the Eligible Employees other than the KEIP Participants
is an ordinary course of business transaction that does not require Court approval.   However, to afford the Eligible
Employees comfort that their previously negotiated compensation structure will not be disrupted, Navillus requests
that this Court enter an order confirming same.

44.    Navillus therefore believes that the approval of the KEIP as a continuation of the Performance Bonus Program with respect to the KEIP Participants satisfies the horizontal dimension test because providing incentive-based bonuses to management and project management integral in the profitability of a construction company's operations is a standard practice in the construction industry.    Indeed, Navillus regularly monitors compensation practices in the construction industry and is aware that comparable profit-sharing programs are common and necessary as a means of incentivizing employees in the industry.

45.    Moreover, Navillus believes that the approval of the KEIP satisfies the vertical dimension test because Navillus' creditors should reasonably expect that Navillus will utilize an incentive-based compensation structure for the KEIP Participants who are essential to the successful operation of the business.    Navillus has utilized the Performance Bonus Program since at least 2010 to incentivize its employees and achieve increased profitability.    Accordingly, Navillus submits that the KEIP represents an ordinary course of business transaction pursuant to the standards applied by the Second Circuit.

**B.    Payments Under the KEIP Represent the Exercise of Navillus' Sound Business Judgment and are Justified Under the Facts and Circumstances of the Case**

46.    Moreover, as set forth below, the proposed payments under the KEIP are justified by the facts and circumstances of the case, i.e., Navillus has exercised its sound business judgment in developing the KEIP.    As set forth more fully below, providing market-competitive compensation to the KEIP Participants is critical to ensuring that Navillus continues to receive the highest quality performance from its KEIP Participants, especially in light of the various challenges that they are required to undertake during this chapter 11 case.

-20-

47.     This Court has held that the requirement in section 503(c)(3) of the Bankruptcy Code for a transaction to be "justified by the facts and circumstances of the case" is the same as the "business judgment" standard applied under section 363(b) to a proposed use, sale, or lease of estate property outside the ordinary course of the debtor's business. See In re Dana Corp., 358 B.R. 567 (Bankr. S.D.N.Y. 2006). The Court asserted that section 503(c)(3) "gives the court discretion as to bonus and incentive plans, which are not primarily motivated by retention or in the nature of severance." In re Dana Corp. at 576 (citing In re Nobex Corp., 2006 WL 4063024, 2006 Bankr.LEXIS 417 (Bankr. D. Del. 2006)).

48.     When determining whether payments to a debtor's employees are "justified by the facts and circumstances of the case," courts apply the business judgment test, which requires analysis of the following factors:

- whether the plan has a reasonable relationship to the results to be obtained;

- whether the cost is reasonable in light of the debtor's assets, liabilities, and earnings potential;

- whether the scope of the plan is fair and reasonable or discriminates unfairly;

- whether the plan comports with industry standards;

- whether the debtor undertook due diligence in investigating the need for a plan, the employees who should be incentivized, and market standards; and

- whether the debtor received independent counsel in performing due diligence in investigating the need for a plan.

In re Residential Capital, LLC, 491 B.R. 73, 84 (Bankr. S.D.N.Y. 2013); In re Glob. Aviation Holdings Inc., 478 B.R. 142, 150 (Bankr. E.D.N.Y. 2012); In re Velo Holdings Inc., 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012); In re Dewey & LeBoeuf LLP, No. 12-12321 MG, 2012 WL 3065275, at *4 (Bankr. S.D.N.Y. July 30, 2012); In re Borders Grp., Inc., 453 B.R. 459, 474 (Bankr. S.D.N.Y. 2011); In re Dana Corp., 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006).

49.     Here, the KEIP satisfies all six factors.

50.     *Reasonable Relationship to Results to be Obtained*.    The proposed payments under the KEIP have a reasonable relationship to the results to be obtained.    The amounts proposed to be paid to KEIP Participants are directly correlated to the net profits generated on the Eligible Projects.    Through the financial review meetings, the Project Team and Senior Management that generally comprise the KEIP Participants have the ability to strategize regarding ways to maximize the profits on each project and increase efficiencies.    Accordingly, the net profits to which the Formula will be applied have a direct relationship to the efforts of the KEIP Participants.    The KEIP Participants must, among other things, ensure that the construction projects are completed in a timely and efficient manner.    Preservation of Navillus' assets also depends primarily upon the continued efforts of these KEIP Participants. Given the numerous responsibilities that the KEIP Participants face, particularly during this chapter 11 case, the proposed payments under the KEIP will incentivize them to achieve the best results for Navillus and its creditors.

51.     The payments under the KEIP also have a reasonable relationship to the results to be obtained because Navillus is seeking to pay the amounts due under the KEIP to incentivize the KEIP Participants to utilize their best efforts to: (a) assist Navillus in completing over $500 million of work in progress on open construction projects; (b) close out of any remaining construction projects for which Navillus is still liable under its surety bonds; and (c) assist Navillus in preparing bids for new construction projects, all of which will enhance the value of the estate.    Given that historical net profit figures will be more challenging to achieve during this chapter 11 case, the assurance of an incentive payment if those results are in fact achieved is more critical than ever.

-22-

52.    *Cost of the KEIP is Reasonable*.  As further set forth above, the costs of the KEIP are entirely reasonable.  The calculation of the payments to be made under the KEIP is the product of detailed data-driven metrics for each Eligible Project and is subject to the profitability of each Eligible Project.  Navillus has determined that based on its historical performance the proposed payments are reasonable in light of Navillus' financial position.

53.    *Scope of the KEIP is Fair and Reasonable*.  Likewise, the KEIP does not discriminate unfairly.  Navillus, using its business judgment, has selected the KEIP Participants whom it deems vital to its operations and reorganization.  Since the KEIP Participants are responsible for the tasks that are critical to Navillus' operations post-petition and will maximize the value of the estate, it is fair that they receive a bonus.  See In re Borders Grp., Inc., 453 B.R. at 476 (citing to a case in which the court held that "a small group of employees could benefit from the retention plan - to the exclusion of others - because not every employee is 'similarly situated in terms of their employment to the reorganization process.'" (citation omitted)).

54.    *KEIP Comports With Industry Standards*.  The proposed payments under the KEIP comport with industry standards and are consistent with other incentive plans.  The KEIP is essentially a profit-sharing plan which is one of the most common types of incentive plans in the construction industry.  Further, the proposed payments are consistent with Navillus' Performance Bonus Program which has been in place since at least 2010.  It has been the established practice of Navillus to award Performance Bonuses to its employees on an annual basis in the ordinary and normal course of its business, and the continuation of this program through the KEIP is similarly in the normal course.

55.    *KEIP is Based on Due Diligence*.  Navillus formulated the KEIP after extensive due diligence.  The Performance Bonus Program was developed by management in 2010 based

on their knowledge of project performance and operating metrics.  The Formula was then revised in April 2015 to ensure that the Project Team working on smaller-scale projects would not be undercompensated relative to the Project Team on larger projects.  Upon the commencement of this case, Navillus consulted with its bankruptcy counsel, financial advisors and chief restructuring officer to determine that the continuation of the Performance Bonus Program through the KEIP was necessary for Navillus' reorganization.

56.     _Independent Counsel Review of KEIP_.     Although Navillus did not retain independent legal counsel during the initial development of the Performance Bonus Program that Navillus seeks to continue as a KEIP, courts have approved similar plans nonetheless. In re Borders Grp., Inc., 453 B.R. at 477 (determining that lack of legal counsel was "not fatal" to approval of key employee incentive program); In re Global Aviation Holdings, 478 B.R at 153. As stated above, Navillus' bankruptcy counsel, financial advisors and Navillus' chief restructuring officer were involving in analyzing the KEIP and took all efforts to protect Navillus' interests. Therefore, the KEIP should be approved notwithstanding the lack of independent counsel.

57.     As previously noted, Navillus' request to continue its Performance Bonus Program through a KEIP is motivated by its desire to continue a program that fosters hard work and efficiency in its workforce. Under the business judgment rule, this valid business purpose results in a presumption that Navillus' decision is made on an informed basis, in good faith and in the honest belief that the continuance of the KEIP is in the best interests of Navillus. Therefore, because Navillus has satisfied the business judgment test, the KEIP should be approved pursuant to section 503(c)(3) of the Bankruptcy Code.

### C.    Sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code Are Inapplicable to the Performance Bonus Program and the KEIP

58.    Sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code are not implicated by Navillus' request to make payments under the Performance Bonus Program and approve the KEIP because: (a) Navillus is not requesting approval to make a transfer or incur an obligation for inducing any employee to remain with the business in contravention of section 503(c)(1) of the Bankruptcy Code; and (b) the proposed transfers are not severance payments.  Moreover, as set forth above, the proposed payments are permissible under section 503(c)(3) of the Bankruptcy Code which provides certain limitations on transfers made outside the ordinary course of business.

### REQUEST FOR WAIVER OF STAY

59.    Navillus further seeks a waiver of any stay of effectiveness of the order approving this Motion. Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court others otherwise." As set forth above, the payments proposed herein are essential to prevent irreparable damage to Navillus' operations and value.  In order to maintain employee morale during this critical time, it is essential that Navillus have the ability to make payment of the amounts due to Eligible Employees under the Performance Bonus Program for the Initial Incentive Period during this calendar year.  Accordingly, Navillus submits that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

### NOTICE

60.    Notice of this Motion has been given to (a) the United States Trustee for the Southern District of New York; (b) counsel to the Committee; (c) counsel to Liberty Mutual

Insurance Company; and (d) all other parties who have requested to receive notices in this chapter 11 case.  Navillus submits that, under the circumstances, no other or further notice is required.

61.    No previous application for the relief sought herein has been made to this or any other Court.

## **CONCLUSION**

62.    For the reasons set forth herein, it is critically important that Navillus be able to pay the sums due to Eligible Employees under the Performance Bonus Program and continue this program in the ordinary course of business.  Navillus' Eligible Employees are expecting payment on account of amounts earned under the Performance Bonus Program this holiday season, and discontinuing the program could result in low morale and a less efficient workforce during a critical time for Navillus.  Furthermore, during the post-petition period the KEIP's goal is to motivate the KEIP Participants to positively contribute to Navillus' projects during the chapter 11 process.  A highly motivated workforce is essential to Navillus during this time of reorganization and rebuilding.

**WHEREFORE**, Navillus respectfully requests entry of the Order, substantially in the form annexed hereto as **Exhibit "2"**, granting the relief requested herein, together with such other and further relief as the Court deems just and proper.

Dated: Garden City, New York
      December 8, 2017

                                          CULLEN AND DYKMAN LLP

                                          By: */s/ Elizabeth M. Aboulafia*
                                          C. Nathan Dee, Esq.
                                          Elizabeth M. Aboulafia, Esq.
                                          100 Quentin Roosevelt Boulevard
                                          Garden City, New York 11530
                                          (516) 357-3700

                                          *Proposed Counsel to Navillus Tile, Inc.*

**<u>Exhibit 1</u>**

[To Be Provided Under Seal]

**<u>Exhibit 2</u>**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                                        :
In re:                                                  :    Chapter 11
                                                        :
NAVILLUS TILE, INC., DBA NAVILLUS                       :    Case No. 17-13162 (SHL)
CONTRACTING                                             :
                                                        :
                        Debtor.                         :
                                                        :
---------------------------------------------------------------x

### ORDER (I) AUTHORIZING THE DEBTOR TO (A) MAKE PAYMENTS TO ELIGIBLE EMPLOYEES UNDER THE PERFORMANCE BONUS PROGRAM AND (B) CONTINUE THE PERFORMANCE BONUS PROGRAM IN THE ORDINARY COURSE OF BUSINESS; (II) APPROVING THE KEY EMPLOYEE INCENTIVE PROGRAM; AND (III) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[1] of Navillus Tile, Inc, as debtor and debtor-in-possession in the above-captioned chapter 11 case ("Navillus" or the "Debtor"), pursuant to sections 105, 363 and 503 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order (i) authorizing Navillus to (a) make payments to the Eligible Employees (defined herein) under its pre-petition performance incentive bonus program (the "Performance Bonus Program") in the ordinary course of business for the prior periods including from April 1, 2016 through March 31, 2017 (the "Initial Incentive Period") and (b) continue the Performance Bonus Program in the ordinary course of business for the period from April 1, 2017 through March 31, 2018 (the "Current Incentive Period") and any subsequent Incentive Period (defined herein); (ii) approving a key employee incentive program (the "KEIP") for the KEIP Participants for the Current Incentive Period and any subsequent Incentive Period; and (iii) granting related relief; and the Court having jurisdiction to consider the Motion and the relief

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and it appearing that no other or further notice need be provided; and the relief being requested being in the best interests of Navillus and its estate and creditors; and the Court having reviewed the Motion and any documents submitted in support of the Motion and having heard the statements in support of the relief requested therein at the hearing before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor; IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      Navillus is hereby authorized to make payments to the Eligible Employees under the Performance Bonus Program for the Initial Incentive Period in the ordinary course of business in the same manner that such payments have been made prior to the Petition Date.

3.      Navillus is hereby authorized to continue the Performance Bonus Program in the ordinary course of business for the Current Incentive Period and any subsequent Incentive Period with respect to the Eligible Employees other than the KEIP Participants.

4.      Pursuant to sections 363 and 503(c)(3) of the Bankruptcy Code, the KEIP is hereby approved with respect to the KEIP Participants, and Navillus is authorized to implement the KEIP on the same terms set forth in the Motion with respect to the Performance Bonus Program for the Current Incentive Period and any subsequent Incentive Period.

5.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this order shall be immediately effective upon its entry.

6.      Navillus is authorized to take all actions it deems necessary or appropriate to effectuate the relief granted pursuant to this Final Order in accordance with the Motion.

7.      The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.


Dated:        December ___, 2017
              New York, New York


                                         _____
                                         HONORABLE SEAN H. LANE
                                         UNITED STATES BANKRUPTCY JUDGE