CULLEN AND DYKMAN LLP
100 Quentin Roosevelt Boulevard
Garden City, New York 11530
(516) 357-3700
C. Nathan Dee, Esq.
Elizabeth M. Aboulafia, Esq.

*Proposed Counsel to Navillus Tile, Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

In re:

NAVILLUS TILE, INC., DBA NAVILLUS
CONTRACTING

       Debtor.
-----------------------------------------------------------------x

Chapter 11
Case No. 17-13162 (SHL)

## DECLARATION OF CHRISTOPHER K. WU IN SUPPORT OF MOTION OF NAVILLUS TILE, INC. FOR AN ORDER (I) AUTHORIZING THE DEBTOR TO (A) MAKE PAYMENTS TO ELIGIBLE EMPLOYEES UNDER THE PERFORMANCE BONUS PROGRAM AND (B) CONTINUE THE PERFORMANCE BONUS PROGRAM IN THE ORDINARY COURSE OF BUSINESS; (II) APPROVING THE KEY EMPLOYEE INCENTIVE PROGRAM; AND (III) GRANTING RELATED RELIEF

I, **CHRISTOPHER K. WU**, declare under the penalty of perjury:

    1.    I am the proposed Chief Restructuring Officer of Navillus Tile, Inc. d/b/a Navillus Contracting, the above-captioned debtor and debtor-in-possession (the "Debtor" or "Navillus"), President of Teneo Restructuring and Senior Managing Director at Teneo Capital LLC ("Teneo"). I make this declaration to support the *Motion of Navillus Tile, Inc. for an Order (I) Authorizing the Debtor to Make Payments to Eligible Employees under the Performance Bonus Program and (B) Continue the Performance Bonus Program in the Ordinary Course of*

1

*Business; (II) Approving the Key Employee Incentive Program; and (III) Granting Related Relief* (the "Motion")[1] which was filed via ECF on December 8, 2017.

2.  My statements in this declaration are based on my personal knowledge, review of relevant documents, and with respect to the requirements of applicable law (including the Bankruptcy Code), discussions with Navillus' counsel.

## BACKGROUND

3.  Approximately sixty five (65) of Navillus' employees as of the Petition Date are non-union, salaried employees including, without limitation, management, project managers, project supervisors, estimators, accounting and other in-house administrative staff (the "Eligible Employees"). The Eligible Employees are the proposed recipients of Performance Bonuses under the Motion. In addition, a percentage of the amounts payable under the Performance Bonus Program are paid to project foremen based on exceptional performance on Navillus' projects. These project foremen are hourly, union employees.

### A.    The Performance Bonus Program

4.  Prior to the Petition Date, in the ordinary course of business, Navillus compensated its Eligible Employees through (a) base salary on a weekly basis and (b) cash bonuses earned under the Performance Bonus Program. For some Eligible Employees, the cash bonus component comprises more than fifty (50%) percent of their annual income and generally the Performance Bonuses represent anywhere from approximately twenty (20%) to seventy (70%) percent of annual compensation.

5.  The Performance Bonus Program, which has been in place since at least 2010, is a critical component of employee compensation at Navillus which is disclosed to Eligible

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

2

Employees at the time of hire which Eligible Employees rely on to supplement to their base weekly salary.

6. Through the Motion, to provide the Eligible Employees with the balance of their compensation earned prior to the Petition Date, Navillus has requested, among other things, authority to pay the amounts due to the Eligible Employees under the Performance Bonus Program for the Initial Incentive Period in the aggregate dollar amount of approximately $3,737,789. Given the confidential nature of the amounts payable to each Eligible Employee, I understand that Navillus' bankruptcy counsel will be filing a schedule listing the amount proposed to be paid pursuant to the Performance Bonus Program for the Initial Incentive Period under seal with the Court with copy to the U.S. Trustee, counsel to Liberty and counsel to the Committee. In addition, I and members of my team and an employee of the Debtor met with the proposed financial advisors to the Committee to review the Performance Bonus Program and its structure and my team and I will continue to support their follow up diligence requests.

7. I understand that the failure to pay the amounts due and owing to Eligible Employees under the Performance Bonus Program for the Initial Incentive Period would cause certain of the Eligible Employees to experience personal financial hardship, and believe that this would have an extremely detrimental effect on employee morale that would carry over into construction operations and lead to a decline in the quality of work performed. I understand that the Performance Bonus Program is integral to the Company's historical and continued success.

**B.    Description of the Performance Bonus Program**

8. Prior to the Petition Date, Navillus maintained the Performance Bonus Program in the ordinary course of business as an incentive program developed for the purpose of rewarding Eligible Employees for their performance and contribution to Navillus, providing the Eligible

3

Employees with an incentivizing financial interest in the profitability of Navillus and rewarding long-time employment with Navillus. This objective is achieved by tying the success of the company, through its individual projects, to the compensation of the Eligible Employees who, directly and indirectly, are responsible for that success.

9. In 2010, Navillus formalized its then-existing bonus program into the current Performance Bonus Program based on a formula of multiple data-driven metrics which directly correlate to project profitability on each of Navillus' open construction projects. The Performance Bonus Program is funded with a portion of net profits (the "Performance Bonus Fund") derived from certain projects (the "Eligible Projects").

10. A summary of the key terms of the Performance Bonus Program is as follows:

- Eligible Employees: All full time non-union, salaried employees including, without limitation, management, project managers, project supervisors, estimators, accounting and other administrative staff, or any other position that Navillus deems to be eligible, including certain project foremen who are union members.[2] Navillus' President and Chief Executive Officer is not participating in the Performance Bonus Program.

- Program Period: The amounts payable under the Performance Bonus Program have historically been assessed on or around September 30 for the period from April 1 of the prior year through March 31 of the following calendar year (the "Incentive Period").

- Payment Terms: Once assessed and calculated, any Eligible Employee will be notified of the amount of their Performance Bonus earned for the Incentive Period. Payments under the Performance Bonus Program can be made at any time after November 30, either in full or in installments, at the request of each Eligible Employee upon approval by Navillus. Historically, the Eligible Employees have requested repayment of amounts earned under the Performance Bonus Program during the holiday season to supplement their year-end income.

---

[2] Any employee who terminates their employment with Navillus within six (6) months of the end of the Incentive Period will not be eligible for any portion of the bonus for the prior and/or current Incentive Period, unless otherwise agreed to by Navillus and in such circumstances that Navillus should see fit and proper. Navillus is not seeking to pay any amounts to terminated employees by the Motion.

4

- Performance Bonus Program Cost: The aggregate amount of all Performance Bonus Program payments proposed to be made to the Eligible Employees for the Initial Incentive Period is approximately $3,737,789.

- Eligible Projects: Generally, all projects that are at least fifty (50%) percent complete as of the end of the Incentive Period.

- Program Payment Metrics: Amounts payable under the Performance Bonus Program for a given Incentive Period are calculated pursuant to a waterfall formula (the "Formula")[3] which is applied to calculate the Performance Bonuses for project-level Eligible Employees (the "Adjusted Bonus Amount"). In the example below, the net profit margin on the illustrative example Eligible Project is assumed to be ten (10%) percent:

| Illustrative Example Based on $15,000,000 Contract Value ("CV") | | | | | | |
|---|---|---|---|---|---|---|
| CV Tier | Beginning | End | CV Calculation | Net Profit (10% Assumed) | Adjusted Bonus Percentage | Adjusted Bonus Amount |
| $100,000 | $0 | $100,000 | $100,000 | $10,000 | 20.0% | $2,000 |
| $500,000 | $100,001 | $500,000 | $400,000 | $40,000 | 17.5% | $7,000 |
| $1,000,000 | $500,001 | $1,000,000 | $500,000 | $50,000 | 13.0% | $6,500 |
| $2,500,000 | $1,000,001 | $2,500,000 | $1,500,000 | $150,000 | 11.5% | $17,250 |
| $5,000,000 | $2,500,001 | $5,000,000 | $2,500,000 | $250,000 | 10.0% | $25,000 |
| $10,000,000 | $5,000,001 | $10,000,000 | $5,000,000 | $500,000 | 9.0% | $45,000 |
| $25,000,000 | $10,000,001 | $25,000,000 | $5,000,000 | $500,000 | 8.5% | $42,500 |
| $50,000,000 | $25,000,001 | $50,000,000 | | | 7.0% | $0 |
| $100,000,000 | $50,000,001 | $100,000,000 | | | 5.5% | $0 |
| $200,000,000 | $100,000,001 | $200,000,000 | | | 4.0% | $0 |
| TOTAL | | | $15,000,000 | $1,500,000 | | $145,250 |

Under the Formula, the amount completed for each contract value tier as of the end of the Incentive Period is multiplied by the estimated net profit percentage to arrive at the estimated net profit for that contract value tier. This net profit is assigned a fixed bonus percentage depending on the contract value tier.

The Adjusted Bonus Amount derived from the Formula for each Eligible Project represents approximately sixty (60%) percent of the amount payable to the Performance Bonus Fund on account of that particular Eligible Project. The Adjusted Bonus Amount is ultimately used for the payment of Performance Bonuses for project-level Eligible Employees. The remaining forty (40%) percent of the

---

[3] Navillus began utilizing the Formula in the Incentive Period beginning on April 1, 2015. Subject to Navillus' discretion, payments due under Eligible Projects that were twenty five (25%) percent or more complete as of April 1, 2015 continued to be calculated using the original formula (the "Original Formula"). Pursuant to the Original Formula, 5.8% of Net Profit was used to derive the Adjusted Bonus Amount. Accordingly, approximately 167 of the Eligible Projects whose net profits partially fund the Performance Bonus Fund for the Initial Incentive Period utilize the Original Formula.

Performance Bonus Fund for a particular Eligible Project is used towards Performance Bonuses payable to office-level Eligible Employees. An additional 0.4% of net profits is also included in the Performance Bonus Fund as a contingency.

- <u>Bonus Payments for Project-Level Eligible Employees</u>: Once the Performance Bonus Fund is calculated following the conclusion of a particular Incentive Period, Navillus' President, Vice President and Chief Estimator, and Financial Controller review the amount of the Performance Bonus Fund allocable to each Eligible Project. Sixty (60%) percent of that amount is then earmarked for the project-level Employees to be distributed to the project manager and one or more assistant project managers, project superintendents and foremen on the Eligible Project. The project manager in consultation with the project team for each Eligible Project reviews the proposed distribution and the project manager makes a recommendation to senior management regarding the proposed distributions. Once approved, each member of the project team is notified of their Performance Bonus amount.

- <u>Bonus Payments for Office-Level Eligible Employees</u>: Once the Performance Bonus Fund is calculated following the conclusion of a particular Incentive Period, Navillus' President, Vice President and Chief Estimator, and Financial Controller review the proposed office-level Eligible Employees who will share in the remaining forty (40%) percent of the Performance Bonus Fund. The amount of Performance Bonus payable to each Eligible Employee that works in the office is discretionary in nature, but a year-over-year basis typically reflect a modest increase to the extent the amount of the Performance Bonus Fund supports it. The Performance Bonus payable to Navillus' Vice President and Chief Estimator, Financial Controller and Head of Payroll is established by Navillus' President, who himself is not participating in the Performance Bonus Program.

## C.  Continuation of the Performance Bonus Program

11. I believe that the Performance Bonus Program is an ordinary course of business practice at Navillus, as it is one of the two primary mechanisms that are used for employee compensation. However, to provide Navillus' Eligible Employees with comfort that the continuation of the Performance Bonus Program is clearly authorized on a post-petition basis, Navillus through the Motion seeks approval to continue the Performance Bonus Program in the ordinary course of business for the Current Incentive Period and any subsequent Incentive Periods with respect to the Eligible Employees other than those proposed to be subject to the KEIP.

### D. Approval of the KEIP

12. Given the limitations placed on compensation to officers and managers of a chapter 11 debtor under the Bankruptcy Code, with respect to certain Eligible Employees, some of whom are insiders and/or officers and managers of Navillus, Navillus seeks authority to continue the Performance Bonus Program as a KEIP pursuant to a framework that is well-established in chapter 11 cases.

*(i) Identification of KEIP Participants*

13. Upon the commencement of this case, I consulted with Navillus' management, bankruptcy counsel and financial advisors to determine that the continuation of the Performance Bonus Program through the KEIP was necessary for Navillus' reorganization. I have worked with Navillus' management and its other chapter 11 advisors to review the Performance Bonus Program and identify both the individuals whose efforts most directly drive the project profitability which forms the foundation of the Performance Bonus Program and the individuals who have experienced the most significant increase in the demands of their job responsibilities as a result of this chapter 11 case. As a result of this review and analysis, Navillus has identified the following Eligible Employees at the project-level and the office-level whose specific and direct contributions to Navillus' operations result in the creation of the profits that are utilized to pay performance-based bonuses (the "KEIP Participants"): (a) thirteen (13) project managers; (b) twelve (12) assistant project managers; (c) eight (8) project superintendents; (d) two (2) of Navillus' officers including its Vice President/Chief Estimator, and its Director of Operations; and (e) Navillus' senior management comprised of its Financial Controller and Head of Payroll.

14. I believe that the KEIP Participants' collective understanding of Navillus' construction operations, estimating and bidding, customer and vendor relationships and the

7

infrastructure of Navillus' large-scale operations are vital not only to the day-to-day operations of the company, but also to the ability to effectuate a successful reorganization that will enable Navillus to emerge from chapter 11 on a strong financial footing.

15. The project managers, assistant project managers and project superintendents (collectively, the "Project Team") are classified as KEIP Participants because they are the individuals most directly involved in tracking profits on each project and taking measures designed to increase profitability. Every other month, the Project Team for each project meets to strategize about ways to reduce costs and increase efficiencies to ultimately increase the estimated margin on each project. The direct correlation of project profitability to performance bonuses incentivizes both the Project Team and senior management to perform at the highest possible levels.

16. Certain officers and members of the senior management team, all but one of whom are insiders of Navillus (collectively, "Senior Management") are also classified as KEIP Participants because, in addition to their critical responsibilities maintaining key areas of Navillus' operations, these individuals are also heavily involved in the development of Navillus' reorganization strategy. I understand that leading up to and during this chapter 11 case, Senior Management had to devote significant time to various critical and exigent matters in addition to the normal affairs attendant to daily operations including, without limitation, (a) responding to customer, supplier, creditor and employee inquiries about the chapter 11 case; (b) negotiations with and responses to information and meeting requests from various key constituencies including Navillus' surety and various project owners; (c) the preparation and negotiation of various "first day" and "second day" pleadings in this chapter 11 case; and (d) the ongoing development of Navillus' chapter 11 strategy.

8

17. Accordingly, I believe that Navillus will continue to require extraordinary efforts from each of the KEIP Participants to continue to prosecute construction operations and implement a successful reorganization strategy that maximizes the value of the estate. For the Project Team, I understand that field-level operations following the chapter 11 filing have become increasingly complex with project owners, general contractors, subcontractors and suppliers seeking additional assurances of performance and in some instances changing the payment terms that the parties had in place prior to the Petition Date. The Project Team has been handling these additional challenges while continuing to focus on the timely progression of work on each project. For Senior Management, I understand that overseeing the chapter 11 process and interfacing with the professionals, complying with chapter 11 reporting requirements and managing operations at Navillus has similarly required an increased time commitment and the development of an understanding of the chapter 11 process.

18. I believe that the absence of incentives for the KEIP Participants to undertake these additional responsibilities at this critical time would likely severely impact this chapter 11 case, potentially resulting in significant losses to the estate and its stakeholders.

*(ii)    Overview of the KEIP*

19. As to the KEIP Participants, I believe that the Performance Bonus Program that it has maintained in the ordinary course of business since at least 2010 is a valid KEIP because it is an incentive-based plan pursuant to which the payments to be made are directly tied to project profitability. Navillus proposes to utilize the same detailed, data-driven metrics described above in connection with the Performance Bonus Program to incentivize the KEIP Participants to achieve increased profits during this chapter 11 case and earn payments under the KEIP. Navillus proposes that Performance Bonuses would be payable to KEIP Participants according to

9

the same payment schedule and terms described above in connection with the Performance Bonus Program.

20. While the Performance Bonus Fund has typically increased year-over-year due to the growth of the business and increased profitability, I believe that achieving the same level of profitability during the Current Period will undoubtedly pose additional challenges given the pendency of this chapter 11 case. Accordingly, I believe that under the KEIP, the KEIP Participants will have to work even harder to attempt to achieve the same levels that have been recognized in the past, thus making it even more critical to ensure that financial incentives are in place to reward the KEIP Participants for their extraordinary efforts. Moreover, just as members of the Project Team are rewarded for profitability, I understand that the Project Team members are also required to bear financial responsibility for losses incurred on construction projects as projected and actual project losses are netted against bonus amounts for profitable projects for Project Team members which may be offset with a contingency bonus pool. Accordingly, while I understand that Navillus bears the majority of the financial impact of any losses experienced on its construction projects, it does allocate a certain portion of the loss to the Project Team members responsible for the project. Certain losses attributed to Project Team members can be partially offset by the contingency amount. Thus, just as much as the KEIP incentivizes exceptional performance, a Project Team member may experience some financial penalty if the outcomes are not achieved.

21. Accordingly, I believe that approval of payments under the Performance Bonus Program for the Initial Incentive Period to all Eligible Employees and for the Current Incentive Period for all Eligible Employees other than the KEIP Participants, as well as the approval of the

KEIP as to the KEIP Participants, will motivate Navillus' workforce to continue to work tirelessly to achieve the best outcome for Navillus and its creditors in this chapter 11 case.

22. I believe that the payments proposed in the Motion are essential to prevent immeasurable damage to Navillus' operations and value. In order to maintain employee morale during this critical time, I believe that it is essential that Navillus have the ability to make payment of the amounts due to Eligible Employees under the Performance Bonus Program for the Initial Incentive Period during this calendar year.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: December 14, 2017

                                                       */s/ Christopher K. Wu*
                                                    CHRISTOPHER K. WU