UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------x
                                             :
In re:                                       :  Chapter 11
                                             :
NAVILLUS TILE, INC., DBA NAVILLUS            :  Case No. 17-13162 (SHL)
CONTRACTING                                  :
                                             :
NAVILLUS TILE, INC., DBA NAVILLUS            :  Case No. 17-13162 (SHL)
CONTRACTING                                  :
                                             :
                    Debtor.                  :
                                             :
---------------------------------------------x


**AMENDED DISCLOSURE STATEMENT WITH RESPECT TO
~~CONSENUAL~~CONSENSUAL AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF
NAVILLUS TILE, INC. D/B/A NAVILLUS CONTRACTING
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**


Dated:  August ~~—~~ 24, 2018


CULLEN AND DYKMAN LLP
100 Quentin Roosevelt Boulevard
Garden City, NY 11530
(516) 357-3700
C. Nathan Dee, Esq.
Elizabeth M. Aboulafia, Esq.

Counsel for Debtor
and Debtor in Possession


**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.
ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE
STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS**

**DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

## **DISCLAIMER**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE CHAPTER 11 PLAN OF REORGANIZATION OF NAVILLUS TILE, INC. D/B/A NAVILLUS CONTRACTING PROPOSED BY NAVILLUS AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATING TO THE PLAN, CERTAIN EVENTS THAT HAVE OCCURRED IN THE CHAPTER 11 CASE, AND CERTAIN FINANCIAL INFORMATION.  ALTHOUGH NAVILLUS BELIEVES THAT ALL SUCH SUMMARIES ARE FAIR AND ACCURATE AS OF THE DATE HEREOF, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF UNDERLYING DOCUMENTS AND TO THE EXTENT THAT THEY MAY CHANGE AS PERMITTED BY THE PLAN AND APPLICABLE LAW.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY NAVILLUS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  NAVILLUS DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE BANKRUPTCY COURT'S CONDITIONAL APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION WITH RESPECT TO THE MERITS OF THE PLAN.  ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE PLAN SUPPLEMENT DOCUMENTS ONCE FILED, AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER APPLICABLE EVIDENTIARY RULES.  THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL

IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN NAVILLUS IN THIS CASE.  YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR WITH RESPECT TO ANY QUESTIONS OR CONCERNS REGARDING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE PLAN.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE TAX CODE; (B) SUCH DISCUSSION IS INCLUDED HEREIN BY NAVILLUS IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY NAVILLUS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................................................ 1

II.     OVERVIEW OF THE PLAN .............................................................................. 1

        A.      General Structure of the Plan .................................................................. 1
        B.      Summary of Treatment of Claims and Equity Interests under the Plan ... 2

III.    PLAN VOTING INSTRUCTIONS AND PROCEDURES ................................... 9

        A.      Notice to Holders of Claims and Equity Interests in Navillus ............... 9
        B.      Voting Rights .......................................................................................... 10
        C.      Solicitation Materials .............................................................................. 11
        D.      Voting Procedures, Ballots, and Voting Deadline .................................. 12
        E.      Combined Hearing and Deadline for Objections to Final Approval of
                Disclosure Statement and Confirmation of Plan ..................................... 13
        F.      RECOMMENDATION .......................................................................... 13

IV.     GENERAL INFORMATION CONCERNING NAVILLUS ........................ ~~13~~14

        A.      Overview of Navillus' Corporate History ......................................... ~~13~~14
        B.      Navillus' Equity Structure ...................................................................... 14
        C.      Navillus' Prepetition Capital Structure .............................................. ~~14~~15
        D.      The Union Funds Litigation .................................................................... 15
        E.      Events Leading to the Filing of the Chapter 11 Case .............................. 16
        F.      Anticipated Future of Navillus ................................................................ 17

V.      THE CHAPTER 11 CASE ................................................................................ 17

        A.      Commencement of the Case .................................................................... 17
        B.      First Day Orders ................................................................................ ~~17~~18
        C.      Retention of Professionals ................................................................. ~~18~~19
        D.      Committee of Unsecured Creditors ......................................................... 19
        E.      DIP Financing ................................................................................... ~~19~~20
        F.      Claims Administration ............................................................................ 20
        G.      Other Matters Addressed During the Chapter 11 Case ....................... ~~21~~22
        H.      Liberty Global Settlement ....................................................................... 24
        I.      Avoidance Actions .................................................................................. 25
        J.      Financial Performance During the Chapter 11 Case ........................... ~~26~~27
        K.      Original Plan and Disclosure Statement .................................................. 27

- i -

VI.     SUMMARY OF ISSUES INVOLVING NAVILLUS AND THE UNION
        PARTIES DURING THE CHAPTER 11 CASE AND THE UNION
        PARTIES SETTLEMENT ................................................................................. 28

        A.      The Navillus Appeal .............................................................................. 28
        B.      ACS Sale Trial ...................................................................................... 28
        C.      Priority Claim Objections ..................................................................... 29
        D.      Case-Wide Mediation ........................................................................... 30
        E.      Union Parties Settlement ...................................................................... 3031

VII.    SUMMARY OF THE PLAN OF REORGANIZATION ................................. 32

        A.      Treatment of Claims and Equity Interests Under Plan ......................... 32
        B.      Means for Implementation of Plan ....................................................... 3637
        C.      Treatment of Executory Contracts and Unexpired Leases ................... 3940
        D.      Provisions Governing Distributions and Disputed Claims ................... 4344
        E.      Procedures For Resolving Disputed, Contingent, And Unliquidated
                Claims And Distributions With Respect Thereto .................................. 4849
        F.      Retention of Jurisdiction ....................................................................... 5152
        G.      Release, Discharge, Injunction and Exculpation .................................. 5354

VIII.   VOTING ON AND CONFIRMATION OF PLAN ......................................... 5859

        A.      General Requirements for Confirmation ............................................... 5859
        B.      Voting Procedures and Standards ......................................................... 5961
        C.      Acceptance By Impaired Classes .......................................................... 6263
        D.      Confirmation Without Acceptance by All Impaired Classes ("Cram
                Down") .................................................................................................. 6263
        E.      New Value Contribution to Satisfy New Value Requirement in a Cram
                Down ..................................................................................................... 6465
        F.      Best Interest of Creditors/Liquidation Analysis .................................. 6466
        G.      Feasibility ............................................................................................. 6567
        H.      The Release Provisions Are Integral Components of the Plan ............. 68
        I.      Further Information; Additional Copies ................................................ 6670

IX.     CERTAIN RISK FACTORS TO BE CONSIDERED ..................................... 6771

        A.      Certain Business Considerations ........................................................... 6771
        B.      Certain Bankruptcy Considerations ...................................................... 6872
        C.      Certain Tax Considerations ................................................................... 7074

X.      CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE
        PLAN ............................................................................................................... 7074

        A.      U.S. Federal Income Tax Consequences to the Debtor ........................ 7175
        B.      U.S. Federal Income Tax Consequences to the Holders of Claims ...... 7276

C.    Information Reporting and Backup Withholding ................................ ~~72~~76

D.    Importance of Obtaining Your Own Professional Tax Assistance ........... ~~73~~77

XI.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
      THE PLAN ................................................................................ ~~73~~77

A.    Alternative Plan(s) of Reorganization ........................................... ~~73~~77

B.    Liquidation Under Chapter 7 or Chapter 11 ................................... ~~74~~77

XII.  RECOMMENDATION AND CONCLUSION ....................................... ~~75~~79

Disclosure Statement

## **TABLE OF EXHIBITS**

Exhibit A    Chapter 11 Plan of Reorganization of Navillus Tile, Inc. d/b/a Navillus
Contracting Under Chapter 11 of the Bankruptcy Code

Exhibit B    Pro Forma Financial Projections

Exhibit C    Liquidation Analysis

Disclosure Statement

# I.    INTRODUCTION

Navillus Tile, Inc., d/b/a Navillus Contracting, as debtor and debtor-in-possession ("Navillus" or the "Debtor"), submits this amended disclosure statement (the "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code"), for use in the solicitation of votes on the Consensual Amended Chapter 11 Plan of Reorganization of Navillus Tile, Inc. d/b/a Navillus Contracting Under Chapter 11 of the Bankruptcy Code, dated August [    ].24, 2018 (the "Plan"). This Disclosure Statement and Plan are being proposed by Navillus with the support of the Committee and, the Union Parties and Liberty. **A copy of the Plan is attached as Exhibit A to this Disclosure Statement. All capitalized terms used in this Disclosure Statement but not otherwise defined herein have the meanings ascribed to such terms in Article I of the Plan.**

This Disclosure Statement sets forth certain information regarding Navillus' prepetition operating and financial history, its reasons for seeking protection and reorganization under chapter 11, significant events that have occurred during the Chapter 11 Case and the anticipated organization, operations, and financing of Navillus upon its successful emergence from chapter 11.

This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which Distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

**NAVILLUS AND THE COMMITTEE BELIEVE THAT THE PLAN WILL ENABLE NAVILLUS TO SUCCESSFULLY REORGANIZE AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF NAVILLUS AND ITS CREDITORS AND EQUITY HOLDERS. NAVILLUS AND THE COMMITTEE URGE HOLDERS TO VOTE TO ACCEPT THE PLAN.**

# II.    OVERVIEW OF THE PLAN

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan. For a more detailed description of the terms and provisions of the Plan, see Article VII of this Disclosure Statement, entitled "Summary of the Plan of Reorganization."

## A.    General Structure of the Plan

The Plan is a plan of reorganization that provides for the reorganization of Navillus as a going concern with the support of Liberty for future operations. The Plan will be funded by one or more of the following sources: Cash on hand, the Exit Financing, and/or

the New Value Contribution.[1]   The Plan divides Holders of Claims against and Equity Interests in Navillus into six (6) separate Classes based on the nature of their legal rights, two (2) of which are Impaired, and four (4) of which are Unimpaired.  The Plan also provides for Distributions to Holders of Claims in four (4) unclassified categories comprised of Administrative Claims, Professional Fee Claims, Priority Tax Claims and the Liberty DIP Loan Claim.

Distributions to holders of Allowed Claims and Equity Interests will be made on or as soon as practicable after the Effective Date, and Distributions on account of Disputed Claims will be held in a Distribution Reserve until such Disputed Claims are resolved.

### B.        Summary of Treatment of Claims and Equity Interests under the Plan

The Plan divides holders of Claims against and Equity Interests in Navillus into separate Classes based on the nature of the Claims and the legal rights related to each Claim.  In addition, the Plan provides for payment of unclassified Administrative Claims, Professional Fee Claims, Priority Tax Claims and the Liberty DIP Loan Claim.

The table below summarizes the classification and treatment of the Claims and Equity Interests under the Plan, together with projected estimated recoveries for holders of Allowed Claims and Equity Interests.  Estimated Claim amounts are calculated as of the Petition Date, subject to the outcome of the Claims allowance process to date.  Estimated percentage recoveries are also set forth below for certain Classes of Claims.  Estimated percentage recoveries have been calculated based upon a number of assumptions, including the estimated amount of Allowed Claims in each Class.

For certain Classes of Claims, the actual amounts of Allowed Claims could materially exceed or could be materially less than the estimated amounts shown in the table that follows.  The amounts set forth herein as estimated recoveries on account of Claims and Equity Interests are based on known Claims, and to the extent any additional Claims are filed against Navillus consistent with the terms of the Plan, the estimated recoveries set forth herein could vary.  Navillus has not yet fully reviewed and analyzed all Claims and Equity Interests.  The deadline for filing proofs of Claims and Equity Interests was February 14, 2018.  Estimated Claim amounts for each Class set forth below are based upon Navillus' review of its books and records, filed Proofs of Claim, the outcome of the Claims allowance process to date, and include estimates of a number of Claims that are contingent, disputed, and/or unliquidated.

| DESCRIPTION AND AMOUNT OF CLAIMS OR EQUITY INTERESTS | SUMMARY OF TREATMENT |
|---|---|
| Unclassified: Administrative Claims | • Unimpaired |

---

[1] To the extent the Plan ~~is not confirmed~~fails to become effective due to the failure of the occurrence of the conditions to the Effective Date set forth in ~~Article X~~Section 10.2 of the Plan, Navillus reserves the right to seek to fund Distributions ~~under the Plan~~ through the proceeds of the liquidation of assets, either through (x) a sale of substantially all of its assets pursuant to section 363 of the Bankruptcy Code or (y) the wind-down of its construction operations and orderly liquidation of assets, and the Committee reserves all of its rights regarding the same.

| DESCRIPTION AND AMOUNT OF CLAIMS OR EQUITY INTERESTS | SUMMARY OF TREATMENT |
|---|---|
| Current Aggregate Amount of Claims: $47,977.50<br><br>Estimated Aggregate Allowed amount of Administrative Claims: $297,977.40 (including U.S. Trustee fees for the third quarter which will come due in October 2018) | • Each Holder of an Allowed Administrative Claim shall receive, in full and complete settlement, release, and discharge of such Claim, Cash in an amount equal to the Allowed amount of its Administrative Claim on or as soon as reasonably practicable after the ~~later of (a) the~~ Effective Date ~~or (b) the date such Administrative Claim becomes Allowed~~, or receive such less favorable treatment as may be agreed by such Holder and Navillus; provided, however, that the Allowed Administrative Claims representing liabilities incurred in the ordinary course of business by Navillus, including, without limitation, the undisputed Union Ordinary Course CBA Claims, shall be paid in full and performed by Navillus in the ordinary course of business according to normal and customary terms existing between the parties. Notwithstanding the immediately preceding sentence, Administrative Claims of the U.S. Trustee for fees pursuant to 28 U.S.C. § 1930(a)(6) shall be paid in accordance with the applicable schedule for payment of such fees.<br><br>• Not entitled to vote on the Plan.<br><br>• Estimated Recovery: 100% |
| Unclassified: Professional Fee Claims<br><br>Current Aggregate Amount of Claims: N/A<br><br>Estimated Aggregate Allowed amount of | • Unimpaired<br><br>• Each Holder of an Allowed Professional Fee Claim ~~for services rendered through the Confirmation Date~~ shall receive Cash in an amount equal to the Allowed amount of such Professional Fee Claim on or as soon as reasonably practicable after the later of (a) the Effective Date or (b) the date such Professional Fee Claim becomes Allowed, or shall receive such other less favorable treatment as may be |

| DESCRIPTION AND AMOUNT OF CLAIMS OR EQUITY INTERESTS | SUMMARY OF TREATMENT |
|---|---|
| Professional Fee Claims: $4,500,000 | agreed by such Holder and Navillus. For the avoidance of doubt, the Claims of the Fee Examiner and the Fee Examiner Professionals shall not be treated as Professional Fee Claims and shall be paid as set forth in Section 13.09 of the Plan.<br><br>• Not entitled to vote on the Plan.<br><br>• Estimated Recovery: 100% |
| Unclassified: Priority Tax Claims<br><br><br>Current Aggregate Amount of Claims: $2,124,255.45<br><br><br>Estimated Aggregate Allowed amount of Priority Tax Claims: $1,681,462.56 | • Unimpaired<br><br>• Unless otherwise agreed to by Navillus and the Holder of an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, in the sole discretion of Navillus, and in full and complete settlement, release, and discharge of such Claim: (i) Cash in the amount equal to such Allowed Priority Tax Claim on or as soon as reasonably practicable after the later of (a) the Effective Date or (b) the date such Priority Tax Claim becomes Allowed; or (ii) Cash equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code (or such lesser rate as is agreed to by the Holder of such Allowed Priority Tax Claim), payable over a period ending no later than five (5) years from the Petition Date; provided, however, that Navillus reserves the right to prepay such amounts at any time under the latter option.<br><br>• Not entitled to vote on the Plan.<br><br>• Estimated Recovery: 100% |

| DESCRIPTION AND AMOUNT OF CLAIMS OR EQUITY INTERESTS | SUMMARY OF TREATMENT |
|---|---|
| Unclassified: Liberty DIP Loan Claim<br><br>Current Aggregate Amount of Claims: $300,000.00<br><br>Estimated Aggregate Allowed amount of Liberty DIP Loan Claim: $300,000.00 | • Unimpaired.<br><br>• Pursuant to the Union Parties Settlement, Liberty has agreed to assign to the Union Parties any and all Distributions on account of the Allowed Liberty DIP Loan Claim in an amount of upnot to exceed three hundred thousand ($300,000) dollars to the Union Parties and to waive (a) any and all other Distributions in excess of three hundred thousand ($300,000) dollars on account of the Allowed Liberty DIP Loan Claim as against the Estate and (b) all other rights and Claims relative to the specific post-petition costs and expenses that are the subject of the Allowed Liberty DIP Loan Claim against the Estate, DOS and all other Indemnitors. On or as soon as reasonably practicable after the Effective Date, the Distributions payable on account of the Allowed Liberty DIP Loan Claim shall be paid in Cash to the Union Parties in an amount of up to three hundred thousand ($300,000) dollars in accordance withdeposited in escrow with the Union Parties Cure Claim Escrow Agent who, in turn, shall release such funds according to the governing escrow agreement and the Union Parties Settlement Allocation.<br><br>• Not entitled to vote on the Plan.<br><br>• Estimated Recovery: 100% |
| Class 1: Article 3A Claims<br><br>Current Aggregate Amount of Claims: | • Unimpaired<br><br>• Class 1 consists of Article 3A Claims against Navillus.<br><br>• The legal, equitable and contractual rights of the Holders of Allowed Class 1 Claims will be unaltered by the Plan. |

| DESCRIPTION AND AMOUNT OF CLAIMS OR EQUITY INTERESTS | SUMMARY OF TREATMENT |
|---|---|
| $11,342,696.00<br><br>Estimated Aggregate Allowed amount of Class 1 Claims:  TBD following payment in ordinary course of business | On the Effective Date, each Holder of an Allowed Article 3A Claim shall receive in full, final and complete satisfaction, settlement, release, and discharge of such Claim, payment in full in Cash of the Allowed Article 3A Claim, or reinstatement and subsequent payment of such Allowed Article 3A Claim, in the ordinary course of business, each in accordance with the provisions of Article 3A and such agreements and terms as existing as of the Petition Date, which agreements will continue in full force and effect<br><br>• Not entitled to vote on the Plan.<br><br>• Estimated Recovery: 100% |
| Class 2: Other Secured Claims<br><br>Current Aggregate Amount of Claims: $3,869,318.87<br><br>Estimated Aggregate Allowed amount of Class 2 Claims:  $3,869,318.87 | • Unimpaired<br><br>• Class 2 consists of all Other Secured Claims against Navillus.<br><br>• On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, in full, final and complete satisfaction, settlement, release, and discharge of such Claim, in the sole discretion of Navillus: (i) reinstatement and unimpairment of its Allowed Other Secured Claim in accordance with section 1124(2) of the Bankruptcy Code, or (ii) in exchange for such Other Secured Claim, either (a) Cash in the full amount of such Allowed Other Secured Claim, including any reasonable postpetition interest accrued pursuant to section 506(b) of the Bankruptcy Code, (b) the proceeds of the sale or disposition of the collateral securing such Allowed Other Secured Claim to the extent of the value of the Holder's secured interest |

- 6 -

| DESCRIPTION AND AMOUNT OF CLAIMS OR EQUITY INTERESTS | SUMMARY OF TREATMENT |
|---|---|
|  | in such collateral, (c) the collateral securing such Allowed Other Secured Claim and any reasonable interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (d) such other distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code.  In the event Navillus sells or otherwise disposes of the collateral securing any Allowed Other Secured Claim, all expenses relating thereto, including but not limited to transportation, shipping and storage expenses, shall be borne by the Holder of the Class 2 Other Secured Claim.<br><br>• Not entitled to vote on the Plan.<br><br>• Estimated Recovery: 100% |
| Class 3:  Other Priority Claims<br><br><br>Current Aggregate Amount of Claims: $28,479.04<br><br><br>Estimated Aggregate Allowed amount of Class 3 Claims: $28,479.04 | • Unimpaired<br><br>• Class 3 consists of Other Priority Claims against Navillus.<br><br>• On the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Other Priority Claim shall receive, in full, final and complete satisfaction, settlement, release, and discharge of such Claim, Cash in the amount equal to such Allowed Other Priority Claim.<br><br>• Not entitled to vote on the Plan.<br><br>• Estimated Recovery: 100% |

| **DESCRIPTION AND AMOUNT OF CLAIMS OR EQUITY INTERESTS** | **SUMMARY OF TREATMENT** |
|---|---|
| Class 4  Union Parties Cure Claims<br><br>Current Aggregate Amount of Claims: $170,198,031.34<br><br>Estimated Aggregate Allowed amount of Class 4 Claims:<br><br>$170,198,031.34 | • Impaired<br><br>• Class 4 consists of the Union Parties Cure Claims against Navillus.<br><br>• The treatment of the Class 4 Union Parties Cure Claims shall be, as follows:<br><br>i.   On ~~or as soon as reasonably practicable after~~ the Effective Date _or with respect to the Distribution on the TSC Allowed Claim when the first Distribution to Holders of Class 5 Allowed Claims is made_, the holders of the Allowed Union Parties Cure Claims shall receive, in the aggregate, and in full, final and complete cure and satisfaction, settlement, release, and discharge of such Union Parties Cure Claims: (x) a one-time Cash Distribution in the amount equal to twenty five million ninety thousand six hundred sixty six ($25,090,666) dollars; ~~and~~_plus_ (y) _a_ one-time Cash Distribution in an amount not to exceed six hundred fourteen thousand ($614,000) dollars on account of ~~(i)~~ the assigned Distributions on account of _(i) the_ Allowed Liberty DIP Loan Claim and (ii) ~~Proof of~~_the Allowed TSC_ Claim ~~number 45 filed by TSC~~.<br><br>ii.  _Funds sufficient to make_ Distributions on account of the Union Parties Cure Claims shall be ~~made subject to~~_deposited in escrow with the Union Parties Cure Claim Escrow Agent who, in turn, shall release such funds according to the governing escrow agreement and_ the Union Parties |

Disclosure Statement

| DESCRIPTION AND AMOUNT OF CLAIMS OR EQUITY INTERESTS | SUMMARY OF TREATMENT |
|---|---|
| | Settlement Allocation.<br><br>• Entitled to vote to accept or reject the Plan.<br><br>• Estimated Recovery: 14.69% |
| Class 5: General Unsecured Claims<br><br>Current Aggregate Amount of Claims: $46,326,968.65<br><br>Estimated Aggregate Allowed amount of Class 5 Claims: Approximately $8,724,170.25 | • Impaired<br><br>• Class 5 consists of General Unsecured Claims against Navillus.<br><br>• On or as soon as reasonably practicable on the date on which all objections to Class 5 General Unsecured Claims have been resolved or ruled on by the Bankruptcy Court, each Holder of an Allowed General Unsecured Claim shall receive, in full, final and complete satisfaction, settlement, release, and discharge of such Claim, the lesser of (i) ten (10%) percent of the Allowed amount of its Allowed General Unsecured Claim; or (ii) its Pro Rata Share of six hundred thousand ($600,000) dollars.<br><br>• Class 5 is Impaired, and Holders of Class 5 Claims will be entitled to vote to accept or reject the Plan.<br><br>• Estimated Recovery: Approximately 9% |
| Class 6: Equity Interests<br><br>Current Aggregate Amount of Equity Interests: N/A<br><br>Estimated Aggregate Allowed amount of Class 6 Equity Interests: 100% | • ~~Impaired~~Unimpaired<br><br>• Class 6 consists of the Equity Interests in Navillus held by the Donal O'Sullivan Revocable Living Trust and Donal O'Sullivan IDGT II.<br><br>• The current Holders of the Class 6 Equity Interests shall retain their Equity Interests in Navillus in consideration for the payment of the New Value Contribution by DOS. |

Disclosure Statement

| DESCRIPTION AND AMOUNT OF CLAIMS OR EQUITY INTERESTS | SUMMARY OF TREATMENT |
|---|---|
| | • Class 6 is Unimpaired, and Holders of Class 6 Equity Interests will not be entitled to vote to accept or reject the Plan.<br><br>• Estimated Recovery: 100% |

## III.    PLAN VOTING INSTRUCTIONS AND PROCEDURES

### A.    Notice to Holders of Claims and Equity Interests in Navillus

This Disclosure Statement is subject to approval by the Bankruptcy Court finding that this Disclosure Statement contains information of a kind and in sufficient and adequate detail to enable Holders of Claims entitled to vote on the Plan to make an informed judgment about whether to accept or reject the Plan. THE BANKRUPTCY COURT'S CONDITIONAL APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

IF THE PLAN IS APPROVED BY THE REQUISITE VOTE OF HOLDERS OF CLAIMS AND EQUITY INTERESTS ENTITLED TO VOTE AND IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, NAVILLUS, WHETHER OR NOT THEY WERE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN. ADDITIONALLY, THE RELEASES SET FORTH IN SECTION 12.01(E) OF THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS TO THE FULLEST EXTENT PERMITTED BY LAW. ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN NAVILLUS ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT, THE PLAN AND THE COMMITTEE'S PLAN SUPPORT LETTER ARE THE ONLY DOCUMENTS CONDITIONALLY APPROVED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. NO REPRESENTATIONS HAVE BEEN CONDITIONALLY AUTHORIZED BY THE BANKRUPTCY COURT CONCERNING NAVILLUS OR THE PLAN, EXCEPT AS EXPLICITLY SET FORTH IN THE DISCLOSURE STATEMENT. CONDITIONAL APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT INDICATE THAT THE BANKRUPTCY COURT RECOMMENDS EITHER ACCEPTANCE OR REJECTION OF THE PLAN NOR DOES

Disclosure Statement

SUCH CONDITIONAL APPROVAL CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT IS SUBJECT TO FINAL APPROVAL AT THE COMBINED HEARING.

No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning Navillus other than the information contained herein.

B.    **Voting Rights**

Pursuant to the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are "impaired" and not deemed to have rejected a plan are entitled to vote to accept or reject the plan. Any claim or equity interest holder whose legal, contractual or equitable rights are altered, modified or changed by the proposed treatment under a plan or whose treatment under the Plan is not provided for in section 1124 of the Bankruptcy Code is considered "impaired."

Under the Plan, Holders of Allowed Claims and Equity Interests in Classes 1, 2, 3 and 6 are Unimpaired and deemed to have accepted the Plan. Holders of Claims in Classes 4 and 5 are Impaired and entitled to vote on the Plan (the "Voting Classes"). The determination as to whether a Class of Claims or Equity Interests is Impaired is based on Navillus' projected estimated recoveries and analysis of the legal nature of the treatment of the Claims and Equity Interests under the Plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the allowed claims that cast ballots for acceptance of the plan. For a more detailed description of the requirements for confirmation of the Plan, see Article VIII – "Confirmation of the Plan".

If a Class of Claims or Equity Interests entitled to vote on the Plan rejects the Plan or is deemed to have rejected the Plan, Navillus reserves the right to amend and revise the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code, or both. Section 1129(b) of the Bankruptcy Code enables the confirmation of a chapter 11 plan notwithstanding the rejection of a plan by one or more impaired classes of claims and equity interests. Under that section, a plan may be confirmed by a bankruptcy court if it complies with section 1129(a) of the Bankruptcy Code (except for 1129(a)(8)) and as to the rejecting class does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class. For a more detailed description of the requirements for confirmation of a non-consensual plan, see Section VIII.ED.

The date of entry of the Conditional Approval Order is fixed as the "Voting Record Date." Only Persons who hold Allowed Claims on the Voting Record Date are entitled to receive

a copy of this Disclosure Statement and all of the related materials. Only Persons who hold Claims on that date that are Impaired under the Plan and are not deemed to reject the Plan are entitled to vote on the Plan.

### C.     Solicitation Materials

In soliciting votes for the Plan pursuant to this Disclosure Statement, Navillus, through its voting agent, Garden City Group, LLC (the "Voting Agent"), will send to Holders of Claims who are entitled to vote copies of (a) this Disclosure Statement and the Plan, (b) the notice of, among other things, (i) the date, time, and place of the combined hearing to consider final approval of the Disclosure Statement, confirmation of the Plan and related matters and (ii) the deadline for filing objections to final approval of the Disclosure Statement and confirmation of the Plan (the "Combined Hearing Notice"), (c) one or more Ballots (and return envelopes) to be used in voting to accept or to reject the Plan, (d) the Committee's letter in support of confirmation of the Plan, and (e) other materials as authorized by the Bankruptcy Court, as more fully set forth in the Conditional Approval Order.

If you are the Holder of a Claim or Equity Interest who believes you are entitled to vote on the Plan, but you did not receive a Ballot or your Ballot is damaged or illegible, or if you have any questions concerning voting procedures, you should contact the Voting Agent:

**If by first class mail:**

Navillus Tile, Inc. Case Administration
c/o GCG
P.O. Box 10446
Dublin, Ohio 43017-4046

**If by hand-delivery or overnight mail:**

Navillus Tile, Inc. Case Administration
c/o GCG
5151 Blazer Parkway, Suite A
Dublin, Ohio 43017

### D.     Voting Procedures, Ballots, and Voting Deadline

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying Ballot.

Disclosure Statement

In voting to accept or reject the Plan, you must use only the Ballot(s) sent to you with this Disclosure Statement.  IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND <u>RECEIVED</u> BY THE VOTING AGENT NO LATER THAN [_____] EASTERN TIME (THE "VOTING DEADLINE") AT THE FOLLOWING ADDRESS:

**If by first class mail:**

Navillus Tile, Inc. Case Administration
c/o GCG
P.O. Box 10446
Dublin, Ohio 43017-4046

**If by hand-delivery or overnight mail:**

Navillus Tile, Inc. Case Administration
c/o GCG
5151 Blazer Parkway, Suite A
Dublin, Ohio 43017

<u>ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED UNLESS OTHERWISE ORDERED BY THE BANKRUPTCY COURT</u>**.** <u>ANY BALLOTS CAST BY FACSIMILE, E-MAIL OR OTHER ELECTRONIC MEANS WILL NOT BE ACCEPTED UNLESS OTHERWISE ORDERED BY THE BANKRUPTCY COURT. BALLOTS THAT ARE RECEIVED BUT NOT SIGNED WILL NOT BE COUNTED</u>.  The Voting Agent will prepare and file with the Court a certification of the results of the balloting with respect to the Plan.

If you have any questions about (a) the procedure for voting your Claim or Equity Interest, (b) the packet of materials that you have received, or (c) the amount of your Claim, or if you wish to obtain, at your own expense (unless otherwise specifically required by Bankruptcy Rule 3017(d)), an additional copy of the Plan, this Disclosure Statement, the Plan Supplement (once filed), or any appendices or exhibits to such documents, please contact the Voting Agent <u>at</u> the address specified above or the undersigned counsel to Navillus at (516) 357-3700.

For further information and general instructions on voting to accept or reject the Plan, see Article XII of this Disclosure Statement and the instructions accompanying your Ballot.

**E.**    **Combined Hearing and Deadline for Objections to Final Approval of Disclosure Statement and Confirmation of Plan**

Pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Bankruptcy Court will hold the Combined Hearing commencing at __:00 _.m. (Eastern Time), on _____, 2018 at the United States Bankruptcy Court for the Southern District of New York, 1 Bowling Green, Courtroom 701, New York, New York 10004, before the Honorable

- 13 -

Sean H. Lane, United States Bankruptcy Judge.  The Combined Hearing may be adjourned from time to time without further notice.  At the Combined Hearing, the Bankruptcy Court will (i) determine whether the requisite vote has been obtained from the Voting Classes, (ii) hear and determine objections, if any, to the final approval of the Disclosure Statement and to confirmation of the Plan that have not been previously disposed of, (iii) determine whether the Disclosure Statement contains adequate information and the Plan meets the confirmation requirements of the Bankruptcy Code, (iv) determine whether to approve the Disclosure Statement on a final basis and confirm the Plan, and (v) grant such other and further relief as the Bankruptcy Court deems reasonable and appropriate.

Any objection to final approval of the Disclosure Statement or confirmation of the Plan must be in writing and filed with the Bankruptcy Court and served in a manner so as to be received on or before _____, 2018 at 5:00 p.m. Eastern Time by: (1) counsel to Navillus, Cullen and Dykman LLP, 100 Quentin Roosevelt Boulevard, Garden City, New York 11530, Attn: C. Nathan Dee, Esq. and Elizabeth M. Aboulafia, Esq.; (2) the Office of the United States Trustee for the Southern District of New York, Attn: Paul Schwartzberg, Esq., 201 Varick Street, Suite 1006, New York 10014; and (3) counsel to the Committee, Hahn & Hessen LLP, 488 Madison Avenue, New York, NY 10022, Attn: Mark T. Power, Esq. and Jeffrey Zawadzki, Esq.

## F.  RECOMMENDATION

**NAVILLUS AND THE COMMITTEE BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AND EQUITY INTERESTS IN NAVILLUS AND STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## IV.  GENERAL INFORMATION CONCERNING NAVILLUS

### A.  Overview of Navillus' Corporate History

Navillus is one of New York City's largest union contractors.  Navillus serves primarily as a masonry subcontractor doing masonry, concrete, stone, tile, steel, restoration, repointing, roofing, carpentry, plastering and fireproofing on large union construction projects.  In addition, Navillus works as a prime and general contractor on public restoration projects where it self-performs the majority of the work.  Navillus works closely with many of New York's most prominent architects, builders, owners, government agencies and institutions and is pre-qualified by numerous commercial and government agencies.

As of the Petition Date, Navillus employed over seven hundred (700) individuals, including approximately six hundred forty (640) individuals to provide labor in connection with approximately sixty eight (68) open construction projects and approximately sixty five (65) individuals at the management level and to provide home office support.  The level of field labor varies depending on the volume of open construction projects, and Navillus employs up to approximately one thousand six hundred (1,600) field laborers during peak times.

- 14 -

Navillus operates its business from a midtown Manhattan headquarters which it has leased since 2015.  Navillus also leases yard space in Long Island City, Queens where it stores construction equipment and its fleet of vehicles.  On average, Navillus has gross annual income of approximately $180 million.  In the 2016 calendar year, Navillus had gross contract revenues of approximately $240 million.

Navillus is obligated to approximately twenty (20) trade unions through collective bargaining agreements ("CBAs") with the Building Contractors Association ("BCA"), Project Labor Agreements ("PLAs"), and/or independent CBAs.  Navillus is one of the largest contributors to union funds in the New York metropolitan area, having contributed more than $172 million to the New York union funds in the last five (5) years alone.

**B.    Navillus' Equity Structure**

Navillus was formed in 1987 as a New York corporation. Navillus has become, largely under the direction of Donal O'Sullivan ("DOS"), one of the largest diversified union construction firms in New York City.  In or around March 2017, DOS transferred his ownership interests to the Donal O'Sullivan Revocable Living Trust and Donal O'Sullivan IDGT II.  The Donal O'Sullivan Revocable Living Trust, of which DOS is the trustee, owns 2 voting shares and 99 non-voting shares in Navillus.  The Donal O'Sullivan IDGT II, of which Helen O'Sullivan is the trustee, owns 99 non-voting shares in Navillus.

DOS remains the sole director, President and Chief Executive Officer of Navillus.

**C.    Navillus' Prepetition Capital Structure**

**1.    *The Liberty Indemnity Agreements***

Prior to the Petition Date, on or around October 24, 1995, December 12, 2006 and March 15, 2007, Navillus, ~~Donal O'Sullivan~~DOS, individually and Kathleen O'Sullivan, individually, and certain other individuals and non-debtor entities executed General Agreements of Indemnity (collectively, the "Indemnity Agreements") in favor of Liberty and for the purpose of obtaining bonding for Navillus' construction operations.

In the Indemnity Agreements, the Indemnitors agreed, among other things, to exonerate, hold harmless and indemnify Liberty from and against any and all liability for losses, fees, costs and expenses incurred by Liberty, *inter alia*, as a result of executing certain surety bonds to guarantee (i) the performance of various contracts (the "Bonded Contracts") and (ii) the payment of certain obligations of Navillus with respect to the Bonded Contracts (the "Bonds").

**2.    *The Signature Pre-Petition Credit Facility and Signature Financial Equipment Loans***

Prior to the Petition Date, Navillus had a thirteen million ($13,000,000) dollar line of credit (the "LOC") with Signature Bank, N.A. ("Signature") which was secured by all personal property assets of Navillus.  Following entry of the District Court Decision and the Union Funds'

commencement of enforcement action, Signature froze Navillus' access to the LOC and, as a result, Navillus no longer had any ability to borrow from Signature under the LOC. As of the Petition Date, there were no amounts outstanding under the LOC, and the LOC expired by its terms on November 29, 2017.

Prior to the Petition Date, Navillus entered into equipment loans with Signature Financial LLC ("Signature Financial") secured by a 2015 Toyota 8FDU25 Forklift and a 2014 Kenworth T800 truck (the "Equipment"). As of the Petition Date, approximately $68,080 remained due and owing Signature Financial on account of the loans secured by the Equipment.

### D.    The Union Funds Litigation

In October 2014, Navillus was named as a defendant in a lawsuit (the "District Court Action") in the United States District Court for the Southern District of New York (the "District Court") brought by five union pension and welfare benefit funds (the "Union Funds")[2] against Navillus and Advanced Contracting Solutions LLC ("ACS"), Time Square Construction, Inc. ("TSC"), HDK Construction, LLC ("HDK"), Donal O'SullivanDOS, Kevin O'Sullivan and Helen O'Sullivan in the consolidated action styled as *Moore, et al. v. Navillus Tile, Inc., et al.* and *Gesualdi, et al. v. Navillus Tile, Inc., et al.* (Lead Case No. 14-cv-08326). On September 22, 2017, the District Court issued Findings of Fact and Conclusions of Law, and judgment was entered against Navillus in the District Court Action in the amount of $76,222,733.32 (together, the "District Court Decision"). The liability basis for the District Court Decision was, in relevant part, a finding that ACS and TSC (for one project only) and HDK (for one project only) were alter egos of Navillus. On that basis, the District Court awarded judgment to the Union Funds for damages arising out of allegedly unpaid fringe benefit contributions relating to hours worked by non-union employees on ASC and TSC's construction projects during the period from July 1, 2013 through June 21, 2016.

---

[2] The Union Funds which brought the action in the District Court are: (1) Metal Lathers Local 46 Pension Fund, Metal Lathers Local 46 Trust Fund, Metal Lathers Local 46 Annuity Fund, Metal Lathers Local 46 Vacation Fund, Metal Lathers Local 46 Apprenticeship Fund, and Metal Lathers Local 46 Scholarship Fund (collectively, "Local 46 Funds"), which are sponsored by Metallic Lathers and Reinforcing Ironworks Local 46 ("Local 46"); (2) Cement & Concrete Workers Pension Trust Fund, Cement and Workers Welfare Trust Fund, Cement & Concrete Workers Annuity Trust Fund, Cement & Concrete Workers Scholarship Trust Fund, and Cement & Concrete Workers Training and Education Trust Fund (collectively, the "Cement Workers Funds"), which are sponsored by Cement and Concrete Workers District and its Affiliated Local Unions 6A, 18A and 20 (the "Cement Workers"); (3) Cement Mason' Local 780 Trust Fund, Cement Masons' Local 780 Pension Fund, Cement Masons' Local 780 Pension Fund, Cement Masons' Local 780 Annuity Fund, Cement Masons' Local 780 Vacation Fund and Cement Masons' Local 780 Apprenticeship Fund (collectively, "Local 780 Funds"), which are sponsored by United Cement Masons' Union Local 780 ("Local 780"); (4) New York City District Council of Carpenters Pension Fund, New York City District Council of Carpenters Welfare Fund, New York City District Council of Carpenters Apprenticeship Journeyman Retraining, Education and Industry Fund (collectively, the "Carpenters Funds"), which are sponsored by NYC District Council of Carpenters Locals 157 and 1556 (the "Carpenters"); and (5) the Trustees and Fiduciaries of the Local 282 Welfare Trust Fund, the Local 282 Pension Trust Fund, the Local 282 Annuity Trust Fund, the Local 282 Job Training Trust Fund, and the Local 282 Vacation and Sick Leave Trust Fund (the "Local 282 Funds"), which are sponsored by the Building Material Teamsters Local 282 ("Local 282"). Local 46, the Cement Workers, Local 780, the Carpenters and Local 282 are collectively referred to herein as the "Sponsoring Unions" and, together with the Union Funds, the "Union Parties".

Navillus strongly believes that the Judgment was wrongly decided and, on September 26, 2017, Navillus timely filed a notice of appeal (the "Navillus Appeal") of the District Court Decision to the United States Court of Appeals for the Second Circuit (the "Second Circuit").

### E.      Events Leading to the Filing of the Chapter 11 Case

Navillus' chapter 11 filing was precipitated by the District Court Decision and related enforcement action taken by the Union Funds, as well as the operational impacts stemming from the District Court Decision.  Outside of chapter 11 and after the Second Circuit denied Navillus' request for a stay of execution of the District Court Decision pending appeal, the Union Funds commenced with execution on the District Court Decision including through serving restraining notices and a levy, resulting in the freezing of Navillus' bank accounts and bringing operations to a halt.

Entry of the District Court Decision also led to numerous issues on Navillus' two largest open construction projects.  On October 3, 2017 and October 5, 2017, Tishman Construction Company of New York, Inc. ("Tishman"), in its capacity as construction manager on Navillus' two largest construction projects – One Vanderbilt Avenue ("the "OVA Project") and Manhattan West – Northeast Tower, (the "MW Project" and, together with the OVA Project, the "Tishman Projects"), respectively, issued notices of default and termination to Navillus, which Navillus has disputed.  The Tishman Projects, with a combined contract value of over $279 million and over $190 million in work in progress remaining as of the Petition Date, accounted for approximately 40% of Navillus' work in progress as of the Petition Date.

Accordingly, Navillus determined that, given the size of the District Court's judgment, absent the protections of chapter 11, it was at risk of having its assets depleted and losing the contracts that comprise its sole source of revenues.  In the exercise of its sound business judgment, Navillus filed this Chapter 11 Case to protect the value of Navillus' business for all of its constituencies.

As part of its reorganization strategy, Navillus determined that it would be in the best interest of the company and its Estate to employ Teneo Capital, LLC ("Teneo") to provide a chief restructuring officer and related support to Navillus to assist it with its reorganization strategy. Accordingly, on November 22, 2017, Navillus retained Teneo and Christopher K. Wu has been designated as Navillus' chief restructuring officer.

### F.      Anticipated Future of Navillus

As of the Petition Date, Navillus continued to perform work on sixty eight (68) construction projects with approximately five hundred forty three million ($543,000,000) dollars' worth of remaining work in progress to be performed. During this Chapter 11 Case, Navillus has continued operating, including continuing to bid on new construction projects through a Bankruptcy Court-approved bidding arrangement, and has remained current with payment of its operational liabilities in the ordinary course of business.

Navillus intends to reorganize pursuant to the Plan so that it may continue working on its backlog of future construction projects, bidding for new work and serving as a significant union employer in the New York construction market. With the Liberty's support for future bonding and under the leadership of DOS, Navillus submits that Reorganized Navillus will be well poised to ramp up its construction operations during the post-Effective Date period.

## V.        THE CHAPTER 11 CASE

### A.        Commencement of the Case

On November 8, 2017, Navillus commenced the Chapter 11 Case by filing a voluntary petition for relief Chapter 11 of the Bankruptcy Code in the Bankruptcy Court. Since the Petition Date, Navillus has continued to operate as a debtor in possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. Navillus is authorized to operate its business and manage its property in the ordinary course, with transactions outside of the ordinary course of business requiring Bankruptcy Court approval.

An immediate effect of the filing of Navillus' bankruptcy petition was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of Navillus, and the continuation of litigation against Navillus. The relief provides Navillus with the "breathing room" necessary to assess and reorganize its business and prevents creditors from obtaining an unfair recovery advantage while the Chapter 11 Case is ongoing.

### B.        First Day Orders

The first day hearing was held in the Chapter 11 Case before the Bankruptcy Court on November 9, 2017. At the hearings held on November 9, 2017 and during the succeeding weeks, the Bankruptcy Court considered certain requests for immediate relief filed by Navillus to facilitate the transition between Navillus' prepetition and postpetition business operations, and related objections, and entered the following orders:

- Interim and Final Orders (I) Authorizing the Debtor to Pay (A) Certain Prepetition Employee Obligations and (B) Prepetition Withholding Obligations, (II) Authorizing the Debtor to Continue Performing Under the Collective Bargaining Agreements (III) Authorizing the Debtor to Continue to Provide Employee Benefit Programs to Non-Union Employees; (IV) Directing Banks to Honor Related Prepetition Transfers; and (V) Granting Related Relief [Dkt. Nos. 31, 81]

- Interim and Final Orders (A) Authorizing the Debtor to (I) Continue its Cash Management System; (II) Maintain Existing Bank Accounts; (III) Receive a Waiver of Certain Operating Guidelines Relating to Bank Accounts, (IV) Receive a Waiver of the Requirements of 11 U.S.C. § 345; and (B)

Immediately Vacating Certain Restraining Notices and Levy [Dkt. Nos. 30, 84]

- Interim and Final Orders (I) Prohibiting Utility Providers From Altering, Refusing, Or Discontinuing Utility Services, (II) Determining Adequate Assurance Of Payment For Future Utility Services, (III) Establishing Procedures For Determining Adequate Assurance Of Payment, And (IV) Granting Related Relief [Dkt. Nos. 66, 162]

- Interim and Final Orders (I) Authorizing the Debtor to (A) Continue to Maintain Prepetition Insurance Programs and (B) Pay or Honor Prepetition Obligations Arising Thereunder and (II) Granting Related Relief [Dkt. Nos. 82, 161]

- Order Extending Time To File Schedules Of Assets And Liabilities, Schedules Of Current Income And Expenditures, Schedules Of Executory Contracts And Unexpired Leases, And Statement Of Financial Affairs, And (II) Granting Related Relief [Dkt. No. 67]

- Order Signed On 12/1/2017, Establishing Notice Procedures And A Master Service List [Dkt. No. 83]

**C.     Retention of Professionals**

During the Chapter 11 Case, the Bankruptcy Court has authorized the retention of various professionals by Navillus, including:

- Cullen and Dykman LLP, as bankruptcy counsel [Dkt. No. 153];

- Otterbourg, P.C., as special litigation and conflicts counsel [Dkt. No. 193];

- Jones Day, as special litigation and labor counsel [Dkt. No. 169];

- Grassi & Co., as financial advisors [Dkt. No. 189];

- Garden City Group, LLC, as claims and noticing agent [Dkt. No. 190];

- Garden City Group, LLC, as administrative advisor [Dkt. No. 191];

- Mercer (US) Inc., as compensation consultant [Dkt. No. 374];

- Lori Lapin Jones PLLC, as counsel to the fee examiner [Dkt. No. 514];

- National Creditor Recovery Services, LLC, as consultant to the fee examiner [Dkt. No. 522];

- Frank J. Sciame, Jr., as consultant [Dkt. No. 553]; and

- 19 -

- Ordinary Course Professionals [Dkt. No. 217].

The fees and expenses of the professionals retained by Navillus are entitled to be paid by Navillus subject to approval by the Bankruptcy Court and in accordance with the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals and (II) Granting Related Relief* [Dkt. No. 218].   In addition, by order of the Bankruptcy Court dated January 9, 2018, the Bankruptcy Court approved the retention of Teneo to provide Christopher K. Wu as chief restructuring officer of Navillus [Dkt. No. 178].

Pursuant to a stipulated order submitted by Navillus, the Committee and the U.S. Trustee, Diana G. Adams, Esq. has been appointed as fee examiner to act as special consultant to the Bankruptcy Court for professional fee and expense review [Dkt. Nos. 416, 419]. The Fee Examiner has retained Lori Lapin Jones PLLC as counsel to the Fee Examiner and National Creditor Recovery Services, LLC as consultant to the Fee Examiner, which retentions have been approved by Orders of the Bankruptcy Court [Dkt. Nos. 514, 522].

## D.    Committee of Unsecured Creditors

On November 28, 2017, the Office of the U.S. Trustee appointed the following three (3) alleged creditors to serve as members of the Committee:  (i) NYC District Council of Carpenters Benefit Funds, (ii) Cement and Concrete Workers District Council Funds, and (iii) District Council of New York City & Vicinity of the United Brotherhood of Carpenters.

The Committee selected Hahn & Hessen LLP ("H&H") to serve as its counsel and FTI Consulting, Inc. ("FTI") as its financial advisors and, by orders of the Court dated January 19, 2018 and January 26, 2018, respectively, H&H and FTI were retained by the Committee.  [Dkt. Nos. 200, 214].   Since the appointment of the Committee, Navillus has consulted with the Committee concerning the administration of the Chapter 11 Case and has worked collaboratively with the Committee during the case-wide mediation process to negotiate the Union Parties Settlement that is embodied in this Disclosure Statement and the Plan.

## E.    DIP Financing

Although Navillus had sufficient liquidity as of the Petition Date to maintain its ongoing operations, Tishman requested that Liberty provide Navillus with backstop financing to ensure its continued progress on the Tishman Projects, and multiple other project owners raised similar concerns regarding Navillus' liquidity and ability to complete work in light of the chapter 11 filing.   On November 21, 2017, Navillus filed a motion (the "DIP Motion" at Dkt. No. 57) seeking authority to obtain secured post-petition financing on a superpriority basis up to the aggregate amount of $135,000,000 (the "DIP Facility") pursuant to the terms and conditions of the DIP Financing Agreement, by and among Navillus and the non-debtor Indemnitors as borrowers and Liberty, as lender.   To secure the DIP Obligations, Navillus granted Liberty a first priority lien on and security interest in all of Navillus' assets directly related to the Bonded Contracts, except for the Equipment subject to Signature Financial's security interest, and a superpriority claim for post-petition borrowings and losses and certain prepetition unreimbursed losses on the Tishman Projects. Pursuant to the DIP Order entered on December 21, 2017, the

DIP Facility was approved on a final basis for use by Navillus to the extent necessary to ensure adequate liquidity after taking into account existing cash balances (Dkt. No. 156).

As of the date of this Disclosure Statement, Navillus has not borrowed any amounts under the DIP Facility and reserves the right to borrow based on its operational needs.  The only amounts incurred under the DIP Order relate to fees and expenses incurred by Liberty post-petition in connection with their continued extension of surety credit to Navillus on the Tishman Projects.

**F.**     **Claims Administration**

**1.**     *Claims Process*

a.     **Schedules and Statements of Financial Affairs**

Navillus filed its Schedules on January 7, 2018 (Dkt. Nos. 174-175) that, among other things, set forth the Claims of known creditors against Navillus as of the Petition Date, based upon Navillus' books and records. Navillus thereafter amended its Schedules on February 7, 2018 and May 10, 2018 (Dkt. Nos. 222, 384).  The Schedules list approximately three hundred forty two (342) Claims, some of which are disputed, contingent and/or unliquidated in nature.

b.     **Bar Date**

On January 3, 2018, the Bankruptcy Court entered an order (the "Bar Date Order") fixing February 14, 2018, at 5:00 p.m. (the "Bar Date") as the last day for filing Proofs of Claim in this Chapter 11 Case for all Claims against Navillus arising prior to the Petition Date and May 7, 2018 as the deadline for all governmental units to file Proofs of Claim against Navillus' Estate. Approximately one hundred fourteen (114) Proofs of Claim have been filed against Navillus' Estate.  Of the Proofs of Claim filed against the Estate, approximately twenty five (25) have been filed on behalf of the Union Parties and other unions and union benefit funds asserting claims against Navillus based on their direct relationship with Navillus, and the remaining approximately eighty nine (89) Proofs of Claim have been filed by a wide variety of other constituents including, without limitation, project owners, trade creditors, personal injury claimants and secured equipment lessors, to name a few.

**2.**     *Omnibus Claim Objections and Status of Claims*

On March 9, 2018, the Court entered an order setting forth certain procedures for the filing of omnibus objections to claims on grounds other than those set forth in Bankruptcy Rule 3007(d) (Dkt. No. 270).  Navillus subsequently filed seven (7) omnibus claim objections to approximately two hundred thirty four (234) Claims scheduled or asserted against the Estate.  As discussed more fully in Section VI(C) herein, following a May 23, 2018 bench decision granting the first omnibus claims objection and reclassifying the Union Wage Claims (defined herein) to general unsecured claims in their entirety, on June 13, 2018, the Bankruptcy Court entered an order granting the first omnibus claims objection (Dkt. No. 466).  On April 20, 2018, the Bankruptcy Court entered orders pursuant to which the Claims subject to the second and third

- 21 -

omnibus claims objections were reduced, disallowed and/or expunged, as applicable (Dkt. Nos. 345-46). Hearing on the fourth and fifth omnibus claims objections was held on May 23, 2018 at which time the Bankruptcy Court granted the fourth omnibus objection and heard oral argument regarding the legal issues presented by the fifth omnibus objection. Hearing on the sixth omnibus claims objection has been adjourned and Navillus is negotiating a proposed resolution with the affected claimants. Hearing on the seventh omnibus claims objection is scheduled for September 13, 2018. To date, $30,001,778.59 in filed and scheduled Claims have been Disallowed or withdrawn against the Estate as a result of claims objections.

Taking into account the Claims that have been Disallowed or withdrawn, there are currently outstanding Claims against the Estate in the amount of $1,026,205,737.35, inclusive of the $802,086,194.28 primarily Contingent Proof of Claim filed by Liberty. Navillus is advised that Liberty intends to file an amended Proof of Claim asserting a General Unsecured Claim for pre-petition unpaid bond premium and withdrawing the portion of its Proof of Claim that represented a Contingent Claim. Without taking into account the Contingent portion of Liberty's Proof of Claim, the total Claims that have not been Disallowed total to $224,119,543.09. Approximately $170,198,031.34 of this amount represents the Union Parties Cure Claims that are subject to the Union Parties Settlement. Navillus intends to file additional omnibus claims objections as it completes its review of the Claims filed against the Estate, and the Plan provides for the reservation of Navillus' right to file objections to Claims for a period of time following the Effective Date.

For a description of the treatment of Allowed Claims, see Section VI(IAA) below.

**G.     Other Matters Addressed During the Chapter 11 Case**

In addition to the first day relief sought in the Chapter 11 Case, Navillus has sought authority with respect to matters designed to assist in the administration of the Chapter 11 Case, maximize the value of Navillus' Estate, and provide the foundation for Navillus' emergence from Chapter 11. Set forth below is a brief summary of certain of the principal motions Navillus has filed during the pendency of the Chapter 11 Case.

**1.     *Motion to Approve Performance Bonus Program and Related Matters***

On December 8, 2017, Navillus filed the *Motion of Navillus Tile, Inc. for an Order (I) Authorizing the Debtor to Make Payments to Eligible Employees under the Performance Bonus Program and (B) Continue the Performance Bonus Program in the Ordinary Course of Business; (II) Approving the Key Employee Incentive Program; and (III) Granting Related Relief* (the "Bonus Motion" at Dkt. No. 100). Pursuant to the Bonus Motion, Navillus sought authority to (i) make payments to certain salaried field and office employees under its pre-petition performance incentive bonus program (the "Performance Bonus Program") for the performance period from April 1, 2016 to March 31, 2017 and continue the Performance Bonus Program in the ordinary course of business on an ongoing basis; (ii) approve the Performance Bonus Program as a key employee incentive program (the "KEIP") for certain employees including Navillus' senior management. The Performance Bonus Program and KEIP did not include DOS.

- 22 -

Following hearings held on December 21, 2017 and February 28, 2018, payment of pre-petition bonuses due to substantially all eligible employees and the continuation of the Performance Bonus Program were approved by orders of the Bankruptcy Court (Dkt. Nos. 155, 376).   The U.S. Trustee, the Committee and another creditor raised objections to the Bonus Motion to the extent it sought approval to pay pre-petition bonuses or approve the KEIP as to Navillus' senior management (Dkt. Nos. 113, 132, 256).   Following further negotiations regarding the KEIP proposed for Navillus' senior management, Navillus, the Committee and the U.S. Trustee reached a resolution which was approved by Order of the Bankruptcy Court (Dkt. No. 377).

To address the under-compensation still remaining for senior management following the resolution described above, the Union Parties Settlement authorizes Navillus to seek approval of the Senior Management Emergence Bonus Program, which is proposed to be implemented through the Plan.

### 2.     *Motion to Approve Completion Agreement*

On January 7, 2018, Navillus filed the *Motion of Navillus Tile, Inc. for Entry of an Order (A) Authorizing Debtor to Enter into Completion Agreement With Liberty Mutual Insurance Company and (B) Granting Related Relief* (Dkt. No. 176) seeking an order authorizing Navillus to enter into a completion agreement with Liberty to enable Navillus to become the completion subcontractor for Liberty on the OVA Project with the consent of the Tishman and the owner of the OVA Project.   The OVA Project, a construction project with an original contract price of $135,926,646, represents Navillus' single largest asset and is critical to a successful reorganization of its Estate.   The completion agreement and this motion were the product of months of negotiations among Navillus, Liberty, Tishman and the OVA Project's owner regarding the best path to enable Navillus to continue work on the OVA Project while mitigating any risk associated with Navillus' pending Chapter 11 Case.   On February 8, 2018, the Bankruptcy Court entered an order authorizing Navillus to enter into a completion agreement with Liberty for the OVA Project (Dkt. No. 224).

### 3.     *Adversary Proceedings*

Navillus has filed two (2) adversary proceedings for breach of contract seeking to recover amounts due and owing for the benefit of the estate.

### a.     **CNY Construction 701 LLC**

On December 21, 2017, Navillus filed the adversary proceeding styled as *Navillus Tile, Inc. dba Navillus Contracting v. CNY Construction 701 LLC* (Adv. Proc. No. 17-01245), as thereafter amended on February 26, 2018, seeking to recover $1,570,586.36 for breach of contract by CNY Construction 701 LLC ("CNY") in connection with the project known as 701 Seventh Avenue, together with $445,000 for the reasonable value of work performed, and attorneys' fees, interest and costs thereon.   CNY filed an answer and counterclaim against Navillus together with a third party complaint against the project's owner, 701 Seventh Property

Owner LLC, on February 26, 2018 and, on March 16, 2018, an answer to Navillus' amended complaint. On March 30, 2018, Navillus filed an answer to CNY's counterclaim, and on June 29, 2018, the project owner answered the third party complaint. Certain third party counterclaims were subsequently withdrawn. The parties have engaged in discussions in an effort to resolve the disputes in this action, and a joint discovery order was entered on July 12, 2018.

### b.   MLB Door Group, Inc.

On March 28, 2018, Navillus filed the adversary proceeding styled as *Navillus Tile, Inc. dba Navillus Contracting v. MLB Door Group, Inc.* (Adv. Proc. No. 18-01040) seeking to recover $87,116.24 for failure to perform and not less than $56,000 for damages for breach of contract arising out of certain construction projects, together with attorneys' fees, interest and costs thereon. MLB Door Group, Inc. has failed to timely answer the complaint or appear at pre-trial conference held on May 23, 2018. Navillus obtained a clerk's entry of a default on May 29, 2018.

### 4.   *Other Motions*

### a.   Motion to Extend Exclusive Periods

On February 7, 2018, Navillus filed the *Motion To Extend Exclusivity Period For Filing A Chapter 11 Plan And Disclosure Statement* [Dkt. No. 219], and following a hearing held on February 28, 2018, the Bankruptcy Court entered an order extending Navillus' exclusive period to file a plan of reorganization through June 6, 2018 and the period within which only Navillus may solicit acceptances of such plan through August 6, 2018 (Dkt. No. 268). Navillus filed its original chapter 11 plan within this initial extended period, and pursuant to the consensual mediation order entered on August 1, 2018 (Dkt. No. 560), the period to solicit acceptances of a plan has been extended through and including October 6, 2018.

### b.   Motion to Extend Time to Assume or Reject Leases

On February 7, 2018, Navillus filed the *Motion to Extend Time to Assume or Reject Non-Residential Real Property Leases Under 11 U.S.C. 365(d)(4)* [Docket No. 220], and following a hearing held on February 28, 2018, the Bankruptcy Court entered an order extending Navillus' deadline to assume or reject non-residential real property leases through July 6, 2018 (Dkt. No. 269). On August 6, 2018, the Bankruptcy Court entered a second order further extending this deadline through and including October 4, 2018, with the consent of the affected landlords (Dkt. No. 575).

### c.   Motion to Enter Into Pre-Bidding Agreement

On May 1, 2018, Navillus filed the *Motion for an Order Authorizing Entry into Pre-Bidding Agreement* [Docket No. 364], and following a hearing held on May 9, 2018, the Bankruptcy Court entered an order authorizing Navillus to enter into a pre-bidding agreement with E. Fitzgerald Electric Co., Inc., an entity wholly owned by DOS, for the purpose of enabling the two entities to submit bids for construction projects as a joint venture. [Dkt. No. 398]. By

order dated July 18, 2018, the Bankruptcy Court authorized entry into a second pre-bidding agreement with E. Fitzgerald Electric Co., Inc. on terms substantially similar to those approved in the initial order. [Dkt. No. 546].

### H.    Liberty Global Settlement

Navillus has continued its efforts to secure new work during the pendency of the Chapter 11 Case.  Prior to the Petition Date, on September 26, 2017, Liberty placed Navillus' account on hold as a result of the District Court Decision.  Liberty thereafter indicated that it would not issue any additional bonds to Navillus for any new bidding opportunities during the pendency of the Chapter 11 Case unless Navillus bid through a joint venture, as contemplated by the pre-bidding agreementagreements described above.

On February 13, 2018, Liberty filed Proof of Claim No. 82 asserting a secured claim in the total aggregate amount of $802,096,194.28, of which $907,792.88 is liquidated and non-contingent, based on certain legal and consulting costs incurred under the Bonds and related Indemnity Agreements.  The balance of the Liberty Unsecured Bond Claim in the amount of $801,149,367 represents a Contingent Claim for Liberty's potential exposure under the Bonds. In the attachment to its Proof of Claim, Liberty expressly reserved the right to treat these amounts as secured and/or superpriority claims under the DIP Order.  Liberty thereafter exercised that right with respect to up to $300,000 of the liquidated portion of its Proof of Claim, which now constitutes the Allowed Liberty DIP Loan Claim.  Navillus is advised that Liberty intends to file an amended Proof of Claim asserting a General Unsecured Claim for pre-petition unpaid bond premium and withdrawing the portion of its Proof of Claim that represented a Contingent Claim.

Following discussions occurring over a period of months regarding Navillus' future bonding and Liberty's exposure under the Bonds as set forth in its Proof of Claim, Navillus and Liberty have negotiated a global resolution of all outstanding issues between the parties.  The Plan represents Navillus' motion to approve a settlement (the "Liberty Global Settlement") of Liberty's Claims against the Estate that will enable Navillus to reorganize as a going concern with Liberty's support for ongoing operations.  The Liberty Global Settlement contains the following key features, all of which remain subject to further negotiation and documentation in a form satisfactory to both Navillus and Liberty:

- Recognizing that Navillus requires the Bonds to complete its open construction projects, Liberty consentsshall consent to Navillus' assumption of the Bonds under the Plan notwithstanding the status of the Bonds as financial accommodations contracts.

- Liberty consentsshall consent to treatment of any and all cure amounts due and owing as a result of the assumption of the Bonds as a Class 5 General Unsecured Claim payable on the terms set forth in the Plan.  Liberty also agrees to waive its right to collect any such amounts from the non-debtor Indemnitors.

- 25 -

- Navillus and Donal O'Sullivan shall reaffirm any and all obligations under the Indemnity Agreements.

- Liberty shall provide Navillus with funding for the Distributions required to be made under the Plan and post-confirmation liquidity through the Exit Financing on terms to be set forth in the Plan Supplement.

- Liberty shall consider the future execution of bonds on behalf of Navillus on a request-by-request basis, pursuant to its underwriting standards.

- Liberty ~~will consent to the reaffirmation of the obligations under the Indemnity Agreements and the collateral security provided for Exit Financing as adequate and sufficient reserve for the portion of its Proof of Claim that is a Contingent Claim.☐        Liberty will~~shall receive releases and exculpations under the Plan.

Navillus believes that the Liberty Global Settlement represents a fair and equitable resolution of Liberty's Claims that provides significant benefits to the Estate through, among other things, funding to make Cash Distributions under the Plan and the continued ability to complete its open construction projects with continuity of bonding and ~~a commitment to provide bonding~~agreement to consider the future execution of bonds on behalf of Navillus upon Navillus' successful emergence from chapter 11 protection.  Absent the Liberty Global Settlement, Navillus would be unable to complete its current projects or secure new work unless another surety would be willing to step into Liberty's shoes on the existing Bonds and provide bonding to Reorganized Navillus, both of which Navillus believes to be unlikely.

## I.    Avoidance Actions

As part of the Schedules, Navillus filed various lists of payments made by Navillus within the 90-day and one-year periods prior to the Petition Date.  Under applicable bankruptcy law, depending on the facts and circumstances surrounding such transfers, certain of these transfers may be subject to avoidance.  The overwhelming majority of transfers during these time periods are transfers of direct project related payments to Article 3A creditors who are beneficiaries of the trust fund provisions of Article 3A.  Accordingly, because Article 3A funds are trust funds that are not property of the estate, these transfers are not properly subject to avoidance.

As to the remaining transfers, Navillus' counsel and financial advisors undertook an extensive review and analysis of transfers made by Navillus to any entity within the preference period and to Insiders and related entities during a time period consistent with the applicable statutory look-back periods under the New York Debtor and Creditor Law.  Following this review and analysis, Navillus' counsel and financial advisors quantified the potential Avoidance Action exposure for each transferee and conducted a preliminary analysis of statutory defenses that the Estate determined would be likely to be asserted in the event the Avoidance Actions were litigated.

This review and analysis was produced to the Committee in connection with the case-wide mediation that took place in June/July 2018, and the potential recovery from Avoidance Actions was factored into the negotiations surrounding the Union Parties Settlement. ~~Ultimately~~ The Committee reviewed the Estate's Avoidance Action analysis and agreed that it is appropriate to grant the releases set forth in Article XII of the Plan as part of the Union Parties Settlement.  In that regard, the participants in the Union Parties Settlement elected to forego the retention of Avoidance Actions in exchange for a one-time Cash Distribution that would enable Reorganized Navillus to continue its post-confirmation operations without devoting additional resources to matters relating to the Avoidance Actions.  Accordingly, on the Effective Date, Reorganized Navillus will be deemed to waive and release all Avoidance Actions, provided that it retains the right to assert them as defenses or counterclaims in the event of a subsequent lawsuit by a transferee of a potential avoidable transfer.

Navillus submits that the release of the Avoidance Actions under the Plan is warranted, either because of the consideration provided by each Released Party under the Plan or due to the Article 3A status of the majority of such transfers.   Specifically as to DOS who received certain transfers during the years preceding the Petition Date, Navillus submits that the release of Avoidance Actions is justified based on, among other things, (i) the New Value Contribution proposed to be made by DOS to fund Distributions under the Plan, (ii) DOS' commitment of significant personal collateral to secure the Exit Financing and certain other obligations to Liberty under the Indemnity Agreements, both of which provide significant benefits to the Estate, and (iii) DOS' critical importance to the continued successful operation of Navillus' business based on his reputation in the industry.   The release of Avoidance Actions against DOS represents a key component of the consideration bargained for when negotiating the New Value Contribution to be made and the collateral requirements for the Exit Financing.

## J.    Financial Performance During the Chapter 11 Case

Since the Petition Date, Navillus has managed its business as a debtor-in-possession and continued operating on its open construction projects in the ordinary course of business.  Navillus has remained current on its ordinary course trade payables as well as the payment of amounts authorized by orders of this Bankruptcy Court.

Navillus has earned gross revenues of $178,537,446 from the period from the Petition Date through June 30, 2018. As of June 30, 2018, Navillus had cash on hand in the amount of approximately $10,250,000.  Navillus has completed work on a number of its open construction projects and, as of June 30, 2018, has fifty two (52) remaining projects of significant size in progress with approximately $308,000,000 worth of work remaining to be performed.

In addition to completing work on a number of projects, Navillus has significantly progressed the work on the Tishman Projects.  Navillus continues to perform on the OVA Project as a completion contractor pursuant to the Bankruptcy Court-approved completion agreement with Liberty, and Navillus has been performing on the MW Project under weekly transition work agreements since October 2017.  The parties are negotiating the reinstatement of the contract and

release of certain retainage which, once released, Navillus will be able to use to fund its working capital requirements.

At the conclusion of this Chapter 11 Case, Navillus intends to emerge from chapter 11 bankruptcy protection as a going concern and continue successfully prosecuting its construction operations in the same manner as it did prior to the Petition Date.

### K.    Original Plan and Disclosure Statement

On May 29, 2018, Navillus filed its original *Chapter 11 Plan of Reorganization of Navillus Tile, Inc., d/b/a Navillus Contracting Under Chapter 11 of the Bankruptcy Code* ("Original Plan" at Dkt. No. 425) and related original *Disclosure Statement with Respect to Chapter 11 Plan of Reorganization of Navillus Tile, Inc., d/b/a Navillus Contracting Under Chapter 11 of the Bankruptcy Code* (Dkt. No. 426). The Original Plan and Disclosure Statement represented Navillus' opening offer to its creditors prior to a case-wide mediation.

Recoveries to certain classes of Claims and Equity Interests under the Original Plan were contingent on the outcome of the Navillus Appeal, and Distributions were proposed to be held in a Distribution Reserve until the Navillus Appeal was decided. The Original Plan also contemplated that the treatment of Equity Interests would be contingent on the outcome of the Navillus Appeal and an auction for the Equity Interests in Reorganized Navillus pursuant to sale procedures to be submitted to the Bankruptcy Court for approval.

Following the filing of the Original Plan, Navillus negotiated a stock purchase agreement with DOS, through counsel, which set forth the terms pursuant to which DOS proposed to serve as a "stalking horse" for the purchase of Equity Interests in Reorganized Navillus. Thereafter, Navillus filed the *Motion for (I) an Order (A) Establishing Bidding Procedures for the Auction of the Reorganized Debtor's Equity; (B) Approving Selection of Stalking Horse and Expense Reimbursement; (C) Approving the Form of Stock Purchase Agreement; (D) Approving the Form and Manner of Service of the Auction Notice; and (E) Scheduling an Auction; and (II) Certain Related Relief* (the "Bid Procedures Motion" at Dkt. No. 462) and related motion to expand the retention of Teneo to serve as investment banker in connection with the equity auction process. Objections to the Bid Procedures Motion were filed by the U.S. Trustee, the Committee and the Union Parties, and the Committee filed a conditional cross-motion to appoint an independent examiner to oversee the proposed sale process (Dkt. No. 497). At a hearing held on June 26, 2018, the Bankruptcy Court adjourned consideration of the Bid Procedures Motion and related motion to expand Teneo's retention pending the outcome of case-wide mediation.

Given the Union Parties Settlement and consensual Plan, Navillus ~~intends to withdraw~~has withdrawn the Bid Procedures Motion and motion to expand the scope of Teneo's retention (Dkt. Nos. 598, 599).

- 28 -

VI.    **SUMMARY OF ISSUES INVOLVING NAVILLUS AND THE UNION PARTIES DURING THE CHAPTER 11 CASE AND THE UNION PARTIES SETTLEMENT**

As set forth above, entry of the District Court Decision and the Union Funds' commencement of enforcement action thereunder was a significant driver of the filing of this Chapter 11 Case. During the approximately six-week period between entry of the District Court Decision and the filing of this Chapter 11 Case, Navillus pursued all of its available options, however it was unable to obtain either bonding to post a supersedeas bond in excess of $76 million, a stay of enforcement pending the Navillus Appeal, or authority to post a bond in a reduced amount. It was also unable to negotiate a settlement with the Union Funds. Accordingly, in the absence of any viable options that would permit Navillus to preserve the value of its business, it filed the Chapter 11 Case on the Petition Date.

A.    **The Navillus Appeal**

Navillus filed its notice of appeal from the District Court Decision to the Second Circuit prior to the Petition Date and, shortly after the Petition Date, Navillus and the Union Funds entered into a *Stipulated and Agreed Order Granting Relief From the Automatic Stay* (Dkt. No. 60) to enable the parties to pursue the Navillus Appeal during the Chapter 11 Case. As of April 27, 2018, briefing was fully submitted to the Second Circuit and oral argument was scheduled for August 28, 2018.

Given the pendency of the Navillus Appeal during this Chapter 11 Case, Navillus has been presented with the challenge of addressing the approximately $180 million in Claims filed by the Union Parties and other union funds who had no involvement whatsoever in the District Court Action that are premised on the District Court's alter ego finding.

B.    **ACS Sale Trial**

Although ACS' chapter 11 case is entirely separate from Navillus' Chapter 11 Case, involving separate counsel and generally separate creditors (except for the Union Funds), Navillus was forced to intervene in ACS' chapter 11 case in connection with a contested sale transaction in which the Union Funds argued that the proposed sale violated section 1113 of the Bankruptcy Code. According to the Union Funds, because ACS was deemed a signatory to Navillus' CBAs as a consequence of the alter ego finding in the District Court Decision, it could not sell its assets free and clear of the CBAs which contain successorship provisions, and any attempt to do so would violate section 1113 of the Bankruptcy Code. The Union Funds also alleged that the proposed purchaser of ACS' assets – Trident General Contracting, LLC ("Trident") – was not entitled to the good faith purchaser finding under section 363(m) of the Bankruptcy Code based on alleged connections to DOS.

Navillus determined that the issue of whether ACS was found to be an alter ego of Navillus as of November 6, 2017 would have a significant impact on Navillus' Estate, particularly in light of the multi-million dollar administrative claims the Union Parties were preparing to file based on their theory of ongoing liability. Moreover, Navillus' Estate would experience irreparable harm if Navillus' CBAs were rejected or modified without its consent.

Accordingly, Navillus intervened in the ACS sale proceeding on January 24, 2018 and filed certain responses regarding the sale transaction and ACS' motion filed under section 1113 of the Bankruptcy Code to explain the potential impact of these matters on the Navillus Estate.

Ultimately, following an expedited discovery process and a two-day trial, on January 31, 2018, the Bankruptcy Court issued a decision approving the sale of substantially all of ACS' assets to Trident, free and clear of all liens, claims and encumbrances, including without limitation any obligations under the CBAs to which Navillus is a party. The Bankruptcy Court also granted "good faith purchaser" status to Trident over the Union Funds' objection.   As part of this ruling, Judge Lane determined that ACS and Navillus were not alter egos at least as of November 6, 2017 – the date of ACS' bankruptcy filing.  Accordingly, the Union Parties' ability to flood Navillus' Estate with Claims alleging alter ego liability was cut off as of November 6, 2017.

The Union Funds appealed directly to the Second Circuit from the Bankruptcy Court's order approving the sale of ACS to Trident.  On April 4, 2018, the Second Circuit dismissed the appeal.

### C.      Priority Claim Objections

As stated in Section VI.A above, in addition to filing Proofs of Claim based on the District Court Decision, the Union Funds asserted Priority Claims for damages for the time period from June 22, 2016 through the Petition Date, including $10,659,259.63 million in Claims seeking priority under section 507(a)(5) of the Bankruptcy Code for alleged contributions to employee benefit plans arising from services rendered during the 180-day period preceding the Petition Date.  The Proofs of Claim filed by the Union Funds (the "Union Fund Claims") total to $85,488,028.37.

Moreover, the Sponsoring Unions, who were not party to the District Court Action and did not assert alter ego based claims prior to the Petition Date, filed an additional $91,628,958.43 in Proofs of Claim (the "Union Wage Claims") for wages allegedly due and owing the Unions based on the hours worked by non-union ACS employees that, according to the Unions, should have been worked by members of the Sponsoring Unions.  The Union Wage Claims include approximately $13,630,616.89 in Claims seeking priority under section 507(a)(4) of the Bankruptcy Code for unpaid wages earned by an individual during the 180-day period preceding the Petition Date.

On March 12, 2018, Navillus filed an omnibus objection to the Union Wage Claims and, after full briefing on the objection, oral argument was held on April 25, 2018.  On May 23, 2018, the Bankruptcy Court issued a bench decision granting Navillus' objection to the priority classification of the Union Wage Claims and ordering that the $13,360,616.89 that the Sponsoring Unions allege was entitled to priority under section 507(a)(4) of the Bankruptcy Code be reclassified as general unsecured claims.  An order reclassifying the Union Wage Claims to general unsecured claims was entered on June 13, 2018 (Dkt. No. 466).

Disclosure Statement

Navillus filed its fifth omnibus claims objection to the Union Fund Claims on April 20, 2018 on the grounds that, among other things, the claims incorrectly asserted a claim for priority which the Union Funds were not entitled to. Following briefing, the Bankruptcy Court heard oral argument on May 23, 2018 and the matter remained *sub judice* at the time of the case-wide mediation. As part of the Union Parties Settlement, Navillus has agreed to request that the Bankruptcy Court not issue a ruling in connection with the objection to the Union Fund Claims.

### D.     Case-Wide Mediation

As set forth in Section VII.B above, one month into this Chapter 11 Case, Navillus filed a motion seeking to compel mediation with the Union Funds which was periodically adjourned [Dkt. No. 102]. On March 26, 2018, the Committee filed a cross-motion (Dkt. No. 303) requesting that the Bankruptcy Court compel Navillus and the Union Parties to submit to case-wide mediation to resolve the disputed issues in this Chapter 11 Case.

Navillus and the Committee negotiated a stipulated mediation order that provided a schedule for pre-mediation discovery and certain other deadlines, including the filing of Navillus' Original Plan and disclosure statement as an opening offer heading into the mediation. (Dkt. No. 560). Navillus, DOS, the Committee, and the Union Parties selected retired Chief Judge Gerald Rosen of the Eastern District of Michigan to serve as mediator and participated in three (3) full days of mediation during June and July, 2018.

At the close of the third day of mediation, Navillus, DOS, the Committee, the Union Parties, Liberty, TSC and HDK reached agreement regarding the material terms of a global settlement (the "Union Parties Settlement") that would be incorporated into a consensual Plan and Disclosure Statement. In recognition of the fact that ACS, as an appellant in the pending appeal from the District Court Decision, would be required to consent to certain of the proposed terms of the Union Parties Settlement, the Union Parties and the creditors' committee in the ACS chapter 11 case spent the next several weeks negotiating towards a global resolution of the ACS chapter 11 case that would include ACS' consent to the proposed vacatur of the District Court Decision. During the weeks following the mediation, Navillus, the Committee and the Union Parties continued their good faith negotiations and ultimately memorialized the key terms of the Union Parties Settlement into a settlement term sheet executed by Navillus, DOS, the Committee, the Union Parties, Liberty, TSC and HDK on August 10, 2018.

### E.     Union Parties Settlement

As agreed in the term sheet and memorialized in the Plan, Navillus, DOS, the Committee, the Union Parties, Liberty, TSC and HDK have entered into the Union Parties Settlement, conditioned in its entirety on the entry of the Final Vacatur Order by the District Court, pursuant to which payments under the Plan (excluding ordinary course payments relating to Navillus' projects, contracts and business operations) are to be funded by Navillus and DOS (through the New Value Contribution), and the current holders of Equity Interests in Navillus are to retain their Class 6 Equity Interests.

The Plan constitutes a motion to approve the Union Parties Settlement which will be implemented as follows:

- **Vacatur of District Court Decision.** The Union Parties Settlement and the occurrence of the Effective Date are conditioned in their entirety on the entry of the Final Vacatur Order by the District Court and dismissal of the related appeal without prejudice as to DOS, Navillus, TSC, HDK and ACS. Navillus and the Union Parties agree to make all necessary motions in a timely manner in order to secure remand of the case underlying the District Court Decision to the District Court and vacatur of the District Court Decision as of the Effective Date.

- **Global Settlement.** Payments under the Plan (excluding ordinary course payments relating to Navillus' projects, contracts and business operations) shall be funded by Navillus and DOS in an amount not to exceed thirty two million ($32,000,000) dollars, and the current Equity Holders of Navillus shall retain one hundred (100%) percent of their Class 6 Equity Interests as set forth in Section 4.06 of the Plan.

- **Assumption of Union Parties ~~Collective Bargaining Agreements~~CBAs and Treatment of Union Parties Cure Claims.** As of the Effective Date, Reorganized Navillus shall assume all of the Union Parties'~~respective collective bargaining agreements~~ CBAs as applicable to Navillus ~~(the "Union Parties CBAs")~~ in accordance with the provisions of Article VII of the Plan. ~~All Claims asserted by the~~The Union Parties ~~in the Bankruptcy Court~~Cure Claims shall be reclassified, to the extent necessary, and Allowed as general unsecured claims in the amounts set forth in the Union Parties' Proofs of Claim filed in the Chapter 11 Case and afforded the treatment set forth in Section ~~4.05 of the Plan.~~ 4.04 of the Plan; provided, however, that any Union Ordinary Course CBA Claims shall not be cured by the treatment of the Union Parties Cure Claims but rather the undisputed portion of such Union Ordinary Course CBA Claims shall be paid in full and performed by Navillus in the ordinary course of business according to normal and customary terms existing between the parties as set forth in Section 3.01 of the Plan.

- **Stay of Bankruptcy Court Litigation.** Navillus, the Committee and the Union Parties shall suspend all pending litigation, claims objections and discovery amongst them in the Bankruptcy Court.

- **Mutual Releases.** Navillus, DOS, the Union Parties and Liberty shall receive the releases set forth in Article XII of the Plan.

- **Senior Management Emergence Bonuses.** The Committee and the Union Parties agree that Navillus shall be authorized to seek, and they will not oppose, approval of the Senior Management Emergence Bonus Program as of the Effective Date.

Following execution of the settlement term sheet, Navillus and the Mediator (with the consent of all parties to the litigation) wrote to the District Court to advise of the need for the proposed vacatur of the District Court Decision. Based on the positive preliminary response received, on August 16, 2018, Navillus – with the consent of all parties to the Navillus Appeal –

- 32 -

filed a motion in the District Court pursuant to FED. R. CIV. P. 60(b) seeking vacatur of the District Court Decision upon a subsequent remand of jurisdiction from the Second Circuit. On August 17, 2018, the District Court entered an Order stating its intent to vacate the District Court Decision if jurisdiction is restored to the District Court upon remand from the Second Circuit. Immediately thereafter, Navillus – with the consent of all parties to the appeal – filed a motion with the Second Circuit seeking the remand of the case to the District Court to facilitate the completion of the vacatur process and secure entry of the Final Vacatur Order effective as of the Effective Date of the Plan. IfOn August 22, 2018, the motion to remand is granted by the Second Circuit, then Navillus (again with the consent of all parties) would issued an order granting Navillus' motion and remanding the case to the District Court. At such time as is agreed by the parties to the Navillus Appeal, Navillus will file a further motion with the District Court seeking the vacatur of the District Court Decision in its entirety effective as of the Effective Date.

## VII.    SUMMARY OF THE PLAN OF REORGANIZATION

THIS SECTION PROVIDES A SUMMARY OF CERTAIN OF THE MATTERS CONTEMPLATED TO OCCUR EITHER PURSUANT TO OR IN CONNECTION WITH CONFIRMATION OF THE PLAN. THIS SUMMARY HIGHLIGHTS THE SUBSTANTIVE PROVISIONS OF THE PLAN AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND CAREFUL READING OF THE PLAN. STATEMENTS REGARDING PROJECTED AMOUNTS OF CLAIMS OR DISTRIBUTIONS (OR THE VALUE OF SUCH DISTRIBUTIONS) ARE ESTIMATES BY NAVILLUS BASED ON AVAILABLE INFORMATION AND ARE NOT A REPRESENTATION AS TO THE ACCURACY OF THESE AMOUNTS.

### A.    Treatment of Claims and Equity Interests Under Plan

The Plan divides Holders of Claims against and Equity Interests in Navillus into six (6) separate Classes based on the nature of their legal rights, two (2) of which are Impaired and four (4) of which are Unimpaired. The Plan also provides for Distributions to Holders of Claims in four (4) unclassified categories comprised of Administrative Claims, Professional Fee Claims, Priority Tax Claims and the Liberty DIP Loan Claim. Distributions to Holders of Allowed Claims and Equity Interests will be made as soon as practicable after the Effective Date, and Distributions on account of Disputed Claims will be held in a Distribution Reserve until such Disputed Claims are resolved.

The Claims asserted against Navillus and Equity Interests in Navillus are separated into Classes based on the nature of the Claims and the legal rights related to each Claim. A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is classified in another Class to the extent that any portion of the Claim or Equity Interest falls within the description of such Class. A Claim is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

Each holder of a Claim or Equity Interest should refer to Articles III, IV and V of the Plan for a full description of the classification and treatment of Claims and Equity Interests provided under the Plan.

### 1.    *Administrative Claims – Not Classified*

Administrative Claims are Claims (other than a Professional Fee Claim or ~~Liberty DIP Loan Claim~~the fees and expenses of the Fee Examiner and Fee Examiner Professionals) for payment of costs or expenses of administration specified in sections 503(b) and 507(a)(2) of the Bankruptcy Code including, without express or implied limitation: (a) any actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the business of Navillus; (b) any ~~payment to be made under the Plan to cure a default on an assumed Executory Contract or assumed Unexpired Lease; (c) any~~ postpetition cost, indebtedness or contractual obligation duly and validly incurred or assumed by Navillus in the ordinary course of its business; and (d~~d~~c) any fees and charges assessed against the Estate under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930.

Each Holder of an Allowed Administrative Claim shall receive, in full and complete settlement, release, and discharge of such Claim, Cash in an amount equal to the Allowed amount of its Administrative Claim on or as soon as reasonably practicable after the ~~later of (a) the~~ Effective Date ~~or (b) the date such Administrative Claim becomes Allowed~~, or receive such less favorable treatment as may be agreed by such Holder and Navillus; provided, however, that the Allowed Administrative Claims representing liabilities incurred in the ordinary course of business by Navillus, including, without limitation, the undisputed Union Ordinary Course CBA Claims, shall be paid in full and performed by Navillus in the ordinary course of business according to normal and customary terms existing between the parties.  Notwithstanding the immediately preceding sentence, Administrative Claims of the U.S. Trustee for fees pursuant to 28 U.S.C. § 1930(a)(6) shall be paid in accordance with the applicable schedule for payment of such fees.

According to Navillus' monthly operating report for June 2018, Navillus is current on post-petition liabilities except for ordinary course liabilities paid according to normal business terms.

*Estimated Percentage Recovery*:  100%

### 2.    *Professional Fee Claims – Not Classified*

Each Holder of an Allowed Professional Fee Claim ~~for services rendered through the Confirmation Date~~ shall receive Cash in an amount equal to the Allowed amount of such Professional Fee Claim on or as soon as reasonably practicable after the later of (a) the Effective Date or (b) the date such Professional Fee Claim becomes Allowed, or receive such other less favorable treatment as may be agreed by such Holder and Navillus. For the avoidance of doubt, the Claims of the Fee Examiner and the Fee Examiner Professionals shall not be treated as Professional Fee Claims and shall be paid as set forth in Section 13.09 of the Plan.

The total amount of Professional Fee Claims will be determined after the Professional Fee Claims Bar Date.

*Estimated Percentage Recovery*: 100%

### 3.    *Priority Tax Claims – Not Classified*

A Priority Tax Claim is a Claim entitled to priority under section 507(a)(8) of the Bankruptcy Code.

Unless otherwise agreed to by Navillus and the Holder of an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, in the sole discretion of Navillus, and in full and complete settlement, release, and discharge of such Claim: (i) Cash in the amount equal to such Allowed Priority Tax Claim on or as soon as reasonably practicable after the later of (a) the Effective Date or (b) the date such Priority Tax Claim becomes Allowed; or (ii) Cash equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code (or such lesser rate as is agreed to by the Holder of such Allowed Priority Tax Claim), payable over a period ending no later than five (5) years from the Petition Date; provided, however, that Navillus reserves the right to prepay such amounts at any time under the latter option.

One Priority Tax Claim has been filed against the Estate by the New York City Department of Finance in the amount of $2,124,155.45. Navillus believes that most of this Claim is invalid and is in the process of exchanging information with the Holder of this Claim in an effort to resolve on an informal basis.

*Estimated Percentage Recovery*: 100%

### 4.    *Liberty DIP Loan Claim – Not Classified*

~~Unless otherwise agreed to by Navillus and Liberty, on or as soon as reasonably practicable after the Effective Date, Liberty shall be paid in full in Cash all outstanding DIP Obligations, if any, as of the Effective Date.~~ The Liberty DIP Loan Claim shall be Allowed as an Administrative Claim in the amount of ~~up to~~ three hundred thousand ($300,000) dollars. Pursuant to the Union Parties Settlement, Liberty has agreed to assign to the Union Parties any and all Distributions on account of the Allowed Liberty DIP Loan Claim ~~in the amount of up to~~ not to exceed three hundred thousand ($300,000) dollars ~~to the Union Parties~~ and to waive (~~a~~i) any and all other Distributions in excess of three hundred thousand ($300,000) dollars on account of the Allowed Liberty DIP Loan Claim as against the Estate and (~~b~~ii) all other rights and Claims

- 35 -

relative to the specific post-petition costs and expenses that are the subject of the Allowed Liberty DIP Loan Claim against the Estate, DOS and all other Indemnitors. On ~~or as soon as reasonably practicable after~~ the Effective Date, the Distributions payable on account of the Allowed Liberty DIP Loan Claim shall be ~~paid in Cash to the Union Parties in accordance~~deposited in escrow with the Union Parties Cure Claim Escrow Agent who, in turn, shall release such funds according to the governing escrow agreement and the Union Parties Settlement Allocation.

As of the date of this Disclosure Statement, Navillus has not borrowed any sums under the DIP Facility, but ~~reserve~~reserves the right to do so based on operational needs during the pendency of this Chapter 11 Case. The only amounts incurred under the DIP Order relate to fees and expenses incurred by Liberty post-petition in connection with their continued extension of surety credit to Navillus on the Tishman Projects.

*Estimated Recovery Percentage: 100%*

### 5. *Class 1 – Article 3A Claims – Unimpaired/Not Entitled to Vote/Deemed to Accept*

On the Effective Date, each Holder of an Allowed Article 3A Claim shall receive in full, final and complete satisfaction, settlement, release, and discharge of such Claim, payment in full in Cash of the Allowed Article 3A Claim, or reinstatement and subsequent payment of such Allowed Article 3A Claim, in the ordinary course of business, each in accordance with the provisions of Article 3A and such agreements and terms as existing as of the Petition Date, which agreements will continue in full force and effect.

Navillus continues to pay valid Article 3A Claims that were outstanding on the Petition Date in the ordinary course of business pursuant to the business terms in effect between the parties. Many of the Article 3A Claims that remain unpaid represent retainage under construction contracts that will be paid upon release pursuant to contract terms.

*Estimated Recovery Percentage: 100%*

### 6. *Class 2 – Other Secured Claims – Unimpaired/Not Entitled to Vote/Deemed to Accept*

On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, in full, final and complete satisfaction, settlement, release, and discharge of such Claim, in the sole discretion of Navillus: (i) reinstatement ~~and Unimpairment~~ of its Allowed Other Secured Claim in accordance with section 1124(2) of the Bankruptcy Code, or (ii) in exchange for such Other Secured Claim, either (a) Cash in the full amount of such Allowed Other Secured Claim, including any reasonable postpetition interest accrued pursuant to section 506(b) of the Bankruptcy Code, (b) the proceeds of the sale or disposition of the collateral securing such Allowed Other Secured Claim to the extent of the value of the Holder's secured interest in such collateral, (c) the collateral securing such Allowed Other Secured Claim and any reasonable interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (d) such other distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code. In the event

Navillus sells or otherwise disposes of the collateral securing any Allowed Other Secured Claim, all expenses relating thereto, including but not limited to transportation, shipping and storage expenses, shall be borne by the Holder of the Class 2 Other Secured Claim.

*Estimated Recovery Percentage:* 100%

7. ***Class 3 – Other Priority Claims – Unimpaired/ Not Entitled to Vote/Deemed to Accept***

Each Holder of an Allowed Other Priority Claim shall receive, in full, final and complete satisfaction, settlement, release, and discharge of such Claim, Cash in the amount equal to such Allowed Other Priority Claim.

*Estimated Recovery Percentage:* 100%

8. ***Class 4 – Union Parties Cure Claim – Impaired/Entitled to Vote***

The Class 4 Union Parties Cure Claims shall receive the following treatment under the Plan:

i. On or as soon as reasonably practicable after the Effective Date, or with respect to the Distribution on the TSC Allowed Claim when the first Distribution to Holders of Class 5 Allowed Claims is made, the Holders of the Allowed Union Parties Cure Claims shall receive, in the aggregate, and in full, final and complete cure and satisfaction, settlement, release, and discharge of such Union Parties Cure Claims: (x) a one-time Cash Distribution in the amount equal to twenty five million ninety thousand six hundred sixty six ($25,090,666) dollars; andplus (y) a one-time Cash Distribution in an amount not to exceed six hundred fourteen thousand ($614,000) dollars on account of (i) the assigned Distributions on account of (i) the Allowed Liberty DIP Loan Claim and (ii) Proof ofthe TSC Allowed Claim number 45 filed by TSC.

ii. Funds sufficient to make Distributions on account of the Union Parties Cure Claims shall be made subject todeposited in escrow with the Union Parties Cure Claim Escrow Agent who, in turn, shall release such funds according to the governing escrow agreement and the Union Parties Settlement Allocation, as set forth more fully in Article VIIISection 8.04 of the Plan.

*Estimated Recovery Percentage: 14.69%*

9. ***Class 5 – General Unsecured Claims – Impaired/Entitled to Vote***

On or as soon as reasonably practicable after the date on which all objections to Class 5 General Unsecured Claims have been resolved or ruled on by the Bankruptcy Court, each Holder of an Allowed General Unsecured Claim shall receive, in full, final and complete satisfaction, settlement, release, and discharge of such Claim, the lesser of (i) ten (10%) percent of the

- 37 -

Allowed amount of its Allowed General Unsecured Claim; or (ii) its Pro Rata Share of six
hundred thousand ($600,000) dollars.

*Estimated Recovery Percentage: Approximately 9%*

10.    *Class 6 – Equity Interests –Unimpaired/Not Entitled to Vote*

The current Holders of the Class 6 Equity Interests shall retain their Equity Interests in
Navillus in consideration for the payment of the New Value Contribution by DOS.

*Estimated Recovery Percentage:  100%*

B.    **Means for Implementation of Plan**

1.    *Reorganization of Navillus*

On the Effective Date, Navillus will be reorganized pursuant to the Plan and other
applicable governance, corporate and other documents to be included in the Plan Supplement.

a.    Vesting of Assets. On the Effective Date, with the exception of any ~~Claims~~claims
and Causes of Action released pursuant to Article XII of the Plan or as expressly
provided in the Plan, all right, title and interest in and to the property and assets of
the Estate will vest fully in Reorganized Navillus, free and clear of all liens,
encumbrances and other liabilities including, without express or implied
limitation, Claims against or Equity Interests in Navillus.  All Claims against and
Equity Interests in Navillus will be classified and treated pursuant to the terms of
the Plan.

b.    Sources of Plan Funding.  On the Effective Date, the Distributions required to be
made to Holders of Claims under the Plan shall be funded by one or more of: (a)
Cash on hand, (b) the Exit Financing, and (c) the New Value Contribution.

2.    *Effective Date Transactions.*

On the Effective Date, the following transactions will occur:

a.    Navillus ~~shall be authorized to consummate~~has entered into the Exit Financing on
the terms to be set forth in the Plan Supplement.

b.    The New Value Contribution, less the portion of the Deposit made by DOS (if
any), shall be made by DOS to the Distribution Agent.

c.    The Deposit shall be released from escrow to the Distribution Agent.

d.    ~~c.~~The Final Vacatur Order shall be entered by the District Court.

e.    ~~d. Posting into escrow with Navillus' bankruptcy counsel or the Distribution
Agent under the Plan of sufficient funds to make the Distributions required to be~~

- 38 -

made on the Effective Date under the Plan. Funds sufficient to make Distributions on account of the Union Parties Cure Claims as set forth in Section 4.04 of the Plan shall be deposited in escrow with the Union Parties Cure Claim Escrow Agent.

f.    The Confirmation Order has become a Final Order; and

g.    All Plan Supplement documents have been entered into and are in effect.

### 3.    *Exit Financing*

On the Effective Date, Navillus shall be authorized to consummate the Exit Financing with Liberty. Confirmation of the Plan shall constitute an approval of the transactions contemplated thereby and all of the actions to be taken and obligations to be incurred by Reorganized Navillus in connection therewith without the need for any further corporate action or further order of the Bankruptcy Court. The proceeds of the Exit Financing will be available, among other things, for any purpose permitted by the governing documents, including the funding of obligations under the Plan and the satisfaction of Minimum Working Capital requirements on an after the Effective Date. The terms of the Exit Financing will be included in the Plan Supplement.

### 4.    *New Value Contribution*

On the Effective Date, DOS will make the New Value Contribution, less the portion of the Deposit made by DOS (if any), in exchange for the retention of Equity Interests by the holders of Class 6 Equity Interests in Navillus and the releases set forth in Article XII of the Plan. The New Value Contribution will be utilized by Reorganized Navillus to fund obligations under the Plan.

### 5.    *Union Parties Settlement*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan constitutes a motion to approve the Union Parties Settlement, the terms of which are further described in Section VI.E of this Disclosure Statement.

### 6.    *Liberty Global Settlement*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan constitutes a motion to approve the Liberty Global Settlement, the terms of which are further described on Section V.H of this Disclosure Statement.

### 7.    *General Corporate Actions*

The entry of the Confirmation Order shall constitute authorization for Navillus and Reorganized Navillus to take or cause to be taken all corporate or other actions necessary or appropriate to consummate and implement the provisions of the Plan prior to, on, and after the

Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court.  All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the shareholders or directors of Navillus or Reorganized Navillus.

### 8.   *Continued Corporate Existence*

~~After~~On and after the Effective Date, Reorganized Navillus may operate its business and use, acquire, dispose of property and settle and compromise Claims or Equity Interests without the supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, subject to the terms of the Plan and the Plan Supplement, and all documents and exhibits thereto implementing the provisions of the Plan.

### 9.   *Board of Directors of Reorganized Navillus*

~~The~~On the Effective Date, the board of directors of Reorganized Navillus will consist of those individuals constituting the current board of directors of Navillus.

### 10.   *Officers of Reorganized Navillus*

The officers of Navillus immediately prior to the Effective Date shall serve as the officers of Reorganized Navillus on and after the Effective Date.  DOS shall continue to serve as President and Chief Executive Officer of Reorganized Navillus on the same terms that were in place prior to the Petition Date, subject to Liberty's review and approval with respect to compensation during the period of time that the Exit Financing remains outstanding.

### 11.   *Senior Management Emergence Bonus Program*

On the Effective Date, Navillus shall be authorized to implement the Senior Management Bonus Program without the need for further corporate action or further order of the Bankruptcy Court.

### 12.   ~~11.~~Preservation of Causes of Action

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code and to the fullest extent possible under applicable law, on the Effective Date, Reorganized Navillus shall retain the right to pursue, prosecute and enforce any ~~Claims~~claims, demands, rights, and Causes of Action that Navillus may hold against any Entity including, without limitation, (i) any and all ~~Claims~~claims against any Entity, to the extent such Entity asserts a crossclaim, counterclaim and/or ~~Claim~~claim for setoff that seeks affirmative relief against Navillus; (ii) any and all ~~Claims~~claims and Causes of Action for turnover of any property of Navillus' Estate; (iii) any and all ~~Claims~~claims and Causes of Action that are subject to pending litigation in either the Bankruptcy Court or a non-bankruptcy forum as of the Effective Date; (iv) any and all ~~Claims~~claims and Causes of Action that are listed on Navillus' Schedules; and (v) any and all breach of contract and other ~~Claims~~claims and Causes of Action

- 40 -

arising out of or relating to the construction projects on which Navillus has performed or presently performs including, without limitation those potential ~~Claims~~claims described below. On the Effective Date, Navillus' right to pursue, prosecute and enforce the such ~~Claims~~claims, demands, rights and Causes of Action shall transfer to Reorganized Navillus, which on and after the Effective Date shall have the exclusive right to pursue, prosecute and enforce such actions. Nothing in the Plan or the Confirmation Order shall be deemed ~~to be~~a waiver or relinquishment of any rights or Causes of Action that Navillus or Reorganized Navillus may have.; provided, however, that Navillus shall be barred from seeking an affirmative recovery on any Avoidance Actions and may only use such Avoidance Actions for defensive purposes.

Navillus may hold certain breach of contract or other ~~Claims~~claims arising out of construction projects that it is currently performing.  In particular, Navillus submits that it may hold ~~Claims~~claims and Causes of Action against Tishman in connection with the MW Project described above based on the Claims for backcharges and delays set forth in Tishman's Proof of Claim as well as the approximately $12 million in excess retainage under the MW Contract. Moreover, the resolution of the wrongful pre-petition termination of the MW Contract has yet to be completed.  Additionally, Navillus may hold ~~Claims~~claims and Causes of Action against Hunter Roberts Construction, LLC, Pavarini McGovern, Oliveira Contracting, Inc. and Plaza Construction, LLC based on the Claims and other matters described in the attachments to their respective Proofs of Claim or any *ex parte* motions for Rule 2004 examinations filed with the Bankruptcy Court on May 24, 2018.  Navillus may also hold ~~Claims~~claims and Causes of Action arising out of any contracts listed on Schedule G of Navillus' Schedules.  Navillus also holds potential ~~Claims~~claims or Causes of Action relating to its work on the NYCHA Rapid Repair projects sponsored by the City of New York.  Navillus may file additional requests for Bankruptcy Rule 2004 examinations with respect to certain potential ~~Claims~~claims and Causes of Action and reserves the right to assert subsequent Causes of Action based on the results of such examination.

### C.    Treatment of Executory Contracts and Unexpired Leases

#### 1.    *General Assumption of Executory Contracts and Unexpired Leases*

**Assumption of Union Parties' CBAs.**  Under the Plan, Reorganized Navillus ~~hereby assumes~~will assume all of the Union Parties CBAs.  Pursuant to the Union Parties Settlement, the Union Parties consent to the proposed assumption.  The Confirmation Order shall constitute an order of the Bankruptcy Court under section 365 of the Bankruptcy Code approving the assumption of all of the Union Parties CBAs as of the Effective Date.

**Union Parties Cure Claims.**  Any defaults under the Union Parties CBAs that must be cured with regard to the proposed assumption of the Union Parties CBAs pursuant to section 365(b)(1) of the Bankruptcy Code shall be deemed cured by the treatment of the Union Parties Cure Claims set forth in Section 4.04 of the Plan, which has been agreed to by the Union Parties; provided, however, that any undisputed Union Ordinary Course CBA Claim shall not be cured by the treatment of the Union Parties Cure Claims but rather paid in full and performed by Navillus in the ordinary course of business according to normal and customary terms existing between the parties as set forth in Section 3.01 of the Plan.

**General Assumption**.  Except as otherwise specifically provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, all prepetition Executory Contracts and Unexpired Leases, including without limitation collective bargaining agreements (other than the Union Parties CBAs) are hereby assumed except for an Executory Contract or Unexpired Lease that (i) was previously assumed or rejected by Navillus pursuant to an order of the Bankruptcy Court entered on or prior to the Confirmation Date, (ii) previously expired or was terminated pursuant to its own terms, which termination has not been disputed by Navillus in writing, or (iii) is the subject of a motion to assume or reject filed by Navillus on or before the Confirmation Date, or (iv) is listed on the schedule of rejected Executory Contracts and Unexpired Leases (the "Rejection Schedule").   The Confirmation Order shall constitute an order of the Bankruptcy Court under section 365 of the Bankruptcy Code approving the assumption of Executory Contracts and Unexpired Leases described above, as of the Effective Date.

**Assumption and Cure Schedule**.  Other than with respect to the Union Parties CBAs, the Plan Supplement shall contain a schedule of Executory Contracts and Unexpired Leases (the "Assumption and Cure Schedule") designating each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan and the cure amount, if any, related to such proposed assumption; provided, however, that Navillus reserves the right, on or prior to the Confirmation Date, to amend the Assumption and Cure Schedule.  Navillus shall provide notice of any amendments to the Assumption and Cure Schedule to the parties affected thereby.  The listing of a document on the Assumption and Cure Schedule shall not constitute an admission by Navillus that such document is an Executory Contract or an Unexpired Lease or that Navillus has any liability thereunder.  If no cure amount for an assumed Executory Contract or Unexpired Lease is listed in the Assumption and Cure Schedule, the cure amount shall be deemed to be $0.

**Rejection**.  The Plan Supplement shall contain a Rejection Schedule designating each Executory Contract and Unexpired Lease to be rejected pursuant to the Plan; provided, however, that Navillus reserves the right, on or prior to the Confirmation Date, to amend the Rejection Schedule.  Navillus shall provide notice of any amendments to the Rejection Schedule to the parties affected thereby.  The listing of a document on the Rejection Schedule shall not constitute an admission by Navillus that such document is an Executory Contract or an Unexpired Lease or that Navillus has any liability thereunder.

**Inclusiveness**.  Unless otherwise specified on the Assumption and Cure Schedule, each Executory Contract and Unexpired Lease listed thereon shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects the Executory Contract or Unexpired Lease, without regard to whether such agreement, instrument or other document is listed on the Assumption and Cure Schedule.

2.    ***Payment of Cure Amounts Relating to Assumption of Executory Contract Contracts and Unexpired Leases***

**Assumption and Cure Schedule.**  Navillus shall file the Assumption and Cure Schedule with the Bankruptcy Court and serve such schedule by first class mail on each non-debtor

- 42 -

counterparty to the Executory Contracts and Unexpired Leases listed thereon at least twenty (20) days prior to the Combined Hearing. The Assumption and Cure Schedule shall list the cure amount as to each Executory Contract or Unexpired Lease to be assumed under the Plan. The counterparties to such Executory Contracts and Unexpired Leases to be assumed by Navillus shall have ten (10) days from the date of service of the Assumption and Cure Schedule (or the date of service of any amendment to the Assumption and Cure Schedule) to file and serve any objection to either the cure amount listed by Navillus or the assumption of such Executory Contract or Unexpired Lease. If there are objections filed, the Bankruptcy Court may either schedule such objection to be heard at the Combined Hearing or at a later hearing on a date to be set by the Bankruptcy Court. Notwithstanding anything to the contrary in the Plan, Navillus or Reorganized Navillus, as applicable, shall be authorized to reject any Executory Contract or Unexpired Lease that is subject to a dispute concerning amounts necessary to cure any defaults through the Effective Date. Each counterparty to an Executory Contract or Unexpired Lease that does not file an objection to the Assumption and Cure Schedule on or before the objection deadline set forth therein will be deemed to consent to the assumption of such Executory Contract or Unexpired Lease and the proposed cure amount (if any) with respect to such agreement.

**Treatment of Cure Claims**. Except as otherwise set forth in the Plan, all Allowed Claims for cure amounts arising from the assumption of any Executory Contract or Unexpired Lease shall be treated as Administrative Claims pursuant to in accordance with the requirements of Section 3.01365 of the PlanBankruptcy Code. The Union Parties Cure Claims shall receive the treatment set forth in Section 4.04 of the Plan pursuant to the Union Parties Settlement; provided, however, that any Union Ordinary Course CBA Claim shall not be cured by the treatment of the Union Parties Cure Claims but rather the undisputed portion of such Union Ordinary Course CBA Claim shall be paid in full and performed by Navillus in the ordinary course of business according to normal and customary terms existing between the parties as set forth in Section 3.01 of the Plan. Any cure costs incurred by Liberty (other than the Liberty DIP Loan Claim) shall, pursuant to the Liberty Global Settlement, be treated as a Class 5 General Unsecured Claim as set forth in Section 4.05 of the Plan. Except as may otherwise be agreed to by the counterparty to the Executory Contract or Unexpired Lease, as soon as practicable after the Effective Date, Reorganized Navillus shall pay all undisputed cure amounts. All disputed defaults that are required to be cured shall be cured either within thirty (30) days of the entry of a Final Order determining the amount, if any, of Navillus' liability with respect to such cure amount, or as may otherwise be agreed to with the counterparty to such Executory Contract or Unexpired Lease.

### 3.    *Rejection Damages Bar Date*

**If the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan results in a Claim, then such Claim must be filed with the Claims Agent and served upon counsel to Reorganized Navillus on or before the Rejection Damages Bar Date, and upon the failure of any Entity to file such Claim on or before such date, such Entity shall be forever barred from asserting a Claim on account of the rejection of such Executory Contract or Unexpired Lease, but shall nevertheless be bound by the provisions of the Plan. The foregoing applies only to Claims arising from the rejection of an Executory**

**Contract or Unexpired Lease; any other Claims held by a party to a rejected contract or lease ~~shall have been~~not evidenced by a Proof of Claim filed by the applicable Bar Date ~~or~~ shall be barred and unenforceable. Nothing in Section 7.03 of the Plan will extend any prior Bar Date set by prior order of the Bankruptcy Court.**

All Allowed Claims arising from the rejection of an Executory Contract or Unexpired Lease shall be treated, to the extent applicable, as General Unsecured Claims, unless otherwise ordered by Final Order of the Bankruptcy Court. There shall be no restriction on the right of Reorganized Navillus to object to any Claims relating to the rejection of Executory Contracts or Unexpired Leases, or to assert any defense or counterclaim to any such Claim, notwithstanding that such defenses or counterclaims may not have otherwise been identified in the Plan, Disclosure Statement or otherwise.

### 4.   *Postpetition Contracts and Leases*

Navillus shall not be required to assume or reject any contract or lease entered into by Navillus after the Petition Date. Any such contract or lease shall continue in effect in accordance with its terms after the Effective Date as set forth in the Plan, unless Reorganized Navillus has obtained a Final Order of the Bankruptcy Court approving termination of such contract or lease. Contracts or leases entered into after the Petition Date will be performed by Reorganized Navillus in the ordinary course of its business.

### 5.   *Compensation and Benefit Programs*

All compensation and benefit plans, policies and programs of Navillus applicable to its present and former employees, including, without express or implied limitation, all savings plans, retirement plans, health and welfare plans, performance-based incentive plans, retention plans, reimbursement plans, disability plans, severance benefit plans, paid time off plans and life, accidental death and dismemberment insurance plans, including, without express or implied limitation, and the Performance Bonus Program, KEIP and Senior Management Emergence Bonus Program, will be deemed to be, and will be treated as though they are, Executory Contracts and will, on the Effective Date, be deemed assumed under the Plan by Reorganized Navillus in accordance with sections 365(a) and 1123(b)(2) of the Bankruptcy Code, and Reorganized Navillus' obligations under such plans, policies and programs will survive confirmation of the Plan, remain unaffected thereby and not be discharged in accordance with section 1141 of the Bankruptcy Code.

### 6.   *Special Provisions Regarding Insured Claims*

**Limitations on Distributions to Holders of Allowed Insured Claims.** All prepetition Insured Claims not previously Allowed by Final Order shall be deemed Disputed Claims. Distributions under the Plan to each Holder of an Allowed Insured Claim will be in accordance with the treatment provided for under the Plan for the Class in which such Allowed Insured Claim is classified, but solely to the extent that such Allowed Insured Claim is not satisfied from Navillus' deductible under the Insurance Policy Documents or the proceeds of insurance payable to the Holder of such Allowed Claim under Navillus' Insurance Policy Documents or applicable

- 44 -

law.    Holders of Insured Claims that are eligible to be satisfied, in whole or in part, through insurance policies will be obligated, as a condition to receiving any Distributions under the Plan, to seek recovery or assist Navillus or Reorganized Navillus in seeking recovery under such insurance policies with regard to such Insured Claims.

**Assumption and Continuation of Insurance Policies**.    Each insurance policy and any agreements, documents or instruments relating thereto (collectively, the "Insurance Policy Documents") under which the insurer has a continuing obligation to pay Navillus or a third party on behalf of Navillus shall be either deemed assumed by Reorganized Navillus pursuant to section 365 of the Bankruptcy Code and Section 7.01 of the Plan or continued in accordance with its terms such that each of the parties' contractual, legal and equitable rights under the Insurance Policy Documents shall remain unaltered, and the parties to Insurance Policy Documents will continue to be bound by such Insurance Policy Documents as if the Chapter 11 Case had not occurred.  Nothing in the Plan shall affect, impair or prejudice the rights and defenses of any insurer or Reorganized Navillus under the Insurance Policy Documents in any manner, and such insurers and Reorganized Navillus shall retain all rights and defenses under the Insurance Policy Documents, and the Insurance Policy Documents shall apply to, and be enforceable by and against, Reorganized Navillus and the applicable insurers as if the Chapter 11 Case had not occurred.  The rights and obligations of Navillus, Reorganized Navillus and insurers shall be determined under the Insurance Policy Documents and under applicable non-bankruptcy law. Regardless of whether the Insurance Policy Documents are executory, Reorganized Navillus will perform Navillus' obligations thereunder, including any that remain unperformed as of the Effective Date.

### 7.    *Continuing Obligations Owed to Navillus*

Any indemnity agreement entered into between Navillus and any other Person requiring the supplier of indemnity to provide insurance in favor of Navillus, to warrant or guarantee such supplier's goods or services, or to indemnify Navillus for claims arising from the goods or services shall be deemed to be, and shall be treated as though it is, an Executory Contract that is assumed  pursuant to section 365 of the Bankruptcy Code and Section 7.01 of the Plan; provided, however, that if any party thereto asserts any cure amount, at the election of Navillus, such agreement may not be deemed assumed, and Navillus instead reserves the right to reject such agreement pursuant to section 365 of the Bankruptcy Code under the Plan.

Continuing obligations of third parties to Navillus under the Insurance Policy Documents and other contracts or leases that have ceased to be executory or have otherwise expired on or prior to the Effective Date, including, without limitation, continuing obligations to pay Insured Claims, to defend against and process claims, to refund premiums or overpayments, to provide indemnification, contribution or reimbursement, to grant rights of first refusal, to maintain confidentiality, or to honor releases, shall continue and shall be binding on such third parties unless otherwise specifically terminated by Navillus, under the Plan or otherwise by order of the Bankruptcy Court.

- 45 -

### D.    Provisions Governing Distributions and Disputed Claims

#### 1.    *Distributions on the Effective Date*

Except as otherwise provided herein or as ordered by the Bankruptcy Court, all Distributions to Holders of Allowed Claims as of the Effective Date that are unclassified Claims as described in Article III of the Plan and Classes 1, 2, ~~3~~ and ~~4~~3 shall be made on or as soon as practicable after the Effective Date.  Funds sufficient to make Distributions to Holders of Allowed Claims in Class 4 shall be deposited in escrow on the Effective Date with the Union Parties Cure Claim Escrow Agent.  Distributions to Holders of Allowed Claims in Class 5 shall be made as soon as practicable after all objections to Class 5 General Unsecured Claims are either resolved or ruled on by the Bankruptcy Court.  Distributions on account of Claims that first become Allowed Claims after the Effective Date shall be made pursuant to Section 8.02 of the Plan.

#### 2.    *Distributions After the Effective Date*

Distributions made after the Effective Date to Holders of Allowed Claims that are Disputed Claims as of the Effective Date will be deemed to have been made on the Effective Date.  No interest will accrue or be payable on such Claims or any Distributions.  Distributions on account of Claims that first become Allowed Claims after the Effective Date shall be made as soon as practicable after the Claim becomes Allowed.  Distributions made after the Effective Date to Holders of Allowed Claims that are~~: (i)~~ Disputed Claims as of ~~the Effective Date or (ii) Union Parties Cure Claims if the Union Parties Settlement Allocation is provided to Navillus after~~ the Effective Date will be deemed to have been made on the Effective Date.  No interest will accrue or be payable on such Claims or any Distributions.

#### 3.    *Interest on Claims*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

### 4.    *Union Parties Settlement Allocation*

Funds sufficient to make Distributions on account of the Union Parties Cure Claims shall be made(other than with respect to the TSC Allowed Claim) shall be deposited in escrow on the Effective Date with the Union Parties Cure Claim Escrow Agent who, in turn, shall release such funds according to the governing escrow agreement and the Union Parties Settlement AllocationAllocation.    The Union Parties shall provide to Navillus, on or before the Effective Date, the Union Parties Settlement Allocation.  Navillus shall provide to the Union Parties Settlement Allocation toCure Claim Escrow Agent.  Neither Navillus, the Distribution Agent, and neither Navillus, the Distributionthe Union Parties Cure Claim Escrow Agent or any of the other Allocation Release Beneficiaries shall have any liability in connection with the Union Parties Settlement Allocation pursuant to the Allocation Release set forth in Section 12.01(c)(iii) of the Plan.

### 5.    *Distribution Agent*

All Distributions under the Plan shall be made by the Distribution Agent, including all(other than the Distributions ofon the Union Parties Cure Claim to be made according to the Union Parties Settlement Allocation as set forth above) shall be made by the Distribution Agent. The Distribution Agent shall be empowered to (ia) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (iib) make all Distributions contemplated by the Plan, and (iiic) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.  If a Distribution Agent is an independent third party designated to serve in such capacity, such Distribution Agent shall receive, without further approval from the Bankruptcy Court, reasonable compensation for distribution services rendered pursuant to the Plan and reimbursement of reasonable out of pocket expenses incurred in connection with such services from Reorganized Navillus.

### 6.    *Claims Filed After Bar Date*

Any Claim, including without limitation any Claim for alleged withdrawal liability, filed after the Bar Date shall, unless such Claim properly amends a Claim filed before the Bar Date or unless the Bankruptcy Court otherwise directs, be deemed Disallowed in full and expunged without further order of the Bankruptcy Court.  Filed or Scheduled Claims may be amended or reconsidered only as provided in the Bankruptcy Code and Bankruptcy Rules.  A Claim may be amended prior to the Confirmation Date only as agreed upon by Navillus and the Holder of such Claim, or as otherwise permitted by the Bankruptcy Court, the Bankruptcy Rules or applicable law. After the Confirmation Date, except as otherwise specifically set forth in the Plan, a Claim may not be filed or amended without the authorization of the Bankruptcy Court or consent of Reorganized Navillus.

### 7.    *Transmittal of Distributions and Notices*

Any property or notice which a Person is or becomes entitled to receive pursuant to the Plan may be delivered by first class mail, postage prepaid, in an envelope addressed to that Person or authorized agent at the address indicated on the latest notice of appearance or the latest Proof of Claim or other paper filed by that Person or its authorized agent, or with respect to the Union Parties to the address of the Union Parties Cure Claim Escrow Agent indicated in the Union Parties Settlement Allocation escrow agreement filed with the Plan Supplement.  Absent any of the foregoing, the address set forth in the relevant Schedule for that Person may be used.  Property distributed in accordance with this Section 8.07 of the Plan shall be deemed delivered to such Person regardless of whether such property is actually received by that Person.  Notwithstanding anything in the Plan to the contrary, the Distribution Agent shall not have any obligation to attempt to locate any Person who is or becomes entitled to receive any Distribution under the Plan with regard to any undeliverable or uncashed Distributions.

A Holder of a Claim or Equity Interest may designate a different address for notices and Distributions by notifying Navillus and the Distribution Agent of that address in writing.  Any change of address of a party entitled to receive Distributions hereunder must be provided by overnight or registered mail to the address for notices set forth in Section 13.07 of the Plan in order to be effective.  Such notification shall be effective upon receipt.

If any Distribution to a Holder of a Claim or Equity Interest is returned as undeliverable (e.g., "forwarding time expired, "addressee unknown", etc.), no further Distributions to such Holder shall be made unless and until the Distribution Agent is timely notified within ninety (90) days following the Distribution Date with respect to such Holder of a Claim, in writing, of such Holder's then current address, at which time all missed Distributions shall be made to such Holder without interest.

### 8.    *Unclaimed Property*

If any Distribution remains unclaimed for a period of ninety (90) days following a Distribution Date to the Holder of an Allowed Claim or Equity Interest entitled thereto, the Distribution shall constitute Unclaimed Property and the Holder shall no longer be entitled to

- 48 -

such Distribution.    All such property shall be retained by the Distribution Agent in the Distribution Reserve for Distribution pursuant to the terms of the Plan, subject, however, to the Distribution Agent's sole discretion to distribute Unclaimed Property to Holders entitled thereto if such Holders are subsequently located.

### 9.    *Withholding Taxes and Expenses of Distribution*

In connection with the Plan and all Distributions under the Plan, Reorganized Navillus and the Distribution Agent shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions under the Plan shall be subject to any such withholding, payment, and reporting requirements.    Reorganized Navillus and the Distribution Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements.    Notwithstanding any other provision of the Plan, each Holder of an Allowed Claim that is to receive a Distribution of Cash pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and including, in the case of any Holder of a Disputed Claim that has become an Allowed Claim, any tax obligation that would be imposed upon Reorganized Navillus in connection with such Distribution, and no Distribution of Cash shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to Reorganized Navillus and the Distribution Agent for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon Reorganized Navillus in connection with such Distribution.    If such information is not received within ninety (90) days after the Distribution Date by the Distribution Agent, such Distribution shall be treated as Unclaimed Property.

### 10.    *Fractional Distributions*

Notwithstanding any other provision of the Plan to the contrary, no Cash payments of fractions of cents will be made.    Whenever any payment of a fraction of a dollar would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar.

### 11.    *De Minimis Distributions*

Notwithstanding anything to the contrary contained in the Plan, the Distribution Agent shall not be required to distribute, and shall not distribute, Cash, or other property to the Holder of any Allowed Claim if the amount of Cash, or other property to be distributed on account of such Claim is less than $50.    Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed is less than such amount shall have such Claim discharged and shall be forever barred from asserting such Claim against Navillus, Reorganized Navillus or their respective property.    Any Cash or other property not distributed pursuant to this provision shall be the property of Reorganized Navillus, free of any restrictions thereon.

### 12.   *Setoffs and Recoupments*

Except as otherwise provided in the Plan, the Confirmation Order or in agreements previously approved by Final Order of the Court, Navillus may, pursuant to applicable law, setoff or recoup against any Claim (for purposes of determining the Allowed amount of such Claim on which Distribution shall be made and before any Distribution is made on account of such Claim), any and all of the Claims, rights and Causes of Action of any nature that Navillus or the Estate may hold against the Holder of such Claim.

Neither the failure to affect such a setoff or recoupment, the allowance of any Claim hereunder, any other act or omission of Navillus, nor any provision of the Plan, shall constitute a waiver or release by Navillus of any such Claims, rights and Causes of Action that Navillus may possess against such Holder.  To the extent Navillus fails to setoff or recoup against a creditor and seeks to collect a Claim from such creditor after a Distribution to such creditor pursuant to the Plan, Navillus, if successful in asserting such Claim, shall be entitled to full recovery against such creditor.  Navillus may seek periodic Bankruptcy Court approval for any such setoffs or recoupments.

### 13.   *Pre-Payment*

Except as otherwise provided in the Plan, the Plan Supplement, any ancillary documents entered into in connection therewith, or the Confirmation Order, Reorganized Navillus shall have the right to pre-pay, without penalty, all or any portion of an Allowed Claim entitled to payment in Cash at any time; provided, however, that any such prepayment shall not be violative to or otherwise prejudice the relative priorities and parities among the Classes of Claims.

### 14.   *No Distribution in Excess of Allowed Amounts*

Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim shall receive in respect of such Claim any Distribution of a value as of the Effective Date in excess of the Allowed amount of such Claim (excluding payments on account of interest due and payable from and after the Petition Date pursuant to the Plan, if any).

### 15.   *Disposition of Excess Funds*

If, after ninety (90) days following the final Distribution Date, any Unclaimed Property remains, or Cash of inconsequential value to the Estate remains in the possession or under the control of Reorganized Navillus or the Distribution Agent, and the Distribution Agent has satisfied and discharged all the expenses intended to be paid on behalf of the Estate, the Distribution Agent shall first use such Unclaimed Property and Cash to make an additional Pro Rata Distribution to the Holders of Allowed Class 5 Claims, solely to the extent that all prior Distributions to such Holders aggregate less than 10% of their Allowed Claims; provided that such additional Distribution does not impede, hinder or delay entry of a final decree closing the Chapter 11 Case.  Moreover, any expenses associated with the making of any such additional Distribution will be paid from such Unclaimed Property and Cash.  After any such additional Distribution is made, the Distribution Agent shall, at the sole option of Reorganized Navillus,

- 50 -

either apply remaining Cash or Unclaimed Property for further Distribution in accordance with the Plan or abandon such funds in a commercially reasonable manner, including to a charitable organization.

E.      **Procedures For Resolving Disputed, Contingent, And Unliquidated Claims And Distributions With Respect Thereto**

1.      *Prosecution of Objections to Claims.*

From and after the Effective Date, Reorganized Navillus shall have the right to object to the allowance of any Claim and may file with the Bankruptcy Court any appropriate motion or adversary proceeding with respect thereto on or before the Claims Objection Bar Date.  All Claim objections may be litigated to Final Order; provided, however, that Reorganized Navillus may compromise and settle, withdraw, or resolve by any other method approved by the Bankruptcy Court, any objections to any Claim.  To the extent any Claims or Causes of Actions are pending before the Bankruptcy Court pursuant to filings made during the pendency of the Chapter 11 Case, Navillus shall be required to obtain an appropriate order of the Bankruptcy Court concluding any such filings.

2.      *Estimation of Claims*

Navillus may at any time request that the Bankruptcy Court estimate any Contingent Claim, unliquidated Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether Navillus has previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time, including during litigation concerning any objection to such Claim. On and after the Confirmation Date, subject to the Effective Date, Claims which have been estimated subsequently may be compromised, settled, withdrawn or otherwise resolved without further order of the Bankruptcy Court as provided in Section 9.01 of the Plan.

3.      *Resolution of Disputed Insured Claims*

**ADR Procedures**.  Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates a request to approve alternative dispute resolution procedures (the "ADR Procedures") to promote the resolution of prepetition Insured Claims that remain unliquidated or are Disputed Claims as of the Voting Record Date.  A summary of the ADR Procedures is set forth below, and a copy of the ADR Procedures in their entirety will be included in the Plan Supplement.

Offer Exchange Procedures.  The first stage of the ADR Procedures is an offer exchange process (the "Offer Exchange Procedure") requiring the parties to exchange settlement offers and thereby providing the opportunity to resolve the Disputed Insured Claims on a consensual basis without any further litigation.

Mediation Procedure.  If the Offer Exchange Procedure does not result in settlement of a Disputed Insured Claim, the next step is mediation before a mediator chosen from a pre-selected

- 51 -

list.  Following the selection of a mediator and the preparation of mediation statements, and within thirty (30) days of the appointment of a mediator, a mediation conference will be held during which the mediator will work with the parties to resolve the Disputed Insured Claim. Claims not resolved through mediation will proceed to litigation as set forth in Section 9.03(b) of the Plan.

**Disputed Insured Claims Not Resolved Through ADR Procedures**.  After the Effective Date, at Reorganized Navillus' option, any Disputed Insured Claim (as to which a Proof of Claim was timely filed in the Chapter 11 Case) not resolved through the ADR Procedures or a Final Order of the Bankruptcy Court will be determined in the administrative or judicial tribunal in which it is pending on the Effective Date or, if no action was pending on the Effective Date, in any administrative or judicial tribunal of appropriate jurisdiction.  Reorganized Navillus may exercise this option by service upon the Holder of the applicable Insured Claim of a notice informing the Holder of such Insured Claim that Reorganized Navillus has exercised such option.  Upon Reorganized Navillus' service of such a notice, the discharge injunction provided for in Section 12.02 of the Plan will be deemed modified, without the necessity for further Bankruptcy Court approval, solely to the extent necessary to allow the parties to determine the Disputed Insured Claim in the applicable administrative or judicial tribunal.  Notwithstanding the foregoing, at all times prior to and after the Effective Date, the Bankruptcy Court will retain jurisdiction relating to the Insured Claims, including Navillus and Reorganized Navillus' right to have such Claims determined in the Bankruptcy Court (or the United States District Court for the Southern District of New York) pursuant to section 157(b)(2)(B) of title 28 of the United States Code, as may be applicable.

**Treatment of Insured Claims Upon Final Resolution**.  Any Insured Claim determined pursuant to the ADR Procedures or a judgment obtained in accordance with Section 9.03 of the Plan and applicable non-bankruptcy law will be deemed an Allowed Claim in the amount so determined, provided that only the amount of such Allowed Claim that is not satisfied from Navillus' deductible under the Insurance Policy Documents or the proceeds of insurance payable to the Holder of such Allowed Claim under Navillus' Insurance Policy Documents will be treated as an Allowed Claim for purposes of Distributions under the Plan.  In no event will a Distribution be made under the Plan to the Holder of an Insured Claim on account of any portion of an Insured Claim in excess of Navillus' deductible under any applicable Insurance Policy Documents.  In the event an Insured Claim is determined pursuant to a judgment obtained in accordance with Section 9.03 of the Plan and applicable non-bankruptcy law provides for no recovery against Navillus, such Insured Claim will be deemed Disallowed and expunged without the necessity for further Bankruptcy Court approval upon Navillus or Reorganized Navillus' service of a copy of such judgment or Final Order upon the Holder of such Insured Claim.  All Claims, demands, rights, defenses and Causes of Action that Navillus or Reorganized Navillus may have against any Person or Entity in connection with or arising out of any Insured Claim are expressly retained and preserved.

The resolution of Disputed Insured Claims pursuant to this Section 9.03 of the Plan shall be subject to the provisions of Section 7.06 of the Plan.

4.      *No Distribution Pending Allowance*

No Distributions shall be made on account of a Disputed Claim or, if less than the entire Claim is a Disputed Claim, the portion of a Claim that is Disputed, until such Claim becomes an Allowed Claim or on account of Union Parties Cure Claims if the Union Parties Settlement Allocation has not been provided to Navillus.  In lieu of making a Distribution to such Holders, any Distribution to which such Holder would be entitled if that Claim had been Allowed in full shall be placed in the Distribution Reserve until the disposition thereof shall be determined by a Final Order or by written agreement between the Holder of the Claim and Navillus or delivery of the Union Parties Settlement Allocation to Navillus, as applicable.

5.      *Distributions on Account of Disputed Claims Once They are Allowed*

The Distribution Agent shall make Distributions on account of any Disputed Claim that has become an Allowed Claim.  Such Distributions shall be made pursuant to the provisions of the Plan governing the applicable Class.   Such Distributions shall be based upon the Distributions that would have been made to the Holder of such Claim under the Plan if the Disputed Claim had been an Allowed Claim on the Effective Date in the amount ultimately Allowed.

6.      *Reserves for Plan Distributions*

Navillus or Reorganized Navillus may establish any reserves that they deem necessary or advisable to make Distributions to Holders of Allowed Claims (including, without limitation, Professional Fee Claims) and Equity Interests or otherwise to satisfy their obligations under the Plan.

**Distribution Reserve.**  On the Effective Date and on each subsequent Distribution Date, Navillus or Reorganized Navillus shall withhold on a Pro Rata basis from property that would otherwise be distributed to Classes of Claims entitled to Distributions under the Plan on such date, in the Distribution Reserve, an amount or property sufficient to make the Distributions to which Holders of such Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed as of the Effective Date and if the Union Parties Settlement Allocation has not been delivered to Navillus by the Effective Date, the amount to be distributed on account of the Union Parties Cure Claims.  Navillus or Reorganized Navillus may request, if necessary, estimation of any Disputed Claim that is contingent or unliquidated, or for which Navillus or Reorganized Navillus determine to reserve less than the amount of the Disputed Claim. Navillus or Reorganized Navillus may request, if necessary, estimation of any Disputed Claim that is contingent or unliquidated, or for which Navillus or Reorganized Navillus determine to reserve less than the amount of the Disputed Claim.  Navillus or Reorganized Navillus shall withhold the applicable portion of the Distribution Reserve with respect to such Claims based upon the estimated amount of each such Claim as estimated by the Bankruptcy Court.  If Navillus or Reorganized Navillus elect not to request such an estimation from the Bankruptcy Court with respect to a Disputed Claim that is contingent or unliquidated, Navillus or Reorganized Navillus shall withhold the applicable amount of the Disputed Claim based upon the good faith estimate of the amount of such Claim by Navillus or Reorganized Navillus.

- 53 -

F.     **Retention of Jurisdiction**

Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise ordered by the Bankruptcy Court, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured, or unsecured status of any Claim or Equity Interest not otherwise Allowed under the Plan (other than personal injury or wrongful death Claims, unless agreed by the Holder), including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Equity Interests in Navillus;

- hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 327, 328, 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code; provided, however, that from and after the ~~Confirmation~~Effective Date, the payment of the fees and expenses of the Professionals of Reorganized Navillus (other than with respect to the preparation and prosecution of fee applications) shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

- hear and determine all applications for compensation and reimbursement of expenses of the Fee Examiner and the Fee Examiner Professionals under the Plan or under sections 105, 327, 328, 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code;

- hear and determine all matters with respect to the assumption or rejection of any Executory Contract or Unexpired Lease to which Navillus is a party or with respect to which Navillus may be liable, including, if necessary, the nature or amount of any required cure or the liquidation or allowance of any Claims arising therefrom;

- effectuate performance of and payments under the provisions of the Plan and enforce remedies upon any default under the Plan;

- hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Case or the Plan, including without limitation the enforcement of the injunction provisions contained in Article XII of the Plan and any potential ~~Claims~~claims or Causes of Action disclosed in Section VII.B.~~11~~12 of this Disclosure Statement;

- enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Union Parties Settlement, the Liberty Global Settlement, the Plan Supplement, the Disclosure Statement, or the Confirmation Order;

- hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

- consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

- issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the implementation, consummation, or enforcement of the Union Parties Settlement, the Liberty Global Settlement, the Plan or the Confirmation Order;

- enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

- hear and determine any matters arising in connection with or relating to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Union Parties Settlement, the Liberty Global Settlement, the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order;

- enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case (whether or not the Chapter 11 Case has been closed);

- except as otherwise limited herein, recover all assets of Navillus and property of the Estate, wherever located;

- hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

- hear and determine all disputes involving the existence, nature, or scope of Navillus' discharge;

- hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, the provisions of the Bankruptcy Code; and

- enter a final decree closing the Chapter 11 Case.

- 55 -

G.    **Release, Discharge, Injunction and Exculpation**

1.    ***Releases and Related Matters***

a.    **Released Parties**

(i)    For purposes of this section, "**Debtor Released Parties**" means (i) Navillus, (ii) Reorganized Navillus, (iii) the Estate, (iv) each direct or indirect and actual or beneficial Holder of Equity Interests in Navillus, including, without limitation, DOS, the Donal O'Sullivan Revocable Living Trust ~~and~~ Donal O'Sullivan IDGT II**, and any other trust settled by DOS**, (v) TSC, (vi) HDK, and (vii) with respect to the foregoing, each of their respective current and former officers and directors, managers, members, **trustees, beneficiaries,** employees, agents, representatives, financial advisors, professionals, accountants, attorneys, affiliates~~, relatives~~ **(including, without limitation, Kerry Leasing, LLC, Manhattan Tool Repair, Inc., Structure Compliance Group, LLC, Navillus Group, LLC, E. Fitzgerald Electric, Co., Inc., and all their employees, directors, officers, managers, members, agents and representatives), relatives (including, without limitation, Kathleen O'Sullivan, Kevin O'Sullivan and Helen O'Sullivan),** and each of their predecessors, successors and assigns.

(ii)    For purposes of this section, "**Union Released Parties**" means the Union Parties and each of their respective current and former officers, trustees, attorneys, advisors and representatives, and each of their predecessors, successors and assigns.

(iii)    For purposes of this section, "**Liberty Released Parties**" means Liberty and its current and former officers and directors, managers, members, employees, agents, representatives, financial advisors, professionals, accountants, attorneys, affiliates, and each of their predecessors, successors and assigns.

(iv)    For purposes of this section, "**Released Parties**" means the Debtor Released Parties, the Union Released Parties and the Liberty Released Parties.

b.    **Releases by Debtor Released Parties**

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor Released Parties, and any Person or Entity seeking to exercise the rights of Navillus' Estate, shall be deemed to forever release, waive, and discharge:

(i) each of the Union Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action (including Avoidance Actions), and  liabilities whatsoever in connection with or  in any way relating to (a) the District Court Decision and (b) any Proofs of Claim filed by the Union Parties against Navillus; ~~and~~

- 56 -

(ii) each of the Liberty Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action (including Avoidance Actions), and  liabilities whatsoever in connection with or  in any way relating to (a) Navillus, (b) the conduct of Navillus' business, (c) the Chapter 11 Case, (d) the Disclosure Statement or the Plan, (e) any agreement, understanding, contract, instrument or other document which existed prior to the Effective Date relating in any way to the foregoing, and (f) any transaction, event, circumstance, action, failure to act or occurrence of any kind or nature which occurred, existed, was taken, permitted or begun at any time prior to the Effective Date relating in any way to Navillus, the conduct of Navillus' business, the Chapter 11 Case, the Disclosure Statement or the Plan, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date; and

(iii) each of the other Debtor Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action (including Avoidance Actions), and  liabilities whatsoever in connection with or  in any way relating to (a) Navillus, (b) the conduct of Navillus' business, (c) the Chapter 11 Case, (d) the Disclosure Statement or the Plan, (e) any agreement, understanding, contract, instrument or other document which existed prior to the Effective Date relating in any way to the foregoing, and (f) any transaction, event, circumstance, action, failure to act or occurrence of any kind or nature which occurred, existed, was taken, permitted or begun at any time prior to the Effective Date relating in any way to Navillus, the conduct of Navillus' business, the Chapter 11 Case, the Disclosure Statement or the Plan, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date.

Notwithstanding the foregoing, the obligations under Article 3-A, the Plan, the Exit Financing, the Liberty Global Settlement and the Union Parties Settlement are not released.

c.        ~~Released~~Releases by Union Released Parties

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed:

(i) The Union Released Parties shall be deemed to forever release, waive, and discharge each of the Debtor Released Parties and the Liberty Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action (including Avoidance Actions), and  liabilities whatsoever in connection with or in any way relating to (a) Navillus, (b) the conduct of Navillus' business, (c) the Chapter 11 Case, (d) the Disclosure Statement or the Plan, (e) the District Court Decision, (f) any agreement, understanding, contract, instrument or other document which existed prior to

- 57 -

the Effective Date relating in any way to the foregoing, and (g) any transaction, event, circumstance, action, failure to act or occurrence of any kind or nature which occurred, existed, was taken, permitted or begun at any time prior to the Effective Date relating in any way to Navillus, the conduct of Navillus' business, the Chapter 11 Case, the Disclosure Statement, the Plan or, the District Court Decision, or the Proofs of Claim filed by the Union Parties, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, including but not limited to any alter ego claims, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date; provided however, that such release with respect to Navillus shall exclude any ordinary course, non-alter ego based obligations under the Union Parties CBAs arising on or after the Petition Date and any legally required calculation of withdrawal liability, if anyUnion Ordinary Course CBA Claims.

(ii) The Union Parties shall not cause any Person to bring, or assist any Person in developing or bringing, any claims or investigations against Navillus or DOS with respect to matters arising prior to the Petition Date, to the fullest extent permitted by law.

(iii) The Union Released Parties shall be deemed to forever release, waive, and discharge each of the Debtor Released Parties, the Distribution Agent, the Union Parties Cure Claim Escrow Agent and the Liberty Released Parties (collectively, the "Allocation Release Beneficiaries") from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whatsoever in connection with or in any way relating to the Union Parties Settlement Allocation as provided in sectionSection 8.04 of the Plan, or any failure to make or deliver to Navillusdirect the Union Parties Cure Claim Escrow Agent to disburse the Distributions in accordance with such allocation (the "Allocation Release").

Notwithstanding the foregoing, the obligations under Article 3-A, the Plan and, the Union Parties Settlement and any Union Ordinary Course CBA Claims are not released.

d.        **Releases by Liberty**

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, Liberty shall be deemed to forever release, waive, and discharge Navillus, Reorganized Navillus, the Estate, and the Indemnitors from any and all claims and rights for and related to the specific post-petition costs and expenses that are the subject of the Allowed Liberty DIP Loan Claim in the amount in excess of up to three hundred thousand ($300,000) dollars.

e.        **Releases by Holders of Claims and Equity Interests**

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Holder of a Claim against or Equity Interest in Navillus and Reorganized Navillus, excluding the Debtor Released Parties, the Union Released Parties and Liberty, shall, to the fullest extent permitted by law, be deemed to forever

release, waive, and discharge each of the Debtor Released Parties and Liberty Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action (including Avoidance Actions), and   liabilities whatsoever in connection with or in any way relating to (a) Navillus, (b) the conduct of Navillus' business, (c) the Chapter 11 Case, (d) the Disclosure Statement or the Plan, (e) the District Court Decision, (f) any agreement, understanding, contract, instrument or other document which existed prior to the Effective Date relating in any way to the foregoing, and (g) any transaction, event, circumstance, action, failure to act or occurrence of any kind or nature which occurred, existed, was taken, permitted or begun at any time prior to the Effective Date relating in any way to Navillus, the conduct of Navillus' business, the Chapter 11 Case, the Disclosure Statement, the Plan or the District Court Decision, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date; provided, however, that nothing in Section 12.01(e) of the Plan shall operate as a release, waiver or discharge of any Causes of Action or liabilities unknown to such Person as of the Petition Date arising out of willful misconduct, gross negligence, fraud or criminal acts of any such Released Party as determined by a Final Order and any Union Ordinary Course CBA Claims.  Notwithstanding the foregoing, the obligations under Article 3-A, the Plan and, the Union Parties Settlement and any Union Ordinary Course CBA Claims are not released. Without limitation of the exculpation or other provisions of the Plan and the Confirmation Order, and for purposes of the release set forth in Section 12.01(e) of the Plan only, such release will not apply to release the Debtor Released Parties and Liberty Released Parties from any Claims held by Holders of Claims or Equity Interests who (i) voted to reject the Plan; (ii) voted to accept the Plan but opted out of the foregoing release; or (iii) abstained from voting on the Plan but opted out of the foregoing release, subject to applicable law.

## 2.  *Discharge of Claims and Equity Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise provided herein, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, and release, effective as of the Effective Date, of all Claims and Causes of Action that arose before the Effective Date, and all debts of the kind specified in section 502 of the Bankruptcy Code, whether or not (i) a Proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, (iii) a Claim based upon such debt is or has been Disallowed by order of the Bankruptcy Court, or (iv) the Holder of a Claim based upon such debt accepted the Plan. The Plan shall bind all Holders of Claims and Equity Interests, notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to reject the Plan.

As of the Effective Date, the Confirmation Order shall be a judicial determination of discharge of all such Claims and other debts and liabilities against Navillus, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment

obtained against Navillus at any time, to the extent that such judgment relates to a discharged Claim.

>3.     *Injunction*

Except as otherwise set forth herein, all Persons who have held, hold or may hold Claims, Causes of Action or Equity Interests and their successors and assigns, and all other parties in interest, along with their respective present or former directors, officers, principals, employees, agents, professionals, representatives and affiliates shall be permanently enjoined, from and after the Effective Date, from: (a) commencing or continuing in any manner any action or proceeding of any kind with respect to any such Claims, Causes of Action or Equity Interests against Navillus, Reorganized Navillus, the Estate or Debtor Released Parties and Liberty Released Parties, (b) the enforcement, attachment, collection or recovery by any manner or means of a judgment, award, decree or order against Navillus, Reorganized Navillus, the Estate or Debtor Released Parties and Liberty Released Parties on account of such Claims, Causes of Action or Equity Interests, (c) creating, perfecting or enforcing any encumbrance of any kind against Navillus, Reorganized Navillus, the Estate or Debtor Released Parties and Liberty Released Parties or against the property or interests in the property of Navillus, Reorganized Navillus, the Estate or Debtor Released Parties and Liberty Released Parties on account of any such Claims, Causes of Action or Equity Interests, (d) taking any action against, or interfering in any respect with, the Cash or property being distributed in accordance with the Plan or the Distributions being effectuated through the Plan (other than actions to enforce any rights or obligations under the Plan); (e) asserting any right of setoff or recoupment of any kind, directly or indirectly, against any obligation due Navillus, Reorganized Navillus, the Estate or Debtor Released Parties and Liberty Released Parties, except as contemplated or allowed by the Plan; and (f) prosecuting or otherwise asserting any Claim, Cause of Action, right or interest that has been extinguished, discharged, released, settled or exculpated pursuant to the Plan or the Confirmation Order.  Such injunction shall extend to all Persons protected by the discharge, release and exculpation provisions of the Plan and the Confirmation Order, as well as to the successors of such Persons and to the respective property and interests in property of such Persons.

Without limiting the effect of the foregoing provisions of Section 12.03 of the Plan upon any Person, by accepting Distributions pursuant to the Plan, each Holder of an Allowed Claim or Equity Interest receiving a Distribution pursuant to the Plan shall be deemed to have specifically consented to the injunctions set forth in ~~this~~ Section ~~12.03.~~12.03 of the Plan.

Without limiting the effect of the foregoing provisions of Section 12.03 of the Plan, the Union Released Parties shall be permanently enjoined, from and after the Effective Date, from commencing or continuing in any manner any action or proceeding of any kind with respect to any claims or actions released by the Allocation Release.  In the event of a violation of such injunction, the Allocation Release Beneficiaries shall be entitled to injunctive relief and damages caused by such violation, including any costs incurred,

including, but not limited to, reasonable attorneys' fees and disbursements, against the Union Party(ies) violating this injunction.

### 4. *Exculpation and Limitations of Liability*

For purposes of this section, "**Exculpated Parties**" means **Navillus and each of its current and former officers and directors, managers, members, trustees, beneficiaries, employees, agents, representatives, financial advisors, professionals, accountants and attorneys,** the Allocation Release Beneficiaries, the Union Released Parties, the Committee and the Committee's **members and** Professionals.

The Exculpated Parties who provided services to the Estate during this Chapter 11 Case will not have or incur any liability to any Person for any act taken or omission occurring on or after the Petition Date in connection with or related to the Estate, including but not limited to (i) the commencement and administration of the Chapter 11 Case, (ii) the operation of Navillus during the pendency of the Chapter 11 Case, (iii) formulating, preparing, disseminating, implementing, confirming, consummating or administering the Plan (including soliciting acceptances or rejections thereof); (iv) the Disclosure Statement or any contract, instrument, release or other agreement or document entered into or any action taken or omitted to be taken during the administration of the Chapter 11 Case or in connection with the Plan or Plan Supplement; or (v) any Distributions made pursuant to the Plan. Nothing in ~~this section~~**Section 12.04(b) of the Plan** shall (i) be construed as a release of such Person's fraud, gross negligence, malpractice or willful misconduct with respect to the matters set forth in ~~this~~ Section 12.04(b) **of the Plan,** or (ii) limit the liability of Navillus' Professionals to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility. The Exculpated Parties are entitled to rely on, and act or refrain from acting on, all information provided by other Exculpated Parties without any duty to investigate the veracity or accuracy of such information.

## VIII. VOTING ON AND CONFIRMATION OF PLAN

### A. General Requirements for Confirmation

The Bankruptcy Code requires the Bankruptcy Court to determine whether a plan of reorganization complies with the technical requirements of chapter 11 of the Bankruptcy Code. It further requires that a debtor or plan proponent's disclosures concerning such plan have been adequate and have included information concerning all payments made or promised in connection with the plan.

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of determinations regarding the Plan, including that (i) the Plan has classified all Claims and Equity Interests in a permissible manner; (ii) the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and (iii) the proponent's disclosures as required by chapter 11 of the Bankruptcy Code have been adequate. Navillus believes that all of

these requirements will have been met by the date of the Combined Hearing and will seek rulings of the Bankruptcy Court to that effect at that hearing.

Section 1129(a) of the Bankruptcy Code requires that, among other things, for a plan to be confirmed:

- The plan complies with the applicable provisions of the Bankruptcy Code.
- The debtor has complied with the applicable provisions of the Bankruptcy Code.
- The plan has been proposed in good faith and not by any means forbidden by law.
- Any payment made or to be made by the debtor under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.
- The debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan.  The appointment to, or continuance in, such office of such individual, must be consistent with the interests of creditors and equity security holders and with public policy and Navillus must have disclosed the identity of any insider that the reorganized debtor will employ or retain, and the nature of any compensation for such insider.
- Each class of claims or interests has either accepted the plan, is not impaired under the plan or if impaired, with respect to each class of impaired claims or interests, either each holder of a claim or interest of such class has accepted the plan, or will receive or retain under the plan on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code.
- Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims (other than tax claims) will be paid in full on the effective date and that priority tax claims will receive on account of such claims deferred cash payments, over a period not exceeding five (5) years after the order for relief in a case, of a value, as of the effective date, equal to the allowed amount of such claim.
- If a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class.
- Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan (unless such liquidation or reorganization is proposed in the plan).

The Bankruptcy Code also requires that (i) the Plan will have been accepted by the requisite votes of creditors (except to the extent that "cram down" is available under section

- 62 -

1129(b) of the Bankruptcy Code); (ii) the Plan be feasible (that is, confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization); and (iii) the Plan be in the "best interests" of all Impaired creditors that do not vote to accept the Plan (that is, that Impaired creditors which do not vote to accept the Plan will receive pursuant to the Plan value at least equal to the value that they would receive in a liquidation under chapter 7 of the Bankruptcy Code).  To confirm the Plan, the Bankruptcy Court must find that all of these requirements are met.

Thus, even if the Plan is accepted by the requisite votes, the Bankruptcy Court must make independent findings respecting the Plan's feasibility and whether it is in the best interests of Impaired dissenting creditors before it may confirm the Plan.  These statutory conditions are discussed below.

### B.    Voting Procedures and Standards

#### 1.    *Classes Entitled to Vote to Accept or Reject the Plan*

Each Impaired Class of Claims that is receiving a Distribution ~~under the Plan~~ is entitled to vote separately to accept or reject the Plan.  Accordingly, Holders of Claims in Classes 4 ~~–~~and 5 are entitled to vote to accept or reject the Plan.  By operation of law, each Unimpaired Class of Claims is deemed to have accepted the Plan and, therefore, the Holders of Claims or Equity Interests in such Classes are not entitled to vote to accept or reject the Plan.  Consequently, Classes 1- 3 and 6 are deemed to have accepted the Plan and, therefore, none of the Holders of Claims in Classes 1 - 3 and Equity Interests in Class 6 are entitled to vote to accept or reject the Plan.

#### 2.    *Voting Procedures and Standards*

The following procedures for allowance of Claims for purposes of voting on the Plan shall apply to votes upon the Plan:

a.    **Disputed Filed Claims.**  With regard to a Claim that is the subject of an objection filed at least twenty-five (25) days prior to the Voting Deadline, such Claim will be Disallowed provisionally for voting purposes, except to the extent and in the manner that (i) Navillus agrees that the Claim should be allowed for voting purposes in its objection to such Claim; or (ii) such Claim is allowed temporarily for voting purposes in accordance with Bankruptcy Rule 3018 pursuant to a motion filed at least twenty (20) days prior to the Voting Deadline.

b.    **Claims Estimated for Voting Purposes.**  With respect to a Claim that has been estimated or otherwise allowed for voting purposes by order of the Bankruptcy Court, the amount and classification of such Claim will be that set by the Court.

c.    **Wholly Unliquidated Claims.**  A Claim filed as wholly unliquidated, contingent and/or undetermined will be accorded one vote, valued at one dollar, for the purposes of section 1126(c) of the Bankruptcy Code, unless the Claim is disputed as set forth in (a) above.

d.    **Late Claims.**   With respect to a Claim as to which a Proof of Claim has not been timely filed (i.e., was filed after the Bar Date), the voting amount of such Claim (subject to any applicable limitations set forth below) will be equal to the amount listed, if any, in respect of such Claim in the Schedules, to the extent such Claim is not listed as Contingent, unliquidated, or Disputed, unless the Claim is disputed as set forth in (a) above.  If such Claim is either not listed in the Schedules, or is listed as Contingent, unliquidated or Disputed, then the Claim respecting such Proof of Claim will be Disallowed provisionally for voting purposes.

e.    **Duplicate Claims.**  A creditor will not be entitled to vote its Claim to the extent such Claim duplicates or has been superseded by another Claim of such creditor.

f.    **Undisputed Scheduled Claims.**   With respect to a Claim that appears on the Schedules as undisputed, noncontingent and liquidated, and as to which no objection has been filed at least twenty five (25) days prior to the Voting Deadline, the amount and classification of such Claim shall be that specified in the Schedules unless superseded by an undisputed Proof of Claim.

g.    **Bankruptcy Court Determined Claims.**  With respect to a Claim for which an order has been entered reducing, reclassifying or allowing, the amount and classification of the Claim shall be that specified in such order.

### 3.    *Tabulation Procedures*

The Ballots of creditors will be tabulated in accordance with the following procedures:

a.    For the purpose of voting on the Plan, the Voting Agent will be deemed to be in constructive receipt of any Ballot timely delivered to the address designated for the receipt of Ballots cast on the Plan;

b.    Any Ballot received by the Voting Agent after the Voting Deadline shall not be counted;

c.    Pursuant to Bankruptcy Rule 3018(a), whenever a holder of a Claim submits more than one Ballot voting the same Claim prior to the Voting Deadline, the last such Ballot sent and received shall count unless such holder has sufficient cause within the meaning of Bankruptcy Rule 3018(a) to submit, or Navillus consents to the submission of, a superseding Ballot;

d.    The Ballot shall be deemed filed in the amount of a filed Claim, and if no Claim has been filed, in the amount of the Claim as specified in the Schedules, as long as the Claim is listed in the Schedules as undisputed, non-contingent or liquidated; otherwise, the Ballot shall not be counted;

e.    If a holder of a Claim casts simultaneous duplicative Ballots voted inconsistently, then such Ballots shall not be counted;

- 64 -

    f.  The authority of the signatory of each Ballot to complete and execute the Ballot shall be presumed;

    g.  Any Ballot that is not signed shall not be counted;

    h.  Any Ballot received timely by the Voting Agent by electronic communication (i.e. email) or facsimile will not be counted;

    i.  A holder of a Claim must vote all of its Claims within a particular Class under the Plan either to accept or reject the Plan and may not split its vote.  Accordingly, a Ballot that partially rejects and partially accepts the Plan, or that indicates both a vote for and against the Plan, will not be counted;

    j.  Any Ballot that is timely received and executed but does not indicate whether the holder of the relevant Claim is voting for or against the Plan shall not be counted;

    k.  Navillus may waive any defects or irregularities as to any particular Ballot at any time, either before or after the Voting Deadline; provided, however, that any such waivers shall be documented in the Voting Certification filed by the Voting Agent with the Court; and

    l.  No person, including Navillus and the Voting Agent, will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots, nor will any of them incur any liability for failure to provide such notification.

IF A BALLOT IS DAMAGED OR LOST OR IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT.

  Any Impaired Class of Claims that fails to achieve the requisite "accepted" vote will be deemed to have rejected the Plan.

## C.  Acceptance By Impaired Classes

  As a condition to confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Plan, except to the extent that "cram down" is available under section 1129(b) of the Bankruptcy Code (as described in the following section).

  Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually timely and properly vote to accept or to reject the Plan.

  A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

- 65 -

### D.   Confirmation Without Acceptance by All Impaired Classes ("Cram Down")

**NAVILLUS RESERVES THE RIGHT TO CRAM DOWN THE PLAN AGAINST NON-ACCEPTING CLASSES OF HOLDERS OF CLAIMS OR EQUITY INTERESTS.**

The Bankruptcy Code contains provisions for confirmation of a plan even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted the plan.  The "cram down" provisions of the Bankruptcy Code are set forth in section 1129(b) of the Bankruptcy Code.  Under the "cram down" provisions, upon the request of a plan proponent the Court will confirm a plan despite the lack of acceptance by an impaired class or classes if the Court finds that (i) the plan does not discriminate unfairly with respect to each non-accepting impaired class, (ii) the plan is fair and equitable with respect to each non-accepting impaired class, and (iii) at least one impaired class has accepted the plan.  As detailed below, these standards ensure that holders of junior interests, such as stockholders, cannot retain any interest in the debtor under a plan of reorganization that has been rejected by a senior class of impaired claims or interests unless such impaired claims or interests are paid in full or such junior class contributes money or something of new value related to the Plan.  If a junior class contributes new value, then the "new value" exception to the "absolute priority" rule may be applied to evaluate whether the "fair and equitable" standard has been met.

As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have narrow and specific meanings unique to bankruptcy law.  A plan does not discriminate unfairly if claims or interests in different classes but with similar priorities and characteristics receive or retain property of similar value under a plan.  By establishing separate Classes for the holders of each type of Claim and by treating each holder of a Claim in each Class substantially the same, the Plan has been structured so as to meet the "unfair discrimination" test of section 1129(b) of the Bankruptcy Code.

The Bankruptcy Code sets forth different standards for establishing that a plan is "fair and equitable" with respect to a dissenting class, depending on whether the class is comprised of secured or unsecured claims or interests.  In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before any junior class may receive anything under the plan.  In addition, case law surrounding section 1129(b) requires that no class senior to a non-accepting impaired class receives more than payment in full on its claims.

With respect to a class of unsecured claims that does not accept the Plan, either (i) each holder of an unsecured claim in the dissenting class receives or retains under such plan property of a value equal to the allowed amount of its unsecured claim, or (ii) the holders of claims or holders of interests that are junior to the claims of the holders of such unsecured claims will not receive or retain any property under the plan.  Additionally, the holders of claims that are senior to the claims of the dissenting class of unsecured claims receive no more than payment in full on their claims under the plan.  The Plan is designed to satisfy these standard through satisfaction of

- 66 -

the "new value" exception to the absolute priority rule because Class 6 will retain its Equity Interests.

Navillus believes that the Plan will  be fair and equitable with respect to all Classes because the New Value Contribution proposed by DOS is substantial and indispensable to the reorganization.  The New Value Contribution will inure to the benefit of all creditors of Navillus' estate and maximize the Distributions to such creditors under the Plan.

If all the applicable requirements for confirmation of the Plan are met as set forth in sections 1129(a)(1) through (13) of the Bankruptcy Code, except that one or more of Classes of Impaired Claims or Equity Interests have failed to accept the Plan pursuant to section 1129(a)(8) of the Bankruptcy Code, Navillus will request that the Bankruptcy Court confirm the Plan over the dissenting votes of such Classes in accordance with section 1129(b) of the Bankruptcy Code. Navillus believes that the Plan satisfies the "cram down" requirements of the Bankruptcy Code. Navillus may seek confirmation of the Plan over the objection of dissenting Classes, as well as over the objection of individual holders of Claims or Equity Interests who are members of an accepting Class.

**E.    New Value Contribution to Satisfy New Value Requirement in a Cram Down**

As noted above, if one or more Impaired Classes does not vote to accept the Plan and Navillus is required to seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code, Navillus believes that the "fair and equitable" requirement will be satisfied based on what is known as the "new value" exception to the "absolute priority" rule.  Pursuant to the "new value" exception, equity holders may be able to keep their ownership interests in a debtor even though unsecured creditors do not receive full payment of their claims, provided that equity holders contribute new capital to the reorganized debtor in an amount reasonably equivalent to the value of their retained interest in the debtor.

Navillus believes that the New Value Contribution to be proposed by DOS in his capacity as the beneficial holder of all Equity Interests in Navillus will satisfy the applicable legal requirements that "the capital contribution by old equity is: '(1) new, (2) substantial, (3) money or money's worth, (4) necessary for a successful reorganization, and (5) reasonably equivalent to the property that old equity is retaining or receiving.'" In re RAMZ Real Estate Co., LLC, 510 B.R. 712, 718 (Bankr. S.D.N.Y. 2014).  Here, the New Value Contribution being provided by DOS satisfies the applicable legal requirements because it is comprised of Cash in the amount of one million ($1,000,000) dollars which is substantial and necessary to fund Distributions required to be made under the Plan.

Moreover, in recognition of the Supreme Court's holding that a cram down plan providing for a ~~New Value Contribution~~new value contribution made without the benefit of market valuation to test the adequacy of the contribution is not confirmable under the absolute priority rule, Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 458 (1999), Navillus has proposed to subject the New Value Contribution the marketplace through the termination of its exclusive periods to file and solicit acceptances of a chapter 11 plan

effective as of August 27, 2018.  Accordingly, Navillus submits that even if it is forced to pursue confirmation through the "cram down" provisions of the Bankruptcy Code, the Plan can be confirmed based on the New Value Contribution proposed by DOS, which contribution is being subject to a thorough market test through termination of exclusivity, thus enabling the filing of competing plans.

F.      **Best Interest of Creditors/Liquidation Analysis**

As noted above, even if a plan is accepted by each class of Claims and Equity Interests, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the best interests of all holders of Claims or Equity Interests that are impaired by the plan and that have not accepted the plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that all members of an impaired class of Claims or Equity Interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such Holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if a debtor were liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its chapter 11 cases were converted to a chapter 7 case under the Bankruptcy Code.  This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced first, by any amounts due to holders of Article 3A Claims and the claims of secured creditors to the extent of the value of their collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 case and the chapter 11 case.   Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in its chapter 11 case (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the chapter 7 cases, litigation costs, and claims arising from the operations of the debtor during the pendency of the chapter 11 case.  The liquidation would also prompt the rejection of a large number of executory contracts and unexpired leases and thereby significantly enlarge the total pool of unsecured claims by reason of resulting rejection damages claims, and the Union Parties Settlement would no longer be in effect.  Moreover, the liquidation would cause Liberty to experience significant losses under the Bonded Contracts which would be treated as superpriority administrative claims under the DIP Order, thereby depleting any potential recovery to unsecured creditors.

Once the bankruptcy court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation.  If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

- 68 -

To support its belief that the Plan satisfies the best interests test, and in order to determine the amount of liquidation value that would be available to creditors, Navillus prepared a liquidation analysis (the "Liquidation Analysis"), which concludes that in a chapter 7 liquidation, Holders of prepetition unsecured claims would receive less of a recovery than the recovery they would receive under the Plan. This conclusion is premised upon the assumptions set forth in the Liquidation Analysis, which Navillus believes are reasonable. However, these assumptions are inherently subject to significant economic and competitive uncertainties beyond the control of Navillus. The Liquidation Analysis is also based on assumptions with regard to liquidation decisions that are subject to change. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if Navillus was, in fact, to undergo such a liquidation.

The full Liquidation Analysis is annexed as Exhibit C to this Disclosure Statement.

## G.    Feasibility

In connection with confirmation of the Plan, the Bankruptcy Court will be required to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor.

To support its belief in the feasibility of the Plan, Navillus has relied upon the financial projections (the "Projections"), which are annexed to this Disclosure Statement as Exhibit B. The Projections are reasonable, credible as of dates analyses were prepared, utilize reasonable assumptions and establish the Plan is feasible.

The Projections indicate that Reorganized Navillus should have sufficient cash flow to fund its operations and fund Distributions in light of the fact that Distributions will primarily be funded through a one-time payment on or around the Effective Date from the proceeds of the Exit Financing to be provided by Liberty. The Projections further demonstrate that Reorganized Navillus should have sufficient cash flow to satisfy its debt service obligations to Liberty. Accordingly, Navillus believes that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

The Projections are based on numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms; realization of the operating strategy of Reorganized Navillus; industry performance; no material adverse changes in general business and economic conditions; no material adverse changes in competition; Reorganized Navillus' retention of key management and other key employees; the absence of material contingent or unliquidated litigation, indemnity, or other claims; and other matters, many of which will be beyond the control of Reorganized Navillus and some or all of which may not materialize.

To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by Navillus, the assumptions and estimates underlying the Projections are subject to significant

business, economic, and competitive uncertainties and contingencies, many of which will be beyond the control of Reorganized Navillus. Accordingly, the Projections are only estimates and are necessarily speculative in nature. It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and are likely to increase over time.

The Projections should be read together with the information in Article IX of this Disclosure Statement entitled "Certain Risk Factors to be Considered," which sets forth important factors that could cause actual results to differ from those in the Projections.

### H.    The Release Provisions Are Integral Components of the Plan

Section 1123(b)(6) of the Bankruptcy Code provides that a plan may include any other appropriate provision not inconsistent with the provisions of the Bankruptcy Code, which would include the release, exculpation and injunctive provisions contained in Article XII of the Plan, as such provisions are not specifically addressed by other provisions of the Bankruptcy Code. As set forth in Section VII.G above, the Plan provides for, among other things, a release of the Debtor Released Parties and the Liberty Released Parties by various third parties, including any holder of a Claim or Equity Interest in Navillus (the "Third Party Release"). The Third Party Release under the Plan is a critical component of the Union Parties Settlement and the Liberty Global Settlement which collectively form the foundation of the Plan.

Navillus and the Committee have considered the factual circumstances and applicable legal principles that govern such release provisions and have determined that the proposed Third Party Release complies with established judicial standards in the Second Circuit.

The leading case in the Second Circuit governing third party releases is *Deutsche Bank AG v. Metromedia Fiber Network, Inc.* (*In re Metromedia Fiber Network, Inc.*)*.* 416 F.3d 136 (2d Cir. 2005). Under *Metromedia* and its progeny, consensual third party releases under a debtor's chapter 11 plan are appropriate. *See Metromedia*, 416 F.3d at 142; *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 268 (Bankr. S.D.N.Y. 2007). Accordingly, as to each holder of a Claim or Equity Interest that votes to accept the Plan, or that is deemed to have accepted the Plan, the Third Party Release is consensual and appropriate under applicable Second Circuit law. Here, the Committee and the Holders of the Class 4 Union Parties Cure Claims have affirmatively consented to the Third Party Release. Holders of Claims in Classes 1-3 and Equity Interests in Class 6 are Unimpaired and deemed to have accepted the Plan, and therefore are also deemed to consent to the Third Party Release, and it is only the consent of Holders of Class 5 General Unsecured Claims that remains to be determined.

As to any holder of a Claim or Equity Interest that votes to reject the Plan or otherwise does not manifest its consent to the Third Party Release, Navillus submits that the "unique circumstances" present in this Chapter 11 Case warrant the approval of the Third Party Release of the Debtor Released Parties and the Liberty Released Parties on a non-consensual basis.

In determining whether non-debtor releases were appropriate under the facts of the particular case, the Second Circuit in *Metromedia* highlighted the following considerations: (i)

- 70 -

whether the estate received substantial consideration; (ii) the enjoined claims were 'channeled' to a settlement fund rather than extinguished; (iii) the enjoined claims would indirectly impact the debtor's reorganization 'by way of indemnity or contribution'; and (iv) the plan otherwise provided for the full payment of enjoined claims. 416 F.3d at 142. Applying these factors, courts have upheld third party release provisions. *See, e.g., JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 258 (Bankr. S.D.N.Y. 2009) (holding that third party releases satisfied the governing Second Circuit standard because the debtors were to receive substantial financial and non-financial consideration in exchange for the releases, there was an identity of interest between the debtors and the non-debtor releasees by indemnification agreements, and the case involved truly unusual circumstances rendering the third party releases important to the success of the plan); *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233 (Bankr. S.D.N.Y. 2014) (approving third party releases (i) where a party consents to such release, (ii) where releases are for "claims that would trigger indemnification or contribution claims against the Debtors and thus impact the Debtors' reorganization"; and (iii) for parties "who have provided substantial consideration to the reorganization."). Navillus believes that the Third Party Release of the Liberty Released Parties and the Debtor Released Parties satisfies the standard in the Second Circuit as set forth herein.

*Liberty Released Parties*

The success of this Chapter 11 Case and the ability to propose a confirmable plan is premised entirely on Liberty's agreement to provide Reorganized Navillus with the Exit Financing that will fund Distributions and working capital liquidity post-confirmation. Absent the proceeds of the Exit Financing, Navillus' other Cash on hand would be insufficient to fund the Union Parties Settlement or other Distributions required under the Plan. Moreover, without Liberty's consent to the assumption of the Bonds, Reorganized Navillus would be unable to continue to prosecute construction operations on its ongoing Bonded Projects, thus depriving Reorganized Navillus of its sole source of revenues. Navillus has received substantial consideration from Liberty in exchange for the Third Party Release in the form of the agreement to provide the Exit Financing and consent to the assumption of the Bonds and treatment of any related cure costs as a General Unsecured Claim.

Moreover, based on the terms of the Indemnity Agreements that are reaffirmed pursuant to the Plan, Liberty would have an indemnity claim against Navillus (and other Debtor Released Parties) to the extent Liberty were to incur costs in connection with the defense of a claim asserted by one of Navillus' creditors on its Bonded Projects. Accordingly, Reorganized Navillus would be subject to a contingent liability in the form of an indemnity claim on the part of Liberty if the Third Party Release provisions were not approved, and the contingent indemnity claim would impact Navillus' ability to assess its liabilities in connection with the proposed confirmation of a chapter 11 plan. The Liberty Global Settlement and related provision of Exit Financing is the cornerstone of the Plan, and the Third Party Release is a critical component of the settlements that enable Navillus to put an end to this Chapter 11 Case and provide a meaningful return to creditors. Under these circumstances, Navillus submits that the Third Party Release in favor of the Liberty Released Parties is a critical component of the Plan that should be approved.

- 71 -

*Debtor Released Parties*

The Third Party Release in favor of the Debtor Released Parties was a material provision of the Union Parties Settlement, which was the result of exhaustive negotiations by and among Navillus, DOS, the Committee, the Union Parties and Liberty.  Given the unique circumstances, the Third Party Release is fair and equitable, given for fair consideration and in the best interests of Navillus and this Chapter 11 Case.  Moreover, Navillus believes that the Third Party Release is not inconsistent with the Bankruptcy Code and, thus, the requirements of section 1123(b) of the Bankruptcy Code have been satisfied.

In addition, Navillus believes that the release of the Debtor Released Parties is warranted under the unique circumstances in this Chapter 11 Case wherein DOS has agreed to a New Value Contribution of one million ($1,000,000) dollars to fund Distributions to creditors and has pledged approximately twenty million ($20,000,000) dollars in personal collateral and agreed to sign an affidavit of confession of judgment in favor of Liberty in the amount of up to twenty five million ($25,000,000) dollars to secure the Exit Financing that will be the primary source of funding under the Plan.  Accordingly, it is DOS – not the creditors proposed to receive a one-time Distribution upon the Effective Date – who bears the risk of Reorganized Navillus being able to obtain new work and satisfy its debt service obligations.  Absent DOS' substantial contribution of Cash and personal collateral, and the incurrence of a personal obligation to Liberty through the affidavit of confession of judgment, the Exit Financing would be unavailable to Reorganized Navillus to fund the Union Parties Settlement and other Distributions under the Plan.  Moreover, as to the other Indemnitors who are among the Debtor Released Parties, the Indemnity Agreements with Liberty would trigger indemnification or contribution claims against Navillus similar to those described above as to the Liberty Released Parties in the event that Liberty incurred losses under the Bonds and asserted claims under the Indemnity Agreements.

Accordingly, Navillus submits that the Debtor Released Parties are entitled to the releases set forth in the Plan.

**I.** ~~**II.**~~ **Further Information; Additional Copies**

If you have any questions or require further information about the voting procedures for voting your Claim or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, the Plan Supplement (once filed) or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d) or the Conditional Approval Order), please contact the Voting Agent at:

> Navillus Tile, Inc. Case Administration
> c/o GCG
> P.O. Box 10446

Disclosure Statement

Dublin, Ohio 43017-4046
http://cases.gardencitygroup.com/nvs

## IX.    CERTAIN RISK FACTORS TO BE CONSIDERED

THE IMPLEMENTATION OF THE PLAN IS SUBJECT TO A NUMBER OF MATERIAL RISKS, INCLUDING THOSE ENUMERATED BELOW. IN EVALUATING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN NAVILLUS SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS ASSOCIATED WITH THE PLAN AND ITS IMPLEMENTATION, OR ALTERNATIVES TO THE PLAN.

### A.    Certain Business Considerations

#### 1.    *Projected Financial Information*

The Projections annexed as Exhibit B to this Disclosure Statement are dependent upon the successful implementation of the business plan and the validity of the other assumptions contained therein. These Projections prepared by Navillus' management, including its Chief Restructuring Officer, reflect numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms, closing of the Exit Financing, Navillus' anticipated future performance, industry performance, the construction market in the New York metropolitan area, general business and economic conditions, and other matters, many of which will be beyond the control of Reorganized Navillus. In addition, unanticipated events and circumstances occurring subsequent to the preparation of the Projections may affect the actual financial results of Reorganized Navillus. Although Navillus believe that the Projections are reasonably attainable, variations between the actual financial results and those projected may occur and may be material.

Finally, the Projections were not prepared with a view toward public disclosure or with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information. Rather, the Projections were developed in connection with the planning, negotiation and development of the Plan. Neither Navillus nor Reorganized Navillus undertake any obligation to update or otherwise revise the Projections to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events. In management's view, however, the Projections were prepared on a reasonable basis and represent a reasonable view of the expected future financial performance of Reorganized Navillus after the Effective Date. Nevertheless, the Projections should not be regarded as a representation, guaranty or other assurance by Navillus, Reorganized Navillus, or any other person that the Projections will be

- 73 -

achieved and Holders are therefore cautioned not to place undue reliance on the projected financial information contained in this Disclosure Statement.

### 2.  *Historical Financial Information May Not Be Comparable*

The financial condition and results of operations of Reorganized Navillus from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in Navillus' historical financial statements.

### 3.  *Litigation*

Reorganized Navillus will be subject to various Claims and legal actions arising in the ordinary course of its business.  Navillus is not able to predict the nature and extent of any such Claims and actions and cannot guarantee that the ultimate resolution of such Claims and legal actions will not have a material adverse effect on Reorganized Navillus.

### B.  **Certain Bankruptcy Considerations**

Reorganized Navillus' future results are dependent upon the successful confirmation and implementation of a plan of reorganization.  Failure to obtain this approval in a timely manner could adversely affect Navillus' operating results, as Navillus' ability to obtain financing to fund its operations may be harmed by protracted bankruptcy proceedings.  Furthermore, Navillus cannot predict the ultimate amount of all settlement terms for its liabilities that will be subject to a plan of reorganization.

### 1.  *Non-Confirmation or Delay of Confirmation of the Plan*

The Bankruptcy Court, which sits as a court of equity, may exercise substantial discretion.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the confirmation of the Plan not be followed by a need for further financial reorganization and that the value of Distributions to dissenting creditors and interest holders not be less than the value of Distributions such creditors and interest holders would receive if Navillus was liquidated under chapter 7 of the Bankruptcy Code.

Although Navillus believes that the Plan will satisfy all requirements for confirmation under the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not be sufficiently material as to necessitate the resolicitation of votes on the Plan.

In the event that any Class of Claims entitled to vote fails to accept the Plan in accordance with section 1126(c) and 1129(a)(8) of the Bankruptcy Code, Navillus reserves the right: (a) to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code; and/or (b) to modify the Plan in accordance with the terms thereof.  While Navillus believes that the Plan satisfies the requirements for non-consensual confirmation under section 1129(b) of the Bankruptcy Code because it does not "discriminate unfairly" and is "fair and equitable" with respect to the Classes that reject or are deemed to reject the Plan and/or

- 74 -

satisfies the "new value" exception, there can be no assurance that the Bankruptcy Court will reach the same conclusion.    There can be no assurance that any such challenge to the requirements for non-consensual confirmation will not delay Navillus' emergence from chapter 11 or prevent confirmation of the Plan.

Moreover, there can be no assurance with respect to timing of the Effective Date.    The occurrence of the Effective Date is also subject to certain conditions precedent as described in Article X of the Plan, including entry of the Final Vacatur Order and closing of the Exit Financing.    Failure to meet any of these conditions could result in the Plan not being consummated.  In addition, the terms of the Union Parties Settlement expire if not consummated by October 31, 2018.

If the Plan is not confirmed, or if the Effective Date does not occur, there can be no assurance that the Chapter 11 Case will continue rather than be converted to a chapter 7 liquidation case or that any alternative plan of reorganization would be on terms as favorable to the Holders of Claims against and Equity Interests in Navillus as the terms of the Plan.    If a liquidation or protracted reorganization of Navillus' Estate was to occur, there is a substantial risk that Navillus' going concern value would be substantially eroded to the detriment of all stakeholders.

##### 2.        *Classification and Treatment of Claims and Equity Interests*

Section 1122 of the Bankruptcy Code requires that a plan classify claims against, and interests in, a debtor.    The Bankruptcy Code also provides that a plan may place a Claim or Equity Interest in a particular class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests of such class.    Navillus believes that all Claims and Equity Interests in Navillus have been appropriately classified in the Plan.    However, there can be no assurance that the Bankruptcy Court would reach the same conclusion.    Navillus reserves the right to mitigate against this risk by filing a motion pursuant to Bankruptcy Rule 3013 to confirm the validity of the classification structure set forth in the Plan.

The Bankruptcy Code also requires that a plan provide the same treatment for each Claim or Equity Interest of a particular class unless the holder of a particular Claim or Equity Interest agrees to a less favorable treatment of its Claim or Equity Interest.    Navillus believes that the Plan meets this requirement of equal treatment.    To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

##### 3.        *Risk That Distributions Will be Less Than Estimated*

Navillus reserves the right to object to the amount or classification of any Claim or Equity Interest except any such Claim or Equity Interest that is deemed Allowed under the Plan or

- 75 -

except as otherwise provided in the Plan.  There can be no assurance that any estimated Claim amounts set forth in this Disclosure Statement are correct.  The projected Distributions and recoveries set forth in this Disclosure Statement are based on Navillus' estimate of Allowed Claims. There can be no assurance that the estimates will prove accurate.  The actual Allowed amount of Claims likely will differ in some respect from the estimates.  The estimated amounts are subject to certain risks, uncertainties, and assumptions.  Should one or more of these risks or uncertainties materialize, or should the underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary from those estimated herein.

### C.    Certain Tax Considerations

There are a number of income tax considerations, risks, and uncertainties associated with consummation of the Plan.  Interested parties should read carefully the discussions set forth in Article X of this Disclosure Statement regarding certain U.S. federal income tax consequences of the transactions proposed by the Plan to Navillus and Reorganized Navillus and to certain Holders of Claims and Equity Interests in Navillus who are entitled to vote to accept or reject the Plan.

### X.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain anticipated U.S. federal income tax consequences of the Plan to Navillus and Holders of Claims and Equity Interests.  This summary is provided for information purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect as of the date hereof, and all of which are subject to change, possibly with retroactive effect, that could adversely affect the U.S. federal income tax consequences described below.

This summary does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder of a Claim or Equity Interest in light of its particular facts and circumstances or to certain types of Holders of Claims or Equity Interests subject to special treatment under the Tax Code.  In addition, this summary does not discuss any aspects of state, local, or non-U.S. taxation and does not address the U.S. federal income tax consequences to Holders of Claims or Equity Interests that are Unimpaired under the Plan or Holders of Claims or Equity Interests that are not entitled to receive or retain any property under the Plan.

A substantial amount of time may elapse between the date of this Disclosure Statement and the receipt of a final Distribution under the Plan.  Events occurring after the date of this Disclosure Statement, such as additional tax legislation, court decisions, or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder.  There can be no assurance that the Internal Revenue Service (the "IRS") will not take a contrary view with respect to one or more of the issues discussed below. No ruling will be sought from the IRS with respect to any of the tax aspects of the Plan, and no opinion of counsel has been or will be obtained by Navillus with respect thereto.

- 76 -

Accordingly, the following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a Holder of a Claim.  All Holders of Claims are urged to consult their own tax advisors for the federal, state, local and other tax consequences applicable to them under the Plan.

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE TAX CODE; (B) SUCH DISCUSSION IS INCLUDED HEREBY BY NAVILLUS IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY NAVILLUS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A.    **U.S. Federal Income Tax Consequences to the Debtor**

1.    *Conversion of the Debtor*

The formation of Reorganized Navillus as a corporation organized under New York law on or before the Effective Date is a taxable event for both Navillus and its shareholders.  In general, Navillus will recognize gain or loss (subject to certain limitations) in an amount equal to the difference, if any, between the fair market value of Navillus' assets and the adjusted basis of such assets.  In general, if Navillus has net operating loss ("NOL") carryforwards, those carryforwards may be used against any recognized gains.  Unlike subchapter C corporations, which may be subject to two levels of tax (once at the corporate level and then again when distributions are made to the shareholders), a S corporation is not subject to federal income tax.  Instead, items of income, gain, loss, deduction and credit of the limited liability company are allocated to the shareholders, who report such items on their respective tax returns.

2.    *Cancellation of Indebtedness Income*

Under the Tax Code, a U.S. taxpayer generally must include in gross income the amount of any cancellation of indebtedness ("COD") income recognized during the taxable year.  In the present case, the Plan likely may discharge material indebtedness of the Debtor through the Union Parties Settlement.  Therefore, Navillus may have COD income pursuant to the Plan.  COD income generally equals the excess of the adjusted issue price of the indebtedness discharged over the sum of (i) the amount of cash and (ii) the fair market value of any property (including equity interests) transferred by the debtor in satisfaction of such discharged indebtedness.  COD income also includes any interest that has been previously accrued and deducted but remains unpaid at the time the indebtedness is discharged.  The Tax Code permits a debtor in bankruptcy to exclude its COD income from gross income, but requires the debtor to reduce its tax attributes – such as NOL carryforwards, current year NOLs, tax credits, and tax

Disclosure Statement

basis in assets (collectively, "Tax Attributes") – by the amount of the excluded COD income. The reduction in Tax Attributes generally occurs after the calculation of a debtor's tax for the year in which the debt is discharged.

Under the Tax Code, a debtor that recognizes excluded COD income may elect to reduce its basis in depreciable assets prior to the reduction of other Tax Attributes, with any excess COD income applied next to reduce NOLs and other Tax Attributes in the prescribed statutory order.

Navillus will not be required to include COD income in gross income if the indebtedness will be discharged while Navillus is under the jurisdiction of the Bankruptcy Court. Instead, Navillus will be required to reduce Tax Attributes by the amount of the COD income recognized in the manner described above. Navillus has not yet determined whether it will have COD income and if it does whether it would be beneficial to elect to reduce the basis of its depreciable property prior to any reduction of NOLs or other Tax Attributes. The extent to which NOLs and other Tax Attributes remain following Tax Attribute reduction will depend upon the amount of the COD income.

### B.    U.S. Federal Income Tax Consequences to the Holders of Claims

The U.S. federal income tax consequences to Holders of Allowed Claims arising from the Distributions to be made in satisfaction of their Claims pursuant to the Plan may vary, depending upon, among other things: (a) the type of consideration received by the Holder of a Claim in exchange for such Claim; (b) the nature of such Claim; (c) whether the Holder has previously claimed a bad debt or worthless security deduction in respect of such Claim; (d) whether such Claim constitutes a security; (e) whether the Holder of such Claim is a citizen or resident of the United States for tax purposes, or otherwise subject to U.S. federal income tax on a net income basis; (f) whether the Holder of such Claim reports income on the accrual or cash basis; and (g) whether the Holder of such Claim receives Distributions under the Plan in more than one taxable year. For tax purposes, the modification of a Claim may represent an exchange of the Claim for a new Claim, even though no actual transfer takes place. In addition, where gain or loss is recognized by a Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder and how long it has been held or is treated as having been held, whether the Claim was acquired at a market discount, and whether and to what extent the Holder previously claimed a bad debt deduction with respect to the underlying Claim. A Holder who purchased its Claim from a prior Holder at a market discount may be subject to the market discount rules of the Tax Code. Under those rules, assuming that the Holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its Claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

C.     **Information Reporting and Backup Withholding**

Certain payments, including certain payments of Claims pursuant to the Plan, payments of interest, and the proceeds from the sale or other taxable disposition of the Claims and Equity Interests may be subject to information reporting to the IRS.   Moreover, such reportable payments may be subject to backup withholding unless the taxpayer: (i) comes within certain exempt categories (which generally include corporations) or (ii) provides a correct taxpayer identification number and otherwise complies with applicable backup withholding provisions.   In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.   Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

D.     **Importance of Obtaining Your Own Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.   THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.   THE TAX CONSEQUENCES ASSOCIATED WITH THE PLAN ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES.   ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

XI.     **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

Navillus believe that the Plan affords Holders of Claims and Equity Interests in Classes 4 - 5 the potential for the greatest realization on Navillus' assets and, therefore, is in the best interests of such Holders.   If, however, the requisite acceptances are not received or the Plan is not confirmed and consummated, the theoretical alternatives include (a) formulation of an alternative plan or plans of reorganization or (b) liquidation of Navillus under chapter 7 or chapter 11 of the Bankruptcy Code.

A.     **Alternative Plan(s) of Reorganization**

If the requisite acceptances are not received or if the Plan is not confirmed, Navillus could formulate and propose a different plan of reorganization.   Such a plan might involve either a reorganization and continuation of Navillus' businesses or a liquidation of assets.

Navillus believes that the Plan enables creditors to realize the greatest possible value under the circumstances and has the greatest chance to be confirmed and consummated.

Disclosure Statement

## B. Liquidation Under Chapter 7 or Chapter 11

If no plan is confirmed, Navillus' case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate Navillus' assets for distribution in accordance with the priorities established by the Bankruptcy Code. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective Holders of Claims against or Interests in Navillus. As set forth in Section VII.G above, Navillus believes that liquidation under chapter 7 would result in significantly smaller distributions being made to Holders of Claims than those provided for in the Plan.

Navillus could also be liquidated pursuant to the provisions of a chapter 11 plan of liquidation. If no plan is confirmed, Navillus may pursue a sale of substantially all of its assets pursuant to section 363(b) of the Bankruptcy Code. Alternatively, Navillus may sell its assets in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, thus resulting in a potentially greater recovery. Conversely, to the extent Navillus incurs operating losses, Navillus' effort to liquidate its assets over a longer period of time theoretically could result in a lower net distribution to creditors than they would receive through chapter 7 liquidation. Any recovery in a chapter 11 liquidation, while potentially greater than in a chapter 7 liquidation, would also be highly uncertain.

Although preferable to a chapter 7 liquidation, Navillus believe that any alternative liquidation under chapter 11 is a less attractive alternative to creditors than the Plan because of the greater return anticipated by the Plan.

Disclosure Statement

## XII.   RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, Navillus, with the support of the Committee and Liberty, believes that confirmation and implementation of the Plan will provide each creditor with a greater recovery than it would receive if Navillus was to liquidate and distribute their assets under chapter 7. Thus, Navillus and the Committee recommend confirmation and implementation of the Plan as the best possible outcome for creditors.

Navillus and the Committee urge holders of Impaired Claims to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be received by the Voting Deadline.

DATED:  August —24, 2018

NAVILLUS TILE, INC. DBA
NAVILLUS CONTRACTING

_____
Name: Christopher K. Wu
Title:   Chief Restructuring Officer

CULLEN AND DYKMAN LLP
Attorneys for the Debtor

_____
C. Nathan Dee, Esq.
Elizabeth M. Aboulafia, Esq.
100 Quentin Roosevelt Boulevard
Garden City, New York 11530
(516) 357-3700

- 81 -

**Exhibit A**
**Chapter 11 Plan**

**Exhibit B**
**Financial Projections**

**(To be provided)**

**Exhibit C**
**Liquidation Analysis**

**(To be provided)**